UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HADRON INDUSTRIES, INC.,           :
and KLEE DIENES,                   :
                                   :        CIVIL ACTION NO.:
       Plaintiffs,              :        1:18 CV 10830
                                   :
v.                                 :
                                   :
TRIANGLE EXPERIENCE GROUP, INC.    :
ALQIMI ANALYTICS &                 :
INTELLIGENCE, LLC,                 :
ROBERT E. CLARE, JR.,              :        **JURY TRIAL DEMANDED**
and SEAN McCLUSKEY,                :
                                   :
       Defendants.              :

## COMPLAINT

     Plaintiffs Hadron Industries, Inc. ("Hadron") and Klee Dienes (collectively "Plaintiffs"),

by and through their attorneys McCarter & English LLP, allege for their Complaint against the

Defendants as follows:

## NATURE OF THE ACTION

     1.     This is an action arising from, inter alia, the Defendants' unethical, unscrupulous,

and malicious actions undertaken for the specific purpose of absconding with Hadron's business

opportunities in connection with an innovation program for the United States Air Force intended

to fund collaboration technology designed and developed by Hadron.  Defendants actively and

intentionally worked and conspired to ultimately remove Hadron from the program and take it

over for themselves, using Hadron's proprietary information for their own benefit and manipulating the federal contract award process, causing harm to Plaintiffs.

## PARTIES

2.      Plaintiff Hadron is a New Hampshire corporation with a principal place of business in Cambridge, Massachusetts.

3.      Plaintiff Klee Dienes ("Dienes") is an individual and a citizen of the State of New Hampshire.  Dienes is the President of Hadron.

4.      Dienes is a software engineer and former senior engineer at Apple Inc. with Bachelor of Science and Master of Science degrees from the Massachusetts Institute of Technology.  Dienes previously served as team leader and helicopter pilot for a deployed company in southeastern Iraq, and currently serves as a defensive cyberoperations officer in the United States Army National Guard.

5.      Founded in 2010 by Dienes, Hadron is a Service-Disabled Veteran-Owned Small Business ("SDVOSB") software development firm that designs and sells custom computer software and hardware systems focused on enhancing communication, security, and situational awareness for the United States Department of Defense ("DoD").

6.      Defendant Triangle Experience Group, Inc. ("TEG"), upon information and belief, is a Virginia corporation with a principal place of business in Arlington, Virginia.

7.      Defendant ALQIMI Analytics & Intelligence, LLC ("AAI"), upon information and belief, is a Delaware limited liability company with a principal place of business in Rockville, Maryland.  Upon information and belief, AAI is wholly owned by member ALQIMI Technology Solutions, Inc., a Maryland corporation with a principal place of business at the same place of business in Rockville, Maryland.

2

8.      Defendant Robert E. Clare, Jr. ("Clare"), is an individual who, upon information and belief, is a citizen of the Commonwealth of Virginia.  Clare is the President and Chief Executive Officer of TEG.

9.      Clare founded TEG to provide tactical training services and experiences such as basic jungle warfare skills, jungle tracking school, explosive breaching, and long distance shooting.  Upon information and belief Clare began marketing TEG as a technology services provider in and around 2012.

10.     Defendant Sean McCluskey ("McCluskey") is an individual who, upon information and belief, is a citizen of Maryland.  McCluskey is Managing General Partner of TEG.

11.     TEG, Clare, and McCluskey are collectively referred to as "TEG Defendants." TEG Defendants and AAI are collectively referred to as "Defendants."

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and because the matter in controversy exceeds the sum of $75,000.00, exclusive of interests and costs.

13.     The Court has personal jurisdiction over Defendants because: (1) this case arises out of agreements made or to be performed in the Commonwealth of Massachusetts; (2) Defendants transact business within the Commonwealth of Massachusetts; (3) Defendants have committed tortious acts outside the Commonwealth causing injury to Plaintiffs within the Commonwealth; (4) and Defendants have derived substantial revenue from goods and/or services rendered in the Commonwealth and from interstate commerce.

14.     Venue is proper in the District Court of Massachusetts pursuant to 28 U.S.C.

§ 1391 as a substantial part of the events or omissions giving rise to these claims occurred in the

District of Massachusetts.

## BACKGROUND AND FACTS COMMON TO ALL COUNTS

### Hadron's Development of ACES

15.     From 2011 to 2013, Hadron conducted federally funded research as part of the

government's Small Business Innovation Research ("SBIR") program, a highly competitive

awards-based program that encourages domestic small businesses to engage in federal research

and development that has the potential for commercialization.  Specifically, Hadron researched

and developed new, innovative advanced technologies for collaborative computing, spatial

computing, and shared situational awareness applications for the DoD.

16.     Extending its work with the SBIR program, Hadron independently developed two

proprietary software products as a result of its SBIR related work:  Praxis™, a framework for

gestural input and spatial computing; and Photon™, a software platform that permits users

within an organization to share the contents of their display(s) with any other display(s) in the

organization.

17.     The United States Air Force ("USAF") Intelligence, Surveillance and

Reconnaissance Innovations ("A2I"), a technology investment program office of the USAF,

tasked the federal program Advanced Collaborative Enterprise Services ("ACES") in early 2013

to evaluate possible solutions that would allow for the multi-site collaboration of shared data and

information.

18.     Over the course of 2013, various approaches to collaboration through the ACES

program were reviewed and evaluated by the Government.  One such approach was technology

4

from Oblong Industries, Inc. ("Oblong Industries"), relating to the movement of data around a six display environment with the use of manual gestures. However, Oblong Industries' product, Mezzanine, was designed for conference room use and unsuitable to accommodate larger environments common to the DoD, such as operations centers.

19.     In the fall of 2013, A2I approached Hadron about the Government's need for smoother collaboration capabilities among and between mission planners and intelligence analysts. Hadron, in response, offered a unique approach and vision for ACES: a system that would turn all of an organization's screens and input devices into a single, unified, collaborative workspace that could be shared between all users across large distances, in which a given user may allow any other user or users to see what he or she sees in real time, even users separated by geography and security domains.

20.     The USAF approved of Hadron's vision for ACES and, in and around July 2014, the USAF awarded Hadron a Phase III SBIR contract to develop this ACES platform. Pursuant to the Phase III SBIR contract, Hadron was responsible for researching and developing all of the core software of the ACES operating environment, including the computer system environment, data movement functionality, integration work, and physical equipment.

21.     As a Phase III SBIR contractor, Hadron had certain rights and privileges, including the right to sell SBIR-based products to the Government on a sole source basis and the privilege of being the Government's preferred vendor of such products.

22.     In accordance with the Phase III SBIR contract, Hadron developed the ACES software platform. Hadron's proprietary software, Photon™ and Praxis™, are the foundation of the ACES system.

**Hadron's Introduction to TEG Defendants**

23.     A2I works as a type of investment channel for new technologies with DoD applications.  When an agency within the DoD wishes to test a prototype capability in A2I's portfolio, A2I will support the acquisition by providing additional federal funding.  Typically, for an A2I technology to be brought to market and widely deployed throughout DoD, it is critical to identify these early adopters of the technology and to establish a proper funding structure.  Such funding allows the vendor responsible for developing the technology to continue developing its prototype into a stable, operations-ready product that will benefit the Government.

24.     To this end, in and around late 2013, A2I, through the ACES program manager, advised Hadron to engage Clare for the continued purpose of facilitating the relationship between Hadron and A2I.  At the time, Clare held himself out as a Systems, Engineering and Technical Assistance ("SETA") contractor with A2I in addition to his role as President of TEG.

25.     As a SETA contractor, Clare was to provide consulting services to A2I to assist with USAF requirements for the ACES program, such as providing objective innovation and investment guidance, assessments of DoD needs, and vendor capabilities.

26.     SETA contractors, like Clare, generally work closely with the Government's own engineering staff members and often assist the Government with, inter alia, developing work statements and determining specifications and system parameters.  Pursuant to the USAF's directive, Hadron interacted with A2I, in part, through Clare.

**AAI's Introduction to ACES**

27.     As the systems integrator of ACES and in connection with its SBIR contracts, Hadron was to deliver and install a Praxis™ based 6-axis gestural control system, a 6-display

immersive video environment, and a Photon™ based window control system in a facility that could be easily accessed by Government personnel.

28.     Hadron was also required to integrate various mission-oriented analytical tools into Hadron's ACES system.  Such tools, provided by third parties, were intended to allow USAF personnel to demonstrate the utility of ACES to other Government staff using real-world scenarios.

29.     Clare, during his time as a SETA contractor and ostensibly acting on behalf of the A2I office, recommended AAI to Hadron as a potential third party software firm to provide analytical tools for this purpose.  Specifically, AAI offered the Social Insight Fusion Toolkit ("SIFT"), a web-based application used for gathering and filtering intelligence from social media sources.

30.     As part of AAI's prospective engagement by Hadron, a mutual non-disclosure agreement was executed and, in or about February 2014, Walter Greenberg ("Greenberg") traveled to Hadron's office in Boston, Massachusetts to attend a Hadron product demonstration. Upon information and belief, at the time, Greenberg was a managing member and President of GT Solutions, LLC, predecessor of AAI, and AAI's Chief Technology Officer.

31.     Hadron's demonstration to AAI included an overview of the ACES program goals and technology, as well as a demonstration of Hadron's proprietary Photon™ software interacting with Mezzanine, the software that had been previously considered, but ultimately rejected, by the Government for the ACES core technology prior to selecting Hadron's software products.  AAI also demonstrated its SIFT technology.

32.     The demonstration at Hadron's Boston office was AAI's first exposure to Hadron's ACES technology.

## **Defendants' Unfair and Deceptive Conduct**

33.     Defendants actively and intentionally combined and worked together, unbeknownst to Hadron, to unlawfully compete with and ultimately remove Hadron from the ACES program and take it over for themselves, despite lacking the technical background to do so and having had repeatedly acknowledged in bid proposals in response to Government solicitations that the ACES technology platform belonged to Hadron.

34.     While awaiting completion of the final Phase III SBIR contract award to Hadron, the USAF began preparations for an additional ACES development contract using approximately $3,200,000 in end-of-year ("EOY") funds for ACES development in late 2014 and 2015.  In and around March 2014, USAF staff met and made tentative allocations of the funds and, in keeping with Hadron's status as the systems integrator for ACES, the USAF intended that Hadron be the system architect and project coordinator for the EOY contract.  As part of its planning, Clare, ostensibly acting on behalf of the A2I office, requested that Hadron draft a statement of work for the EOY contract, including a feature roadmap for 2015.

35.     In or about April 2014, Hadron provided a proprietary, draft statement of work to Clare for the Government as requested.  In the statement of work, Hadron proposed to, inter alia, design, deliver, install, and customize a single ACES prototype for both research and development as well as operational use by the USAF containing all required Praxis™ and Photon™ software, and to further develop and enhance the ACES platform beyond the work to be performed under Hadron's Phase III SBIR contract.

36.     In or about May 2014, the USAF issued a formal Statement of Work ("SOW") for the new EOY contract.  The SOW sought deliverables highly similar to those set forth in the draft language in the statement of work that was requested of and provided by Hadron to Clare.

8

The SOW specifically required the design, delivery, installation, and customization of an ACES operating environment ("ACES-OE") that included all required Praxis™ and Photon™ software, as well as work related to core Photon™ functions.

37.     Unbeknownst to Hadron, AAI submitted a technical proposal through a third party prime contractor, PAR Government Systems Corporation ("PARGov") who upon information and belief served only as a pass through contractor, in response to the SOW wherein AAI misrepresented that it would be working in conjunction with Hadron to deliver the Government's requirements.

38.     AAI's proposal included many verbatim phrases that originally appeared in Hadron's proprietary, draft statement of work prepared for the Government.  Unbeknownst to Hadron, Defendants combined together for the shared purpose of using Hadron's proprietary information and Hadron's experience and qualifications for purposes of unlawfully competing with Hadron for their own benefit.

39.     Upon information and belief, Clare shared Hadron's proprietary documents with AAI for purposes of AAI itself bidding on the SOW.  Clare would use his influence as an A2I SETA contractor to award the contract to AAI, and AAI would, in turn, outsource a great deal of the EOY contract's deliverables to Clare's company, TEG.

40.     In its proposal, AAI improperly claimed that it had specific technical expertise that was properly attributable to Hadron.  AAI maintained that it was in a unique position to meet the requirements for the SOW based on its previous experience and program successes in relation to the satisfying the ACES-OE task order.  However, contrary to its assertions, AAI's only exposure to Hadron's ACES technology up until that point had been Hadron's demonstration that AAI attended at Hadron's Boston office.

41.     Hadron has never licensed its Praxis™ or Photon™ proprietary software to AAI or TEG.

42.     On or about July 1, 2014, the Government issued a favorable technical evaluation of AAI's proposal based on AAI's misrepresentations that AAI would be using Hadron's proprietary software and relying on Hadron for technical performance.  The Government expressly referred to Hadron's intimate understanding of the Government's needs and to Hadron's Praxis™ and Photon™ software products and their necessity to the contract.

43.     The Government recommended award of the EOY contract to AAI based on the proposal description, personnel to be involved, and having the requisite engineering qualifications to deliver the ACES-OE.

44.     The Government's technical evaluation made no mention of Oblong Industries or use of its Mezzanine software.

45.     Following the Government's award decision, AAI submitted a revised technical proposal that did not reference Hadron and Hadron's Praxis™ and Photon™ software products. Instead, the revised technical proposal contained references to Oblong Industries and its Mezzanine software product.

46.     At the time, McCluskey and Clare both worked for Oblong Industries, provider of the Mezzanine product.

47.     As a result of Defendants' misrepresentations, AAI, through its prime contractor, was awarded the EOY contract on or about July 16, 2014, despite lacking the technical background to fulfill the contract's deliverables and having no means to provide access to the ACES technology owned by Hadron.

48.     AAI subsequently subcontracted TEG for $819,000 worth of services in connection with the EOY contract, including the design, delivery, installation, and customization of an ACES-OE prototype and for spatial computing support and customized application development.  The subcontract's only labor category for the performance of this work was filled by McCluskey, who became Managing General Partner of TEG.  Upon information and belief, however, McCluskey is not an engineer and performed no engineering labor under this subcontract.

### Hadron's Business Relationship with TEG Defendants

49.     Clare departed his position with A2I and began working full time as CEO of TEG in and around August 2014.

50.     Given the complementary nature of Hadron's engineering skills and TEG's contacts in the defense industry through Clare, Hadron and TEG entered into an agreement in and around August 2014 to work together in connection with the ACES program (the "Agreement").

51.     Pursuant to the Agreement, Hadron was required to engineer and develop the ACES software platform.  TEG, which had little technical experience, was required to identify prospective early adopters of ACES within the DoD.  This would involve arranging demonstrations of ACES with these prospective customers, gathering requirements for additional task orders on Hadron's Phase III SBIR contract, and coordinating acquisition efforts between customers, Hadron, and A2I.  The parties agreed to share the revenues evenly between Hadron and TEG.

52.     TEG's primary venue for attracting ACES investments was the Government funded ACES development and demonstration laboratory located in Rosslyn, Virginia (the

11

"ACES Rosslyn Lab").  The ACES Rosslyn Lab includes over 30 large wall-mounted displays, six workstations, and a video teleconferencing system.  All the technology capability on display in the ACES Rosslyn Lab, such as video walls, an infrared motion capture system, and analyst workstations, was designed and built by Hadron.

53.     As with the ACES Rosslyn Lab, Hadron designed and built a similar such demonstration space for A2I at the University of Nebraska-Omaha ("UNO").  The May 2015 proposal submitted by TEG for this work acutely illustrated TEG's role as an interface between Hadron and Hadron's customers.  TEG's proposal further acknowledged Hadron's propriety software, Photon™, as the foundation of ACES and that Hadron would perform the engineering effort.

## AAI's Improper and Malicious Conduct

54.     As part of the deliverable for the EOY contract, AAI was allotted federal funds under the contract to lease office space for a demonstration laboratory for ACES and A2I personnel (the "ACES A2I Lab").  While AAI leased and administered the space, A2I maintained operational control of the ACES A2I Lab.

55.     At or around the time of the award of the EOY contract, Hadron was performing its own SBIR contract to similarly deliver and install a Praxis™ and Photon™ based ACES-OE system in a facility that could be easily accessed by Government personnel.

56.     Given that A2I serves a product marketing role for its portfolio of investments, and because AAI's and Hadron's contracts both required the performance of ACES demonstrations for Government audiences, A2I directed AAI and Hadron to perform their respective contracts in that same office space.  TEG was a subcontractor to both AAI and Hadron.

12

57. Within weeks, the technology capability Hadron designed and built in the ACES A2I Lab, such as video walls, an infrared motion tracking system, and analyst workstations, was being used to provide demonstrations to multiple Government audiences on a weekly basis, attracting attention from high-profile Government customers.

58. Hadron went on to integrate and deliver an ACES-OE beyond the ACES A2I Lab into the Army Geospatial Center, Wright-Patterson Air Force Base, and UNO. These installations were funded by Hadron's Government contract and, in some cases to cover cost overages, by Hadron's private funds.

59. In contrast, as of December 2014, AAI's area of the ACES A2I Lab featured just three displays and no gestural tracking system. During Hadron's time at the ACES A2I Lab, Hadron's own gestural tracking system was the only such system present.

60. Given that Hadron's SBIR contract called for both the development of and demonstrations of the ACES-OE to Government personnel, typically demonstrations were performed during the day and development and engineering work was performed late at night and on weekends. AAI was aware of the fact that Dienes often worked through the night in the ACES A2I Lab to maximize productivity.

61. As part of its SBIR contract, Hadron was also required to integrate various mission-oriented analytical tools into Hadron's ACES system, which requirement had initially occasioned Clare's recommendation of AAI and led to the meeting with AAI in Hadron's Boston office in early 2014.

62. To this end, Hadron integrated SIFT into its ACES-OE at the ACES A2I Lab, which was stored in a Georgia data center and was accessed remotely.

63. The incorporation of the SIFT software into Hadron's ACES-OE allowed AAI to use Hadron's equipment to demonstrate SIFT. Upon information and belief and unbeknownst to Hadron, however, AAI improperly claimed and misrepresented Hadron's achievements as its own to Government personnel. AAI's Chief Technology Officer, Greenberg, misrepresented himself as the lead architect and integrator for ACES.

64. In and around December 2014, the A2I office directed Hadron to move its ACES-OE installation from the ACES A2I Lab to another location. As AAI had failed to make any meaningful progress on its own ACES-OE deliverables, the resulting removal and transfer of Hadron's technology left the ACES A2I Lab largely bare and left AAI with no ability to demonstrate ACES capabilities.

65. Weeks after the transfer, AAI, through several of its staff including its Chief Technology Officer, Senior Program Manager, and Senior Software Engineer, approached the Federal Bureau of Investigation ("FBI") to intentionally and knowingly assert false accusations against Hadron, and specifically Dienes.

66. AAI intentionally and maliciously misrepresented to the FBI the nature of the ACES A2I Lab and Hadron's role in the ACES program. AAI falsely accused Dienes of interfering with AAI's work as a prime contractor for ACES, unlawfully accessing the ACES A2I Lab, copying AAI's proprietary software onto his own equipment, and destroying AAI's hardware. AAI knew these statements to be false.

67. AAI made its statements to the FBI with the ulterior motive of concealing and obfuscating the fact that AAI was incapable of and failed to deliver an ACES-OE under the EOY contract. When Hadron removed its ACES-OE from the ACES A2I Lab per the Government's direction, AAI was left with no means to properly demonstrate the ACES technology that it was

14

required to deliver under the EOY contract and, upon information and belief, for which AAI had already invoiced the Government.

68.     As a direct result of these false allegations, Dienes was arrested in June 2016.

69.     Just two days after providing the FBI with truthful and exculpatory evidence of his innocence, the Department of Justice ("DOJ") moved to dismiss the case against Dienes.  The case against Dienes was dismissed in its entirety.

70.     Dienes' arrest had immediate and long-lasting repercussions both personally and for Hadron's business operations.  Dienes was unable to use his security clearance until such time as the case was dismissed, which was required to perform his job duties.  Also, Hadron's Authority to Operate for ACES was revoked causing irreparable harm to its business prospects in the national security industry.

## TEG Defendants' Unfair and Deceptive Conduct

71.     TEG Defendants actively worked to improperly remove Hadron from the ACES program to unlawfully and unfairly compete with Hadron and take ACES related work over for themselves, despite knowing and acknowledging that the ACES technology platform belonged to Hadron.

72.     TEG Defendants progressively whitewashed Hadron's key role in the ACES program with each successive bid proposal in response to Government solicitations.  So much so, that all Government funding for ACES is currently being awarded to TEG via a sole-source contract.  Upon information and belief, TEG Defendants submitted technical and price proposals for Hadron's hardware and software without full and accurate disclosure to Hadron.

73.     Rather than arranging investments for Hadron in accordance with the Agreement, TEG Defendants instead used Clare's influence with A2I and contract offices and customers

within the DoD to make itself, rather than Hadron, the prime contractor on various acquisitions, claiming in its bid proposals that it had partnered with Hadron to deliver software, hardware, and engineering services.  Ultimately, TEG improperly marketed Hadron's intellectual property as its own in various bid proposals submitted to the Government that were not fully and accurately disclosed to Hadron.

74.     In and around February 2016, TEG Defendants approached Hadron about a business opportunity with Joint Special Operations Command ("JSOC") for a military exercise scheduled for May that would make for a useful demonstration of ACES' capabilities.  Hadron worked diligently at its Massachusetts office and at its own expense to design, assemble, and install systems at two JSOC facilities.  Hadron's system design document expressly provided that Hadron retained ownership of the equipment, and that these were demonstration systems, temporarily deployed for purposes of the event, to be returned to Hadron following the exercise.

75.     TEG Defendants had counseled Hadron to leave the systems at JSOC to improve the chances of selling Hadron's product.  Unbeknownst to Hadron, however, TEG had already been awarded a contract to perform these services for JSOC and failed to compensate Hadron.  Clare subsequently represented that TEG intended to deliver these systems for use in a deployed, operational environment.  Clare was aware that these demonstration systems had not been designed for such purpose.

76.     In addition, TEG also improperly invoiced UNO for the hardware that Hadron had built and installed for the demonstration space located there, the majority of which was done at Hadron's own expense.

77.     From August 2015 through August 2016, Hadron worked to install an ACES deployment for the National Reconnaissance Office ("NRO").  TEG Defendants had represented

16

to Hadron that the NRO was interested in an enterprise-wide, multi-location deployment of ACES, and that a small-scale demonstration system would let the NRO evaluate ACES prior to purchasing.

78.     The installation of the ACES demonstration system for the NRO included 12 large displays, over 15 computers utilized for various purposes, and over a dozen network devices.  This hardware, acquired at Hadron's own expense, was to be part of an experimental deployment and ownership was retained by Hadron.  Hadron's Praxis™ or Photon™ proprietary software was also installed on the equipment.

79.     However, TEG ultimately improperly invoiced the NRO for Hadron's equipment and failed to reimburse Hadron.  Further, Hadron's equipment contained Hadron's proprietary Photon™ software and, thus, TEG essentially sold the NRO the ability to use Hadron's proprietary Photon™ software without Hadron's knowledge and without any right or basis to do so.  At no time did Hadron license to TEG the right to sell, license, or otherwise distribute Hadron's proprietary software.

80.     In and around July and August of 2016, TEG Defendants interfered with Hadron's business opportunities by corrupting the acquisitions process of a solicitation for Hadron's ACES software.  TEG Defendants' desired result was to win the contract for TEG. The solicitation was investigated by the Government and ultimately cancelled in late October 2016.

81.     On or about November 16, 2016, Clare traveled to Hadron's Cambridge, Massachusetts office to meet with Dienes, Hadron's founder.  At that meeting, Hadron delivered to Clare a cease and desist letter wherein Hadron disassociated from TEG.

82.     Soon afterward, TEG Defendants defamed and disparaged Hadron to Government officials by falsely claiming Hadron's products, including those that Hadron installed for the NRO, contained unlicensed third party software code.  TEG Defendants knew this statement to be false.

83.     TEG Defendants further defamed and disparaged Dienes to Government officials by falsely informing them that Dienes' security clearance had been revoked as a result of his arrest when, in fact, it had not.  TEG Defendants knew this statement to be false.

84.     Prior to Hadron's disassociation from TEG, Hadron was being courted by the Army Corps of Engineers to bid on a solicitation to maintain these very same systems at the NRO.  Following TEG Defendants' defamation and disparagement of Hadron and Dienes, however, the very same deliverables that had been sought by the Army Corps of Engineers' solicitation were, instead, added to a Delivery Order on a TEG sole source contract.

85.     Through its cease and desist letter, Hadron made clear that TEG was prohibited from using or distributing any data or equipment related to Hadron's products.  Upon information and belief, TEG Defendants have since shared Hadron's product designs with other Hadron competitors in an effort to reverse engineer Hadron's products and to otherwise exploit Hadron's intellectual property.

86.     TEG continues to pursue business with customers originally interested in Hadron's products, yet in "partnership" with a Hadron competitor.  TEG Defendants have improperly used and modified proprietary system design proposals originally authored by Hadron for customer-specific use cases by improperly replacing references to Hadron's products to those of a Hadron competitor.

ME1 27041818v.1

87.     Upon information and belief, during its business relationship with Hadron, TEG attracted federally funded investments to ACES of approximately $8,000,000.  However, despite the obligation to share equally such revenue evenly between Hadron and TEG in accordance with the Agreement, Defendants only disclosed the existence of less than $3,000,000 to Hadron. Upon information and belief, TEG, at Clare's direction, improperly retained the undisclosed revenue for itself.

88.     After the termination of the parties' relationship, TEG has continued to attract federally funded investments to ACES of approximately $21,000,000 through the ongoing demonstration of Hadron's proprietary technology at the ACES Rosslyn Lab.

89.     TEG Defendants have attracted federally funded investments to ACES totaling approximately $29,000,000.  Upon information and belief, TEG has used a large portion of this federal funding for its personal gain and use to support TEG's efforts to reverse-engineer Hadron's proprietary products and for its own internal business ventures.

90.     TEG Defendants have unfairly, unethically, and improperly obtained federally funded investments designated to ACES to the exclusion of Hadron by demonstrating Hadron's proprietary and SBIR-derived products as their own, by touting the names and expertise of Hadron's staff, and by misleadingly passing off language drafted by Hadron to describe Hadron's vision for ACES as that of TEG.

91.     As a result of their misrepresentations and misconduct, TEG Defendants' calculated interference culminated in the complete removal of Hadron from all ACES funding opportunities.  Currently, all ACES funding is being directed to TEG via a sole source contract award with a ceiling of $49,490,000, despite TEG's general lack of technical engineering expertise and specific lack of experience building the ACES system.

92.     This sole source contract was ostensibly for non-ACES network security services. The published Notice of Intent to Sole Source focused on this non-ACES service, and the published Justification & Approval touted TEG's expertise in this non-ACES service.  None of the published acquisition documentation mentioned anything regarding an ACES-like capability.

93.     The published Justification & Approval for the sole source contract contained many redactions that Clare informed Hadron protected competition-sensitive and national security information.  In fact, however, many of the redactions were text that was originally authored by Hadron to describe its original vision of ACES, and is the same language that TEG reused in Government proposals, statements of work, and task orders for Hadron's development of ACES.  Thus, TEG received a $49,490,000 sole source contract from the Government for a product whose description was a verbatim match of the products and services for which Hadron was, through its SBIR Phase III rights, the Government's preferred vendor.

94.     These redactions were selectively made to conceal from Hadron TEG's intent to use this contract to remove Hadron from the competitive process and deny Hadron the ability to protest the award.


**FIRST COUNT**
**(Violation of Massachusetts Regulation of Business Practices Act)**
**(Against All Defendants)**

95.     Plaintiffs incorporate the allegations contained in Paragraphs 1 - 94 of this Complaint as if fully set forth herein.

96.     At all times relevant hereto, Plaintiffs and Defendants were engaged in the conduct of trade or commerce, as defined by the M.G.L. ch. 93A, §§ 1, 11.

ME1 27041818v.1

97.     Defendants' aforesaid conduct constitutes unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade or commerce within the meaning of M.G.L. ch. 93A, §§ 2, 11.

98.     Defendants have violated M.G.L. ch. 93A, §§ 2, 11 in that they have, inter alia:

(a)     Misappropriated and used Hadron's proprietary technology and information for the express purpose of unfairly and deceptively competing with Hadron in the market;

(b)     Used Hadron's proprietary information and technology to unlawfully mimic Hadron's capabilities and offerings and for the express purpose of absconding with Hadron's business opportunities and take over the ACES program for themselves;

(c)     Defamed and disparaged Plaintiffs to Government officials to attempt to eliminate Plaintiffs from the market; and

(d)     Misrepresented their technical capabilities and improperly traded off of Hadron's technology, expertise, and experience to unfairly and unlawfully secure contracts for themselves to the exclusion of Hadron.

99.     Defendants' unfair and deceptive actions described herein were performed willfully and knowingly.

100.    Defendants' unfair methods of competition and unfair or deceptive trade practices occurred primarily and substantially within the Commonwealth.

101.    By virtue of the foregoing, Hadron has been damaged in that it, inter alia, has sustained substantial injury and ascertainable loss, been deprived of growth opportunities, and has been deprived of the value of its proprietary information within the Commonwealth.

## SECOND COUNT
**(Tortious Interference with Business Relations and Prospective Advantage)**
**(Against All Defendants)**

102.     Plaintiffs incorporate the allegations contained in Paragraphs 1 - 101 of this Complaint as if fully set forth herein.

103.     By, inter alia, claiming Hadron's innovations, skills, and personnel as Defendants' own, using their influence with Government officials to direct contract awards related to ACES away from Hadron for themselves, sharing Hadron's proprietary designs with one another and Hadron's competitors for purposes of excluding Hadron from new business for the ACES system, and defaming Hadron to Government officials and staff and damaging Hadron's reputation, Defendants without justification or excuse have unlawfully and tortiously interfered with Hadron's business relations and prospective advantage.

104.     Defendants' interference was accomplished by improper and inappropriate means.

105.     Defendants have acted maliciously and with intent to harm Hadron, or with conscious indifference to the consequences of their actions.

106.     Hadron has suffered financial injury as a direct and proximate result of Defendants' willful and tortious interference with Hadron's business relations and/or advantageous relationships, and is entitled to recover compensatory damages, as well as punitive damages and attorneys' fees and costs.

ME1 27041818v.1

**THIRD COUNT**
**(Conspiracy)**
**(Against All Defendants)**

107.    Plaintiffs incorporate the allegations contained in Paragraphs 1 - 106 of this Complaint as if fully set forth herein.

108.    By virtue of their conduct, TEG, AAI, Clare, and McCluskey knowingly combined and provided substantial assistance to one another to contribute to a common plan of improperly and unfairly competing with Hadron and unscrupulously interfere and abscond with Hadron's business relationships and opportunities.

109.    Defendants conspired to, and did, use Hadron's proprietary technology and information and misappropriated it for their combined benefit by using the information to unlawfully and deceptively compete with Hadron in the federal contract award process.

110.    As a result of the actions and combination of Defendants, Hadron has suffered, and continues to suffer, damages.

**FOURTH COUNT**
**(Breach of Contract)**
**(Against TEG Defendants)**

111.    Plaintiffs incorporate the allegations contained in Paragraphs 1 - 110 of this Complaint as if fully set forth herein.

112.    Hadron and TEG entered into the Agreement, which was supported by fair and adequate consideration and constitutes a valid and binding obligation between the parties.

113.    TEG, at the direction of Clare and McCluskey, breached the Agreement by, inter alia, failing to pay amounts due to Hadron in connection with federally funded investments that were obtained to develop ACES, interfering with the contracts and relationships between Hadron

23

and its customers and potential customers, and actively soliciting business for itself and directing business away from Hadron, all for its own benefit.

114.    Hadron has fully performed its contractual obligations to TEG and satisfied all conditions precedent, if any, to Hadron's right to recover under the Agreement.

115.    As a direct and proximate result of TEG Defendants' breach of the Agreement, Hadron has been damaged.

## FIFTH COUNT
### (Breach of the Covenant of Good Faith and Fair Dealing)
### (Against TEG Defendants)

116.    Plaintiffs incorporate the allegations contained in Paragraphs 1 - 115 of this Complaint as if fully set forth herein.

117.    TEG, at the direction of Clare and McCluskey, breached the covenant of good faith and fair dealing by breaching the Agreement in bad faith by, inter alia, willfully misappropriating Hadron's proprietary information and experience as its own for purposes of directing federally funded contract awards to TEG to the ultimate exclusion of Hadron, using TEG Defendants' influence with Government contacts to actively direct funds away from Hadron, sharing Hadron's proprietary information and designs with Hadron's competitors, all for TEG Defendants own benefit and economic advantage.

118.    TEG Defendants' conduct was intentional, malicious, wanton, and done with reckless indifference to Hadron's interests.

119.    As a direct and proximate result of TEG Defendants' breach of the covenant of good faith and fair dealing, Hadron has been damaged.

**SIXTH COUNT**
**(Commercial Disparagement)**
**(Against TEG Defendants)**

120.    Plaintiffs incorporate the allegations contained in Paragraphs 1 - 119 of this Complaint as if fully set forth herein.

121.    TEG Defendants made knowingly false and derogatory statements to Government officials concerning Hadron and the quality of its products and services.

122.    TEG Defendants' conduct was malicious and calculated to prevent or interfere with Hadron's business relationships.

123.    TEG Defendants have acted maliciously and with intent to harm and disparage Hadron, or with conscious indifference to the foreseeable consequences of their actions.

124.    Hadron has been damaged as a direct and proximate result of TEG Defendants' conduct and Hadron has suffered pecuniary loss.

**SEVENTH COUNT**
**(Conversion)**
**(Against TEG Defendants)**

125.    Plaintiffs incorporate the allegations contained in Paragraphs 1 - 124 of this Complaint as if fully set forth herein.

126.    Defendants TEG, Clare, and McCluskey improperly exercised dominion over ACES demonstration systems and equipment developed and owned by Hadron, without right, thereby depriving Hadron of its rightful use and enjoyment.

127.    Hadron has been damaged as a direct and proximate result of TEG Defendants' conduct.

**EIGHTH COUNT**
**(Unjust Enrichment)**
**(Against TEG Defendants)**

128.     Plaintiffs incorporate the allegations contained in Paragraphs 1 - 127 of this Complaint as if fully set forth herein.

129.     By their conduct, TEG Defendants have knowingly benefited and profited unjustly by, <u>inter alia</u>, failing to properly account for revenue received from contract awards and improperly retaining the undisclosed revenue for themselves, actively and intentionally working to remove Hadron from the ACES program and take it over for themselves, receiving contract awards for ACES to the exclusion of Hadron, and profiting off of the sale of Hadron's proprietary systems equipment.

130.     These contracts were awarded and payments were received by TEG Defendants at the expense of Hadron under circumstances without justification, and TEG Defendants' retention of the benefits conferred would be inequitable and unconscionable.

131.     Hadron has no remedy at law and has been damaged by TEG Defendants' unjust enrichment.

**NINTH COUNT**
**(Abuse of Process)**
**(Against AAI)**

132.     Plaintiffs incorporate the allegations contained in Paragraphs 1 - 131 of this Complaint as if fully set forth herein.

133.     AAI misrepresented its technical capabilities to unfairly and unlawfully secure the EOY contract, improperly traded off of Hadron's expertise and experience, and misrepresented the ACES-OE installed by Hadron in the ACES A2I Lab as AAI's own.

134.     When Hadron removed its ACES-OE from the ACES A2I Lab per the Government's direction, AAI was left with no means to properly demonstrate the ACES technology that it was required to deliver under the EOY contract and, upon information and belief, for which AAI had already invoiced the Government.

135.     AAI approached the FBI and asserted false accusations against Dienes with the ulterior motive of concealing and obfuscating the fact that AAI was incapable of and failed to deliver an ACES-OE under the EOY contract.

136.     AAI improperly and knowingly approached the FBI with false and baseless accusations against Dienes for its own benefit and to distract from its own misconduct.

137.     AAI invoked the criminal process for an illegitimate purpose for which it was not designed nor intended.

138.     As result of AAI's misconduct, Dienes was arrested in June 2016.

139.     The DOJ moved to dismiss the criminal case just two days after Dienes' proffer wherein he provided truthful and exculpatory evidence of his innocence.  The proceedings terminated in Dienes' favor.

140.     Dienes has been damaged as a direct and proximate result of AAI's conduct.

## TENTH COUNT
### (Malicious Prosecution)
### (Against AAI)

141.     Plaintiffs incorporate the allegations contained in Paragraphs 1 - 140 of this Complaint as if fully set forth herein.

142.     AAI invoked and commenced criminal process against Dienes by approaching the FBI with baseless and false accusations against Dienes.

143.     AAI did so intentionally and maliciously and without probable cause.

144.    As a result of AAI's misconduct, Dienes was arrested in June 2016.

145.    The DOJ moved to dismiss the criminal case just two days after Dienes' proffer wherein he provided truthful and exculpatory evidence of his innocence.  The proceedings terminated in Dienes' favor.

146.    Dienes has been damaged as a direct and proximate result of AAI's conduct.


**ELEVENTH COUNT**
**(Defamation)**
**(Against Defendants)**

147.    Plaintiffs incorporate the allegations contained in Paragraphs 1 - 146 of this Complaint as if fully set forth herein.

148.    AAI knowingly made false and derogatory statements to Government officials, and specifically the FBI, concerning Dienes and the propriety of his conduct in the ACES A2I Lab and AAI's product.

149.    AAI maliciously and intentionally falsely imputed criminal conduct to Dienes, causing damage to his reputation and damage Dienes' business relationships.

150.    As a direct result of AAI's conduct, Dienes was unjustly arrested.

151.    TEG Defendants made false and derogatory statements to Government officials that Dienes' security clearance was revoked as a result of his arrest.

152.    TEG Defendants maliciously and intentionally impugned Dienes' clearance status, causing damage to Dienes' reputation and business relationships in the national security industry.

153.    Dienes has been damaged as a direct and proximate result of Defendants' conduct.

ME1 27041818v.1

**TWELFTH COUNT**
**(False Imprisonment)**
**(Against AAI)**

154.    Plaintiffs incorporate the allegations contained in Paragraphs 1 - 153 of this Complaint as if fully set forth herein.

155.    AAI maliciously approached the FBI and intentionally asserted false accusations of criminal conduct against Dienes to Government officials without probable cause and for purposes of causing Dienes harm.

156.    As a direct result of AAI's conduct, Dienes was unjustly arrested and unlawfully confined.

157.    Dienes was harmed was such unlawful confinement.

158.    Dienes has been damaged as a direct and proximate result of AAI's conduct.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs Hadron Industries, Inc. and Klee Dienes request an order granting the following relief:

1) Enjoining Defendants and their respective agents, employees, officers, directors, servants, attorneys, and representatives from directly or indirectly, or alone or in concert with others, from any further use of Hadron's proprietary information developed and used for the ACES platform, including Hadron's proprietary Photon™ and Praxis™ software and any materials authored by Hadron in connection with ACES;

2) Directing Defendants and their respective agents, employees, and representatives to immediately removal and return to Hadron, and certify as to the removal and return, of all of Hadron's proprietary information and equipment and any and all copies thereof, including, among other things, the Photon™ and Praxis™ software;

Case 1:19-cv-00035-LO-MSN   Document 1   Filed 04/27/18   Page 30 of 30 PageID# 30

3)  Directing Defendants to account for and pay to Hadron all profits earned from business unlawfully diverted from Hadron and from the sale and/or delivery of Hadron's property;

4)  Damages in an amount to be determined, but not less than $63,000,000;

5)  Punitive damages against Defendants in an amount to be determined;

6)  Attorneys' fees and costs; and

7)  Such other legal or equitable relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Dated:  April 27, 2018                    RESPECTFULLY SUBMITTED,


                                         By:    /s/   Thomas J. Finn
                                               Thomas J. Finn  (BBO # 561346)
                                               tfinn@mccarter.com
                                               Paula Cruz Cedillo (BBO # 671443)
                                               pcedillo@mccarter.com
                                               Nicholas W. Allen (BBO # 663409)
                                               McCARTER & ENGLISH, LLP
                                               265 Franklin Street
                                               Boston, Massachusetts 02110
                                               Telephone: 617.449.6500
                                               Facsimile:  617.326.3106

                                               Alexander W. Major
                                               amajor@mccarter.com
                                               Franklin C. Turner
                                               fturner@mccarter.com
                                               McCARTER & ENGLISH, LLP
                                               1015 15th Street, NW
                                               12th Floor
                                               Washington, DC  20005
                                               Telephone: 202.753.3400
                                               Facsimile:  202.296.0166

                                               Attorneys for Plaintiffs
                                               Hadron Industries, Inc. and Klee Dienes

ME1 27041818v.1