1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division




-------------------------------:
                               :
HADRON INDUSTRIES, INC., et al., :
               Plaintiff,      :
                               :
     -vs-                      :    Case No. 1:19-cv-35
                               :
                               :
TRIANGLE EXPERIENCE GROUP, INC., :
et al.,                        :
               Defendants.     :
                               :
-------------------------------:




                         HEARING ON MOTIONS


                          May 10, 2019


                  Before:  Liam O'Grady, USDC Judge
```

APPEARANCES:


Thomas J. Finn, Paula C. Cedillo, and Franklin C. Turner,
Counsel for the Plaintiffs

Richard D. Kelley and Jonathan M. Harrison,
Counsel for Defendant Triangle,

Leslie P. Machado, Kristen W. Broz, and W. Michael Holm,
Counsel for Defendant ALQIMI

2

```
            THE CLERK:  The Court calls case 1:19-cv-35, Hadron
2   Industries, Inc., et al. versus Triangle Experience Group,
3   Inc., et al. for a motion hearing.
4           May I have the appearances, please, first for the
5   plaintiffs.
6           MR. FINN:  Good morning.  Thomas Finn, McCarter &
7   English, for the plaintiffs, Hadron Industries, Inc. and Kell
8   Dienes.
9           THE COURT:  All right.  Who is with you this morning,
10  sir?
11          MR. FINN:  With me is my colleague, Paula Cruz
12  Cedillo, also of McCarter & English.  And Franklin Turner, also
13  of McCarter & English.
14          THE COURT:  All right, good morning to each of you.
15          MR. TURNER:  Good morning, Your Honor.
16          MS. CEDILLO:  Good morning, Your Honor.
17          MR. MACHADO:  Good morning, Your Honor.  Les Machado
18  on behalf of the defendant ALQIMI Analytics, also known as AAI
19  in this case.  And with me at counsel table is my partner
20  Kristin Broz and my partner Michael Holm.
21          THE COURT:  All right.  Good morning.
22          MR. HOLM:  Good morning.
23          MR. KELLEY:  Good morning, Your Honor.  Richard
24  Kelley with Bean Kinney & Korman for the Triangle Experience
25  Group defendants.  With me this morning is my colleague,
```

1   Jonathan Harrison, newly admitted to the court this morning.

2          And also with me in the courtroom today are my

3   clients Robert Clare and Sean McCluskey.

4          THE COURT:  All right, good morning to you.  Good

5   morning.

6          All right.  Well, thank you for coming in.  I will be

7   candid, we have been in trial all week, and although I have

8   looked at the pleadings, I haven't studied the cases with the

9   kind of care that I would need to to give you decisions from

10  the bench this morning.  So I wanted to give you that heads up.

11         But my reading of the pleadings and the complaint at

12  this stage leaves me with the impression that there is an awful

13  lot of facts that are necessary for me to make some of the

14  decisions that you're asking me to make at the 12(b)(6) stage.

15  You know, whether the events occurred in Massachusetts or

16  Virginia for Count 1.  And that seems to me --  you know, what

17  choice of law would require me to have more information.

18         You've got the malicious prosecution where I really

19  don't fully understand, was there an investigation going on for

20  a year before charges were brought?  And how does that affect

21  ALQIMI assuming that Virginia law applies.  And the statute of

22  limitations issues that there is, obviously, a dispute under,

23  and how can I really look at that at this stage.

24         So I wanted to throw that out there so you can

25  address it to the extent you would like to in your arguments.

4

1  Otherwise, I will hear -- as I said, I have read the pleadings,

2  but I don't know the case law as well as you all do at this

3  stage.

4              So who would like to start on defendants' side?

5              MR. MACHADO:  Your Honor, Les Machado again on behalf

6  of AAI.  I think Mr. Kelley and I have conferred, and we agreed

7  that I would go first and then he would backfill.

8              THE COURT:  All right.

9              MR. MACHADO:  And I appreciate Your Honor -- the

10  insight Your Honor shared about kind of where you are and some

11  of your initial thoughts.

12              I agree that there may be some facts that are

13  necessary to resolve some of these motions that you have before

14  the Court.  The difference about this complaint as opposed to

15  many of the cases that were cited by the plaintiffs is that

16  those facts are found in the pleading here.

17              And so, in a lot of cases I do think there is some

18  disagreement or the complaint is a little less detailed and a

19  little bit more sparse about where exactly certain events

20  occurred or when they occurred.  That's not the case here.

21              And as Your Honor is fully aware, that probably is

22  because there was already significant briefing before this case

23  landed on Your Honor's docket in Massachusetts, and that

24  included briefing over whether the case really should stay in

25  Massachusetts or be transferred here.

1          And because of that briefing, the plaintiff went

2    through and in great detail put in where events occurred, when

3    they occurred, in an effort to try to tie this case to

4    Massachusetts and show that the Massachusetts court should

5    still retain the case.

6          Of course, the judge up in Massachusetts finally

7    disagreed with that and found that really the case belonged

8    down here and brought it down here.  But you now have the

9    benefit of that pleading.  And when you go through that

10   pleading, what you will find is that it does in fact contain

11   sufficient enough detail to allow Your Honor to make the

12   decisions that we're asking you to make here and now.

13         This has been fully -- there has been a fair amount

14   of briefing that has been put on these topics, Your Honor, and

15   I am not going to repeat what we said in the briefs because I

16   don't think that's a good use of my time or yours.  I want a

17   hit a couple points because I do think that those are important

18   from our perspective.

19         So the first count is the Massachusetts 93A count.

20   And we do think this is one that is susceptible to Your Honor

21   resolving here and now.

22         Choice of law is dispositive on this count.  As Judge

23   Cacheris held in a very similar case a new years ago, this is a

24   count that is unique to Massachusetts.  And so, if

25   Massachusetts law doesn't apply to this tort count, the tort

6

1   count goes away right then and right there.

2          And under the Massachusetts choice of law rules,

3   which both the parties have agreed on, there are several

4   factors Your Honor looks at.  And again, when you look at the

5   complaint and you look at those factors, the complaint provides

6   all the details that would allow you to make that decision

7   right here and right now.  The factors are, the place where the

8   injury occurred.  And the plaintiff says, well, Hadron is

9   located in Massachusetts.  And so, that's where the injury

10  occurred.

11         And we will accept that for purposes of right now.

12  There has been some paper that they've put before state courts

13  that would suggest that the facts are in fact different, but

14  for right now they say Hadron is in Massachusetts and that's

15  where the injury occurred.

16         The place where the conduct causing the injury

17  occurred though is not Massachusetts.  And that's, again, pled

18  in the complaint.  They allege that my client made deceptive

19  statements to the government in an effort to get -- in an

20  effort to get business from the government through an RFP

21  process.

22         My government is not -- my client is not in

23  Massachusetts.  Those statements, wherever they were made, were

24  not made in Massachusetts.  They were made in Maryland where my

25  client is located, and that's alleged in the complaint; or they

1    were made in New York, where the prime contractor my client was

2    working with was located.  But that's not Massachusetts.

3              So that's already in the complaint, you can use that

4    to make that decision.

5              The domicile, residence, nationality, place of

6    incorporation, and place of business of the parties.  Again,

7    all those details are in the complaint.  AAI is located in

8    Maryland.  It's registered in Delaware.  Hadron is alleged to

9    be in Massachusetts.  So that's that factor.

10             And then, finally, the place where the relationship

11   between the parties is centered.  There was no relationship

12   with the parties.  Anything that happened between the parties

13   happened outside Massachusetts.

14             When you look at the plaintiffs' opposition, what

15   they harp on time and time again is, well, Hadron is located in

16   Massachusetts.  Hadron's employees are located in

17   Massachusetts.  Hadron's technology was developed in

18   Massachusetts.  Hadron was injured in Massachusetts.

19             Assuming all that's true, all that shows is that the

20   injury was felt in Massachusetts.  It doesn't show the rest of

21   these factors point to Massachusetts.

22             So to Your Honor's point, yes, there are facts that

23   are necessary for Your Honor to make this decision, but those

24   facts are found in the complaint.  And Your Honor has

25   previously, as we cited in our reply brief, found that at the

8

1   motion to dismiss stage in similar circumstances where someone

2   is coming into this court and saying, well, I'm bringing a

3   claim under the Connecticut Deceptive Practices Act, Your Honor

4   has found, wait a second, Connecticut laws doesn't apply here,

5   you can't bring that claim.

6          And so, we think once the Court focuses on the

7   complaint, you'll find that the allegations necessary to make

8   that decision are found on the face of the complaint and don't

9   require any further exploration through discovery.

10          THE COURT:  So the meetings with Mr. Dienes which

11   occurred in New Hampshire or Massachusetts all relate to the

12   injury, and you would confine that to that?

13          MR. MACHADO:  There was one meeting alleged in the

14   complaint, Your Honor, with an AAI witness who traveled to

15   Massachusetts for the purpose of a product demonstration.  And

16   Mr. Dienes was at that meeting.

17          Absent that, all the rest of the conduct happened

18   outside of Massachusetts, as alleged in the complaint.

19          And again, what you will hear from the plaintiff is

20   that the injury was felt there and, therefore -- and we're

21   there, and people are there, and there were communications

22   there.  But that all goes, again, to the injury.  It doesn't go

23   to these other factors.  You have can't reduce this multifactor

24   est to just the place of the injury.  And that's going to sound

25   familiar when I get to the next point.

9

1           So again, we think Your Honor can make the choice of

2   law decision at this stage because this is a complaint that

3   contains the facts necessary to make that determination.

4           Even if Massachusetts law applied to this case, or

5   even if Your Honor found somehow that it was -- you couldn't

6   make this choice of law decision, so we'll let this count --

7   the count doesn't go away on the basis that Massachusetts

8   doesn't apply, there is an independent basis why the 93A claim

9   goes away.  And that's because the 93A claim can only be

10  brought if the conduct giving rise to that claim occurred

11  primarily and substantially within the Commonwealth of

12  Massachusetts.

13          And again, I think it's important here to focus on

14  the language of the statute giving rise to this claim and then

15  juxtapose that with the arguments that the plaintiffs are

16  making.

17          What the statute says is, "no action shall be brought

18  or maintained under this section unless the actions and

19  transactions constituting the alleged unfair method of

20  competition or deceptive act or practice occurred primarily and

21  substantially in Massachusetts."

22          So the focus under the statute is not on the place of

23  the injury.  It's on the place of the alleged unfair method of

24  competition or deceptive act or practice.

25          That's what -- even if this case was pending in

10

1    Massachusetts or even if they could bring this 93A claim, you

2    still need to show that it arises primarily and substantially

3    in Massachusetts.  And when you're looking at whether it arises

4    primarily and substantially in Massachusetts, you focus not on

5    the place of the injury, but you focus on the place of the acts

6    because that's what the statute pivots off of.

7            And when you focus on the first amended complaint --

8    and again, all these facts are in the first amended complaint,

9    although the plaintiff says, you know, often times this is an

10   issue that is resolved at summary judgment after these facts

11   have by fully explored, that may be true in other cases, but in

12   cases where the complaint contains the sufficient detail, as

13   here, there is nothing that prevents the Court from looking at

14   it and saying, are these claims -- did these claims arise

15   primarily and substantially in Massachusetts.

16           And when you look at this complaint, what is the

17   alleged unfair or deceptive conduct that underlies the 93A

18   claims as pled by the plaintiffs?  Well, they say it's that AAI

19   misappropriated Hadron's technology and information for the

20   purpose of competing.  This is, again, their allegation that

21   AAI made certain misrepresentations in its response to the

22   government RFP.

23           Again, that didn't happen in Massachusetts.  We were

24   not in Massachusetts.  That happened in Maryland where we're

25   located or in New York where the prime was located.

11

1           They say that after AAI got the work, it was

2   physically located over in Rosslyn, and while it was in Rosslyn

3   it made misrepresentations to the government.  That happened in

4   Virginia.  It didn't happen in Massachusetts.

5           They say, well, AAI made statements to law

6   enforcement about the individual plaintiff.  That happened

7   apparently in Virginia, as they have said in their opposition

8   brief.

9           And then they said AAI -- and again, these are right

10  from the complaint.  These are right from the 93A cause of

11  action.  When you look at the conduct that they say we engaged

12  in, these are what they say.

13          And then when you tie it back to the factual

14  allegations in the complaint, they are very specific about

15  where those things occurred.

16          They say, finally, that we misrepresented our

17  technical capabilities in this RFP response.  And again, that

18  happened in Maryland or New York.

19          The law we cite in our reply brief says, if you have

20  got a series of facts about where the conduct occurred and they

21  are in equipoise, then they didn't occur primarily and

22  substantially in Massachusetts.

23          Here they are not even close to being 50/50.  They

24  tip substantially away from Massachusetts.

25          And so, when you look at the complaint, what you will

12

1    find is that actual deceptive or unfair conduct that they have

2    alleged we engaged in, they have also engaged that conduct did

3    not happen in Massachusetts.  They have alleged that it

4    happened in Virginia or New York or elsewhere.

5              One more point on this before I leave, Your Honor.

6    Which is, a lot of the conduct underlying this entire

7    complaint, frankly, most of this case, is because, based upon

8    their allegation, that when AAI responded to this government

9    RFP -- this is an RFP that the government issued.  And they

10   thought they were going to get it.  That is abundantly clear,

11   they thought it was wired for them.  They thought they were set

12   up to get it.  They thought they were going to get it.  And

13   then the government put it out and our client was a sub and

14   another company who was the prime in New York, they got the

15   contract.

16             They allege that the only way we got that was in our

17   response to the RFP we made misrepresentations in which we

18   essentially traded off their name.  That's the gravamen of this

19   case.  They say, we made misrepresentations in which we said

20   that we were going to use their technology, we are going to use

21   their capabilities, we're going to work with them.  And they

22   say, you essentially made those misrepresentations, and through

23   those misrepresentations you obtained this work.

24             We put before the Court the actual RFP responses.

25   They are alleged in the complaint, they are integral to the

1   complaint, they are incorporated by reference.  And we put them

2   before the Court in our motion to dismiss because we thought it

3   was important for the Court to see what exactly we said.  We

4   didn't say anything about Hadron, about using Hadron, about

5   working with Hadron, about working with Hadron's technologies.

6           To the extent the word "Hadron" even appears in that

7   RFP response, it's because it's in the question that says:

8   What's your familiarity with these technologies?  And we said,

9   we're using somebody else's technologies.

10          So it's demonstrably false, the entire complaint

11  falls apart because it's based upon these allegations that we

12  have put before the Court.  We have said, here are the actual

13  RFP responses.

14          We already submitted them when the case was up in

15  Massachusetts.  We were expecting maybe on reply for them to

16  come back and say, no, here is the RFP response that we were

17  relying upon when we made our complaint.  They didn't say that.

18          So I bring that only up to say that a lot of times

19  we're talking about in the complaint these allegations that

20  Hadron made these misrepresentations, these allegations that

21  Hadron made these -- misrepresented its technical capabilities,

22  or misrepresented who it was going to work with.  And the fact

23  is, that is just false.

24          But even if it was true, it didn't happen in

25  Massachusetts.  And that's what is pled in the complaint.

14

1          THE COURT:  So the two software systems that Hadron

2    trademarked, they're not part of those RFPs?

3          MR. MACHADO:  They are a part of the RFPs to the

4    extent that they were part of the question.  Again, what Hadron

5    alleges is that the government wanted to work with Hadron, so

6    the government essentially asked Hadron to ghost write the RFP.

7    According to them, they ghost wrote the RFP.  And the RFP sort

8    of said, we anticipate you using the two technologies that are

9    Hadron proprietary software.

10         In our RFP response -- and again, you'll see that in

11   the RFP in the question box.  What you will see in the answer

12   box is we say we intend to use Oblong and intend to use these

13   other technologies.  We didn't say, we're going to work with

14   Hadron.  We didn't say, we're going to work with Hadron's

15   technologies.  We said, we're using somebody else's.

16         THE COURT:  So this is all before Hadron and the

17   defendants were put in the office together in Rosslyn; is that

18   right?

19         MR. MACHADO:  Correct.  So as I understand the

20   chronology there, so then we said -- our client said as part of

21   this -- and it was a large part of a larger contract, we have a

22   subcontract.  But for this piece our client said, here is what

23   we envision doing, here is the people we envision using, here

24   is the technologies we'll use.  The prime contractor said that.

25   The government awarded the contract to this consortium.

15

1          THE COURT:  This is the second contract, right?  The

2    follow-up to the Hadron --

3          MR. MACHADO:  Hadron had a separate contract, right.

4    The contract contemplated us sort of renting a facility out in

5    Rosslyn and setting it up to work with the government, which we

6    did.

7          THE COURT:  All right.

8          MR. MACHADO:  So envision a big room and we're

9    working over here.  And at a certain point AAI -- Hadron has

10   its own technology and wants to work with the government.  And

11   it is sort -- the government indicates, we would like them to

12   share space.

13         And so, they end up being over in their space.  And

14   then there is this period of time when we're both in the same

15   space, that is relatively short, again as alleged in the

16   complaint, September to December of 2014.  And by December of

17   2014 they vacate the space.

18         Going back to the point Your Honor made in the

19   beginning though.  Again, these are alleged in the complaint.

20   So it's during this period of time they allege that AAI made

21   certain misrepresentations to the government.

22         It's during this period of time that they allege AAI

23   passed off their work because the government would be allegedly

24   touring this room and we'd say, oh, those are our television

25   screens or that's our computer server deck, or whatever.  And

16

1   they're saying, that was your misrepresentations.  That

2   happened in Virginia, and that's alleged in the complaint.

3          So we don't have to guess and we don't need discovery

4   to figure out where that happened.  It is already alleged in

5   the complaint.  You don't apply Massachusetts law in the first

6   instance.  And then, even if somehow you did, or even if you

7   deferred on that, the complaint has pled themselves out of the

8   93A claim because that's the conduct that gave rise to the

9   claim and that's the conduct that happened in Virginia.

10          THE COURT:  Okay.

11          MR. MACHADO:  Just a couple other things on this 93A

12   claim before I leave it.  Again, I think we flushed this out in

13   reply brief.

14          At one point Hadron says, you know, really, the only

15   factor under this primarily and substantially fact test is

16   where the place of injury is.  And that's just not true.

17   That's not what the Fourth Circuit held a couple years ago in

18   the Evans in a similar circumstance.  They said it's a

19   multifactor test.  That's not what the Massachusetts highest

20   court has held, they have held it's a multifactor test.

21          So it can't be reduced to just the place of the

22   injury.  In fact, were you to reduce it to the place of the

23   injury, it would be inconsistent with the actual language of

24   the statute which doesn't say you can bring this claim if the

25   injury is felt in Massachusetts.  It says, don't bring this

1   claim or you can't bring this claim unless the conduct happened

2   principally in and substantially in Massachusetts.

3          And so, you have to focus on the conduct, not on the

4   place of the injury.

5          I think the other couple claims that I want spend a

6   couple minutes on just right now because I think they are

7   important to discuss when we have this opportunity are the two

8   Lanham Act claims.  These were not in the original complaint

9   that was filed in Massachusetts in April of 2018.  They were

10  not put into this case when the case arrived on Your Honor's

11  docket in January of 2019.  They appeared for the first time in

12  the amended complaint that was filed after we filed the motion

13  to dismiss the original complaint.  So they were first filed in

14  this case in March of 2019.

15         In our opening brief we said that under the Virginia

16  two-year statute of limitations that might apply, these are

17  time barred.  Again, these trace back to things that happened

18  in 2014, allegedly deceptive conduct in the misrepresentations

19  in the submissions to the government, the misrepresentations to

20  the government while we were sharing the space.

21         The plaintiffs' response is twofold.  One is that you

22  should apply the Massachusetts statute because it's a four-year

23  statute and it transferred to Massachusetts.  I'm not sure

24  that's the case because I think that applies if -- I don't

25  think that -- and we put this in our brief, so I am not going

18

1    to repeat it.  I think that only applies -- that doesn't apply

2    unless the Massachusetts court had jurisdiction over AAI in the

3    first place.  And they never expressly made that finding that

4    they had jurisdiction.

5           And so, in that circumstance, it may very well be

6    that Virginia's applies.

7           But assuming the Massachusetts statute applies, the

8    conduct happened in 2014.  It was not filed until 2019.

9           They say, well, oh, ho, hang on a second, it relates

10   back.  We filed our original complaint in 2018; therefore, it's

11   timely.

12          So we have to do this gymnastics here where we sort

13   of say on the one hand, you know, it was filed too late, but on

14   the other hand we relate it back.

15          If you work through that maze and you get to the

16   point where you say, okay, the complaint alleges conduct

17   happening in 2014, we'll ignore the fact that you waited until

18   2019 to bring it, and relate it back to the original complaint

19   in 2018 and, therefore, we'll assume that that was timely, you

20   run headfirst without a question into laches.

21          And laches applies in the context of Lanham claims,

22   and it applies at the motion to dismiss stage.  And it says, if

23   you sit on your rights and you let somebody go ahead and engage

24   in the conduct and build up their business and wait and wait

25   and wait, then you can't come in at the eleventh hour after

1    they have done that and slam them with a Lanham Act claim and

2    say, ah ha, treble damages and attorney's fees.

3              And that's exactly what happened here.  And you can

4    make that decision here --

5              THE COURT:  Well, laches requires the demonstration

6    of prejudice as well.  And so, it's more to laches than just

7    looking at the dates and -- you know, I did ten years of

8    intellectual property work, and I can't remember a case where

9    laches was ever considered by a court before dispositive

10   motions, but maybe that's just me.

11             MR. MACHADO:  Your Honor, the only thing I would say

12   is we cited in our reply brief a couple decisions where it has

13   been considered, including one recently from a District Court

14   in the Fourth Circuit in a very similar circumstance where the

15   plaintiff argued, you know, this is fact specific, you need to

16   be able to show that you were actually prejudiced.  And the

17   Court said, you know, almost as a matter of law, almost as a

18   matter of presumption, I am going to find that if you wait and

19   you sit on rights, you've done it.

20             Here is the reason why I think it might be applicable

21   here, Your Honor, despite what Your Honor said.  If you accept

22   what the plaintiff said, which is, we knew all the facts

23   underlying this claim in March of 2018 -- that's what they say

24   because they have to say that in order to get it to relate

25   back.  So they have to say, we knew all of these facts and we

20

1    knew all of this in March of 2018, we just simply didn't plead

2    it at that point.

3             There is no explanation for why they wait another

4    11 months or 13 months after that fact.

5             So we think there is a pretty compelling argument

6    that they should have brought this in 2014 or 2015 because they

7    certainly knew at that point we got the work that they thought

8    they were going to get.  They knew at that point what we were

9    saying to the government.  Everything that they knew that they

10   rely upon for these Lanham Act claims, they knew back in 2014

11   and 2015.

12            But even if you accept their argument, which is, we

13   didn't know until 2018, they have to anchor it in 2018 in order

14   to make it timely even under that longer statute of

15   limitations.  And they have no explanation for why it is they

16   wait another year.

17            And so, if there is ever a circumstance where you

18   would say, you sat on your rights, it strikes me this is

19   exactly that one where they have essentially pled themselves

20   into a box in order to try to avoid statute of limitations.

21            THE COURT:  Okay, thank you.  Next point.

22            MR. MACHADO:  On the substance of the Lanham Act

23   claims, Your Honor -- and again, these are arguments I think

24   Your Honor can consider at this stage --

25            THE COURT:  Yeah.

1          MR. MACHADO:  We would urge you to follow Judge Lee's

2     opinion in the Kratos case.  We think that speaks to what

3     exactly is going on here.

4          What Judge Lee said in that opinion was that the

5     Lanham Act is ill-fitting for RFP responses.  RFP responses are

6     not the type of communication that the Lanham Act was aimed at

7     addressing.  It's a targeted response.  It's something that is

8     solicited from the government.  It goes to a very small

9     universe of recipients.  It is not the type of communication

10    that the Lanham Act is intended to address.  And we think that

11    Judge Lee's decision controls the outcome on the Lanham Act

12    claims and you should follow that.

13          Now, the plaintiffs say, well, hang on, what Judge

14    Lee was really doing in the Kratos case was he was saying, the

15    universe of recipients, the U.S. government was so big and this

16    communication was so small, that it couldn't have really been

17    intended to deceive a measurable portion of the consuming

18    public.

19          I don't think that's a fair reading of that decision.

20    But, furthermore, the plaintiff in this case, in an effort to

21    try to show why it is that the facts here are different than

22    Judge Lee, have essentially again pled themselves in a box.

23    Because what they say here is, well, the universe is this

24    really small, it's this small little universe of people within

25    the government who have the information and the knowledge about

1   this area.  And so, you know Judge Lee's decision, which was

2   sort of the pebble in the pond thing, that's the way you should

3   view that decision and those aren't our facts.

4          That's what they argue in their opposition, is this

5   is much a smaller universe of recipients, it's much more

6   concentrated, and the communication was to that much smaller

7   universe.

8          The problem with that, Your Honor, is twofold.  One

9   is, that is not what they allege in the complaint.  They allege

10  that these communications went to this small universe and a

11  much broader universe and were intended to deceive the much

12  broader universe.

13         So while they say in their opposition it's a small

14  universe, that's not what the complaint alleges.

15         But, secondly, if you accept the fiction that this

16  was the universe of people, according to their own allegations

17  that universe of recipients knew very well about them.

18  According to their own allegations, that universe of recipients

19  had reached out to ask them to work on this project, had asked

20  them to draft the statement of work.

21         The point of the Lanham Act is someone is being

22  deceived.  There can be no argument plausibly made that this

23  universe was going to be deceived.  If there was ever an

24  educated universe about what they were getting and what they

25  were bidding and what they were buying, it would be this

1    universe in these circumstances.

2           And so, we think even at the motion to dismiss stage,

3    if you look at the complaint, in an effort to plead around

4    Kratos and argue that the universe here is much smaller and

5    much more concentrated, they have pled themselves into a box

6    because that universe under Twombly and Iqbal, you have to look

7    at it and say, is this plausible?  And there is no plausible

8    allegation that can be made that that small, concentrated

9    universe that was so imbedded and so tight and to integrated

10   with the plaintiffs, if they are to be believed, was somehow

11   going to be deceived by what AAI was staying in its response.

12          I think the final point I will make, Your Honor, and

13   then I will let Mr. Kelley step up here, is on the -- there are

14   six counts altogether against our client.  I have addressed the

15   93A and the two Lanham act counts.  The conspiracy count, I

16   think we've addressed that in our briefing, I am not going to

17   spend any time on that.

18          The malicious prosecution, for the same reasons.  I

19   don't think under either New Hampshire law or under Virginia

20   law the malicious prosecution count survives.  The allegation

21   is that we made a report to law enforcement, that's it.

22          Under either New Hampshire law or Virginia law, you

23   have to actually initiate something, you have to do something,

24   you have to further it, you have to advance it, you have to

25   swear out a warrant.  We didn't do any of that.

24

1          The allegation is we told the FBI that we thought Mr.

2    Dienes had engaged in some conduct that troubled us, and that

3    the FBI and presumably law enforcement and presumably the

4    AUSA's office took it from there.

5          And to Your Honor's question about, you know, was

6    there a gap of time, it does appear there was a gap of time

7    from the complaint that they were investigating it.  They made

8    their own decision.  There is no allegation that our client had

9    any role in that whatsoever.

10          Literally, our client's involvement, as alleged in

11    the complaint, begins and ends with making a report to the FBI.

12    And that's not enough to bring forth a claim for malicious

13    prosecution under either Virginia law or New Hampshire law.

14          THE COURT:  Right, understood.

15          MR. MACHADO:  Thank you.

16          THE COURT:  All right, thank you.

17          All right, Mr. Kelley.

18          MR. KELLEY:  Thank you, Your Honor.

19          Your Honor, I will try and be brief, and certainly

20    not tread over much of the same territory that my colleague

21    already has.

22          I will note, however, as counsel for ALQIMI had

23    pointed out, this matter was already very thoroughly briefed in

24    Massachusetts.  And Massachusetts law, the choice of law in

25    this case, runs through all of the claims.  It's an important

25

1    decision.  And it is, as my colleague pointed out, it can be

2    made based upon the facts that have been alleged in this first

3    amended complaint.

4            After this case was transferred from Massachusetts

5    after all the discovery, the affidavits, and the briefing that

6    they had, it was transferred here on January 9 of this year,

7    and defendants filed very thorough motions to dismiss.  The

8    plaintiffs chose voluntarily to file a first amended complaint

9    rather than challenge those motions to dismiss.  So already

10   plaintiff has now had two bites, Your Honor, at this apple.

11           And after all of this, after all of the Massachusetts

12   pleadings and after the weeks they have had to mull over the

13   arguments in the motions to dismiss, that did not change, Your

14   Honor, except for the addition of their Lanham Act claims.

15           The best that they can do in their first amended

16   complaint are 13 paragraphs in their first amended complaint

17   that even touch upon Massachusetts.  And I will not belabor the

18   Court with going through each of those paragraphs.  But if I

19   could, I would point them out to the Court.  The 13 paragraphs

20   that are even relevant to the choice of law and the

21   Massachusetts business practices act claim are paragraphs 34,

22   38, 41, 44, 50, 55, 57, 60, 63, 75, 87, 94, and 97.

23           And, Your Honor, when you take a look at each of

24   those allegations, I think you'll see, just as my colleague had

25   said, they just smatter in all of these different mentions of

26

1     Massachusetts, but none of these claims are critical to the

2     choice of law decision.  And more importantly, under the

3     Massachusetts act claim, where any illicit activity occurred.

4           And if you juxtapose what was filed in their original

5     complaint with what they filed in their first amended

6     complaint, I think you can see that they just threw these

7     mentions of Massachusetts in there in the hopes that they could

8     try and anchor some sort of claim that Massachusetts law

9     applies.  And, Your Honor, after you look at those paragraphs,

10    I think you'll see that it just simply does not.

11          The TEG defendants are defendants in one way or

12    another, either the company or the individuals, in 11 of the 12

13    counts.  And I will skip over the majority of those except for

14    commercial disparagement and defamation, the conversion, and

15    the unjust enrichment.

16          And I will state, Your Honor, with regard to

17    commercial disparagement, I think we were very clear in our

18    brief that it just simply doesn't exist in the Commonwealth of

19    Virginia.

20          The defamation claim does exist with a one-year

21    statute of limitations when Virginia law is applied.  And even

22    if commercial disparagement could exist, just like the

23    defamation claim, they simply don't plead it properly with the

24    facts that they have alleged.

25          And again, they have had ample time to allege these

27

1    facts.  And instead, what they have put are bald allegations

2    that someone at TEG spoke with someone at the government at

3    some unknown date at some unknown time in some unknown location

4    and said something about some unidentified product of Hadron's.

5              How is a defendant supposed to defend that sort of an

6    action?  And, Your Honor, it certainly doesn't meet the

7    pleading requirements for defamation in either Twombly or Iqbal

8    as well.

9              THE COURT:  What did you understand the number of

10   times in the defamation allegation is made?  Is it once?  Is it

11   more than once?  It was unclear to me from the amended

12   complaint.

13             MR. KELLEY:  We actually could not tell either, Your

14   Honor, because the claims are so vague and amorphous.  And

15   throughout the course of this complaint, first amended

16   complaint, as we pointed out in our brief, it is sort of a

17   shotgun pleading method where the plaintiff conflates the time

18   periods, conflates the facts, and interweaves all that

19   conflation with the claims.

20             They start out with tortious interference claims and

21   conspiracy claims.  They then claim in paragraph 62 of their

22   first amended complaint that there is an agreement that was

23   made in August of 2014.  They don't say what the agreement

24   really was.  They don't say if it was in writing.

25             I would think they --

28

```
 1              THE COURT:  Oral contract.

 2              MR. KELLEY:  It could be, it could be an oral

 3   contract, in which case our statute of frauds argument may be

 4   applicable.

 5              But regardless, even if it's an oral contract, Your

 6   Honor, one thing you'll note -- and I'll jump off of the

 7   defamation and conversion now.  In conflating the time periods

 8   in the allegations, they have now jumped from, hey, we had a

 9   contract for this to now injecting a tort claim into the case.

10              And as Your Honor knows, under Sensenbrenner and

11   McDevitt, you can't turn a breach of contract claim into a tort

12   claim.

13              And they do the exact same thing with every

14   allegation after paragraph 95.  Hey, you guys got all of this

15   money and you didn't share it with us, and so we're going to

16   sue you for conversion or we're going to sue you for unjust

17   enrichment.  When in actuality, that's all part and partial to

18   a contract claim.

19              And so --

20              THE COURT:  Can I tell whether this -- whether the

21   statute of frauds could be avoided by the completion of the

22   contract within a year?  Does that come into it?  Is that

23   something I need to look at as well?

24              MR. KELLEY:  It's covered in the brief, and they try,

25   Your Honor, to refute that.  But based upon their own
```

1    allegations of the time line where they were now setting up an

2    arrangement whereby the Triangle Experience Group and Mr. Clare

3    and Mr. McCluskey would go out and try and market this product.

4    Then Hadron and Mr. Dienes would try and develop technology for

5    potential government contracts.  And then the government

6    contractors would be approached and engage with them.

7         This contract is at plural, Your Honor.  This has

8    been going on since 2013.  And the cease and desist letter is

9    issued in November of 2016.

10        So based on the time period that they set forth

11   themselves in the complaint, no, Your Honor, this couldn't be

12   completed within a year.  As Your Honor knows, government

13   contracts just don't work that way either.

14        So, Your Honor, we believe that on the face of the

15   allegations in the first amended complaint, and for the reasons

16   we've stated in our briefs, that Your Honor can make a decision

17   on these issues at this point.

18        THE COURT:  Okay.

19        MR. KELLEY:  Thank you, Your Honor.

20        THE COURT:  Thank you, Mr. Kelley.

21        All right, Mr. Finn.

22        MR. FINN:  Thank you, Your Honor.

23        Good morning, Your Honor.  Like my colleagues, I will

24   try to address the things that have been raised during the

25   hearing.  We understand that the matter as been fully briefed.

1          I think what's important, Your Honor, is when you

2    look at the complaint, the defendants would have the Court

3    believe that these are very isolated events whether they are

4    trying to raise a claim with laches or the breach of contract.

5    But what the complaint clearly alleges is this was a conspiracy

6    that was undertaken by the defendants.  It was a concerted

7    effort to take the product after Hadron had SBIR rights, was a

8    preferred contractor, and then systematically in furtherance of

9    their conspiracy substituted itself in the place of Hadron.

10   And then continued to make representations, which I'll point

11   out as I present this to the Court, continued to make

12   representations about whether or not those were the -- whether

13   they were the products of the defendants and misrepresented

14   their capabilities.

15          So this is not -- the complaint has to be read in its

16   totality.  We clearly think that with all the factual

17   allegations that are in the complaint, that it clearly sets

18   forth all of the proper elements for notice pleadings under

19   Rule 8.  But I will address some of the specific things that

20   were raised.

21          The defendants have suggested they would accept the

22   factual allegations.  And in fact, Your Honor said in the

23   beginning, do I not need to make some factual determinations?

24   And that goes to what we raised in our brief that the issues

25   that are raised with the choice of law are premature.  They're

1    either premature or, if the Court accepts the allegations that

2    are set forth in the complaint, the unmistakable conclusion is

3    that Massachusetts law applies.

4          The Court references that the defendants had

5    referenced a number of cases.  In fact, some by this Court.

6    The Bahta case, where the Court had converted a motion to

7    dismiss to a summary judgment.

8          And the other case was the Metro Mail case, which I

9    know Your Honor is familiar with.  But in Metro Mail, the Court

10   was interpreting a choice of law provision in a contract to

11   determine whether Connecticut's unfair trade claim applied.

12         That's not what we have here.  For the Court to make

13   its determination, it would have to make factual findings.  And

14   that's why in our brief we argued that the choice of law

15   analysis is premature.  And we believe that the defendants did

16   not adequately suggest or provide in their briefs that the

17   Court can make that decision.

18         THE COURT:  Well, there is a lot of -- if you assume

19   that conduct -- location of conduct is the key, especially in

20   Count 1, then there is an awful lot of the conduct that occurs

21   down here versus in Massachusetts, right?  And I know there is

22   some district -- Massachusetts local cases that focus on the

23   misconduct.

24         But there is an awful lot of the conduct that occurs

25   down here, right?

32

1          MR. FINN:  There is some conduct that occurs

2  certainly outside of Massachusetts, there is no question, Your

3  Honor.  But when we talk about that, then there is no dispute

4  among the parties that the Massachusetts choice of law

5  framework governs.

6          And so, what Your Honor is referencing is the

7  flexible interest based approach that Massachusetts applies to

8  determine the choice of law.  And what the Massachusetts courts

9  do, and under Massachusetts law, is they apply the place of the

10  injury, the place of the conduct, the domicile of the parties,

11  and the place where the relationship is centered.

12          And we have briefed this fully, but the place of the

13  injury is clearly Massachusetts.  Hadron suffered and felt the

14  effects of the misconduct in Massachusetts.

15          What's significant is Massachusetts' principal place

16  of business -- Hadron's principal place of business is in

17  Massachusetts.  All of its engineering staff is there.  The

18  work that was performed was performed in Massachusetts.  The

19  contracts that we've alleged in the complaint were administered

20  in Massachusetts by the government.

21          When we look at the place of conduct, the defendants

22  unfair and deceptive conduct occurred in Massachusetts.  The

23  whole part of the conspiracy starts where Mr. Clare makes a

24  recommendation to use AAI while he's a SETA contractor.  So

25  while he's supposed to be evaluating independently,

33

1    objectively, with no conflict of interest, technologies for the

2    government, he recommends AAI.

3         And then Hadron in its Massachusetts office in Boston

4    demonstrates the technology to AAI and to TEG.  That all

5    occurred in Massachusetts.

6         The defendants would suggest, oh, there was one

7    meeting.  It wasn't one meeting.  It was the very start of the

8    entire conspiracy that runs through the allegations of the

9    complaint.  It was where AAI learned of the ACES project.  It

10   was where TEG and AAI learned of the capabilities that Hadron

11   had.  It was where, we believe, the conspiracy was hatched.  It

12   was not simply one meeting that occurred in Massachusetts.

13        The defendants engaged in schemes to trade off of the

14   technologies that were developed in Massachusetts.  The

15   defendants reached out to Hadron, that was paragraph 39.

16        In paragraphs 41, 45, and 47, the defendants reached

17   out to Hadron, ostensibly to discuss contracting options on the

18   end of year funds and used Hadron's proposal.

19        I've already talked about the domicile of the

20   parties.  I think that there were two suggestions in that

21   regard.  Number one, that Hadron is a New Hampshire

22   corporation.  And that is true, but its principal place of

23   business is in Massachusetts.  And the second restatement says

24   that the principal place of business is the greater factor.

25        And the suggestion that Hadron was only operating two

1    weeks before the complaint was filed because -- what happened

2    is they filed a certificate of authorization to do business in

3    Massachusetts, that is true.  But the fact is, Hadron operated

4    continuously since 2012 in Massachusetts.  And that's really

5    the most important fact.

6           And then there is the place where the parties'

7    relationship is centered.  And we have alleged in the complaint

8    that the relationship was centered in Massachusetts because the

9    work was performed in Massachusetts, the scheme was hatched in

10   Massachusetts, the contracts were administered in

11   Massachusetts, and the data center which housed the product was

12   all in Massachusetts.

13          So we believe when the Court -- if the Court

14   determined to undertake an analysis under Massachusetts law --

15   number one, it's a fact intense analysis.  But if the Court

16   undertook that analysis from the complaint, accepting the

17   allegations as true, the Court would reach the unmistakable

18   conclusion that Massachusetts law applies.  And I think that is

19   important because that then goes to the other several causes of

20   action.

21          I will touch briefly on the viability of the 93A.

22   The defendants have suggested it's not a viable claim because

23   the conduct did not occur primarily and substantially in

24   Massachusetts.

25          And I think for the reasons that the Massachusetts

35

1    law applies, clearly we have enough in the complaint to allege

2    that the harm occurred in Massachusetts.  Hadron is located in

3    Massachusetts.

4              But what is very important about that is the statute

5    specifically says that for a defendant to raise that the

6    conduct was not primarily or substantially in Connecticut, it

7    is its burden of proof.  The statute itself is referring and

8    contemplating proof, not on the pleadings.  And as I have just

9    outlined for the Court, what we have in the pleadings is the

10   strong nexus to Massachusetts.

11             There was some reference to the Gulf Oil case and the

12   Corinthian Mortgage.  I think those are distinguishable.

13   Corinthian was the same, it's the same type issue.  There was a

14   choice of law provision in the contract.  The Court had to, as

15   a matter of law, analyze the choice of law provision.

16             But what is important in Corinthian is that the Court

17   said that the plaintiff alleged in its complaint that "a

18   substantial part of the events or omissions giving rise to

19   plaintiffs' claims occurred in Virginia."

20             So right there in the complaint, the plaintiff in

21   Corinthian said that the events occurred in Virginia.  What

22   they were trying to do was invoke 93A through a contractual

23   choice of law provision.  And that, I believe, was appropriate

24   to do as a matter of law.

25             That's not what we have here.  The Court would have

36

1    to make either findings of fact or accept that as true.

2            There was a suggestion that this is a case about a

3    disgruntled contractor, that Hadron is raising claims because

4    it wasn't awarded the contract.  And as I have explained,

5    Hadron was a SBIR contractor.  There were statutory rights.

6    They were the preferred vendor.  They were the sole -- they

7    could sell as a sole course to the government.  And the

8    allegation, this is not an action about a disgruntled

9    contractor that didn't get awarded --

10           THE COURT:  Was there any -- and I apologize if you

11   included this and I missed it.  Were there bid protests?  Was

12   there an interagency protest in this case?

13           MR. FINN:  No, Your Honor.  There were no bid

14   protests because there were no bids.  Under the SBIR program,

15   the government was entitled to identify early developers of

16   products and services that the government values.  And the

17   whole purpose of the SBIR program is to then provide funding to

18   those small businesses who then develop the technology with the

19   expectation that they are the preferred vendor and that they

20   are the sole source.

21           THE COURT:  Okay.  They are all sole source

22   contracts.  Okay, thank you.  Go ahead.

23           MR. FINN:  There was another reference I think to the

24   Gulf Oil.  When the Court examines that, that was a simply

25   conclusory fashion.  And we agree that the Court doesn't have

37

1    to accept a conclusory fashion that, you know, Massachusetts

2    law applies, but that's not what's in the complaint.  The

3    complaint is replete with information in connection to

4    Massachusetts to demonstrate that the Massachusetts law

5    applies.

6           We have, cited, Your Honor, in our briefs that at the

7    pleading stage the 93A claim survives where there is an

8    allegation that the harm and the injury occurred primarily and

9    substantially in Massachusetts.  We have cited the cases.

10          What is important about that is the majority of the

11   cases that we've cited were post the Kuwaiti Danish case.  And

12   that's not what we did here.  We did not -- there is not simply

13   a conclusory allegation that says that the harm occurred

14   primarily and substantially.

15          The plaintiffs went through great effort to detail

16   how it was that the harm was primarily and substantially -- and

17   the injury primarily and substantially occurred in

18   Massachusetts.

19          In addition, there were additional facts that we put

20   in the complaint about how AAI specifically met and

21   communicated with Hadron in Massachusetts.  That the defendants

22   deceptively caused Hadron to perform the work and the draft

23   statement of work in Massachusetts.  That the deception led to

24   the end-of-year contract that we discussed, the $3.2 million

25   that is referenced in the complaint for the government in

1    Massachusetts.

2              THE COURT:  Okay, I understand your 93A argument.

3              MR. FINN:  Okay.  Thank you, Your Honor.

4              THE COURT:  Do you think your defamation claim has

5    been sufficiently pled?

6              MR. FINN:  We do, Your Honor.  The defamation -- on

7    the defamation claim, Your Honor, the allegations in paragraph

8    96 of the complaint clearly establish the sufficient basis.

9              What's important about the defamation claim, Your

10   Honor, is that under Massachusetts law, we're not required to

11   plead the exact words.  Regardless, however, Your Honor, in

12   paragraph 96 of the complaint the plaintiffs do plead the exact

13   words, that there were false claims statements made to the

14   government about Mr. Dienes' security clearance and that it was

15   revoked.

16             And so, the defenses that are asserted to the

17   defamation claim are, number one, the statute of limitations.

18   And that would require the Court to engage in fact finding with

19   respect to the defamation claim.

20             THE COURT:  Isn't it your duty to first identify the

21   when, where, what, how, at least to the extent you can?  You

22   haven't identified the TEG defendants.  Is there one?  Is there

23   more than one?  Who the government officials are.  Is there

24   one?  Is there more?  When did it occur?

25             I mean, it's a notice pleading requirement, but where

39

1    is the notice?

2           MR. FINN:  Your Honor, under Massachusetts law, there

3    is not a requirement that the exact words be pled.

4           So before we determine whether the defamation claim

5    is properly pled, the Court has to determine the choice of law.

6           But regardless, in paragraph 96 of the complaint the

7    plaintiffs write that the TEG defendants further defamed and

8    disparaged --

9           THE COURT:  Yeah, I have it here, I am looking at it.

10          MR. FINN:  Okay.  And with respect to the statute of

11   limitations, in paragraphs 94, 95, and 96, when the Court reads

12   those in their totality, that the defamation occurred sometime

13   after the November 2016 meeting.

14          And so, based upon those allegations, the claim would

15   not be time barred because the statute of limitations would be

16   a procedural matter governed by the law of the forum state.

17   And the case was transferred from Massachusetts under 28 U.S.

18   1404(a).

19          So it's the Massachusetts three-year statute of

20   limitations that applies.  And we have cited the case --

21          THE COURT:  Is that four years or three years?

22          MR. FINN:  It is a three-year statute of limitations

23   under Massachusetts since the case initiated in Massachusetts

24   and was transferred.

25          And then one other point.  The Court, when the Court

40

1    made the decision to transfer, the Court made no findings.  The

2    Court never said that the Court has no jurisdiction over AAI, I

3    think as was suggested.  The Court never made any findings

4    whatsoever.  It just simply transferred the matter to the

5    Eastern District.  So there were no findings about

6    jurisdiction.

7           THE COURT:  Just the convenience of the parties

8    argument?

9           MR. FINN:  There were a number of arguments that were

10   made, but we don't know why it was that the Court made its

11   decision.

12          THE COURT:  It just wanted to give us all a present,

13   I guess; is that right?

14          MR. FINN:  Your Honor, I'm prepared to discuss any of

15   the issues with the Lanham Act if the Court would like, but I

16   don't want to make the arguments if the Court thinks that they

17   have been properly framed.

18          THE COURT:  Yeah, I understand the Lanham Act counts.

19   You don't need to discuss those unless you want to highlight

20   something for me.  But I don't need any further comments on

21   that.

22          MR. FINN:  I think the only thing that I would like

23   to be able to highlight for the benefit of the Court is the

24   reliance on the Kratos case.

25          THE COURT:  It did come in as a 12(b)(6) case.  I

41

1    guess it was never --

2         MR. FINN:  Yes, I think the distinction in the Kratos

3    case, Your Honor, is the Court found that there were no

4    specialized allegations in the complaint about a unique or

5    specialized nature that suggested that the purchasing public

6    for the specialized work was exclusively DCMA.  And why it's

7    inapplicable to the complaint here, as I have already gone

8    through the SBIR rights and the SBIR process, there was, and we

9    have carefully alleged that there was a very unique and

10   specialized --

11        THE COURT:  What is --

12        MR. FINN:  -- small size of the market.

13        THE COURT:  What is the market?  Is it just A2I for

14   the Air Force?  Evidently were other government agencies going

15   through the office in Rosslyn that were looking at the screens.

16   And so, what is the market?

17        MR. FINN:  The market itself is -- it's the Air

18   Force, the -- in the complaint in paragraphs 69 to 76, 56, 58

19   to 59, there were misrepresentations made to the A2I office.

20   There were demonstrations made to Department of Defense

21   personnel.  There were misrepresentations made in the statement

22   of work.

23        And so, the market, while it is a small size and

24   narrow, it is not just specifically A2I.  It was any government

25   agency in government that would have believed it could benefit

42

1    from the ACES technology.

2            THE COURT:  Okay.

3            MR. FINN:  Thank you, Your Honor.

4            THE COURT:  All right.  Thank you, Mr. Finn.

5            All right, brief replies.

6            MR. MACHADO:  Thank you, Your Honor.  Les Machado

7    again very briefly.

8            I think Your Honor asked a couple of very helpful

9    questions.  You asked -- you know, specifically observed that

10   in the complaint, accurately observed that in the complaint lot

11   of the conduct is alleged to have occurred in Virginia.  And I

12   have listened very carefully to counsel's response about the

13   primarily and substantially prong requirement under the

14   Massachusetts 93A statute to hear what he was going to say

15   about what was the conduct that occurred in Massachusetts.  And

16   what he said was, we have alleged the harm occurred in

17   Massachusetts.  Hadron was located in Massachusetts.

18           I acknowledge that.  That's not enough.  As Your

19   Honor has observed, the complaint alleges a lot of the conduct

20   occurred in Virginia.  That's their pleading that they have put

21   before the Court.

22           And when you look specifically at the 93A count and

23   look specifically at the deceptive conduct that underlies that

24   count, as pled in the complaint, and then look at where that

25   occurred, it didn't occur in Massachusetts.

43

1          Finally, counsel said that in the <u>Corinthian</u> case,

2    what happened there was that plaintiff had effectively alleged

3    that the conduct occurred in Massachusetts.  Excuse me,

4    occurred in Virginia.

5          THE COURT:  Right.

6          MR. MACHADO:  That's effectively what they have

7    alleged here.  They may not have done it sort of by saying that

8    the conduct occurred in Virginia, but if you look at where they

9    alleged it occurred, they have effectively alleged it occurred

10   here.

11          And finally, I am not a government contracts guy, I

12   don't know the way the government contracts world works.  All I

13   know is Your Honor's question was the right one.  Which was, if

14   in fact they are so imbedded with this government and if in

15   fact the government was only going to work with them, then it

16   sounds like their disagreement is with the government.

17          But what I know is that the government put this

18   contract out for bid.  And AAI won the contract fairly and

19   squarely.

20          And then the final thing I will say is, in the RFP

21   responses that we have put before the Court, that the Court can

22   consider, it shows no misrepresentations of the type alleged in

23   the complaint.

24          Thank you, Your Honor.

25          THE COURT:  All right.  Thank you, Mr. Machado.

44

1          Mr. Kelley.

2          MR. KELLEY:  Your Honor, I will simply state that

3   with regard to the defamation claim, and it's covered in our

4   reply brief, that we disagree with the plaintiffs' contentions

5   about how well they have pled it.

6          And more importantly, about the interpretation of

7   which statute of limitations applies, and that's in our brief.

8          Thank you, Your Honor.

9          THE COURT:  All right, thank you.

10          All right.  Well, thank you for the argument today

11   and the briefing.  As I said, I hope to catch up with you in

12   looking at it soon.

13          I will get you out a decision as soon as I can and we

14   will go from there.  And I appreciate you coming in this

15   morning and providing me with the further argument.

16          Have a good weekend.  And we're in recess.

17   ------------------------------------------------
                        HEARING CONCLUDED
18

19

20

21          I certify that the foregoing is a true and

22      accurate transcription of my stenographic notes.

23

24
                        /s/  Norman B. Linnell
25                 _____
                   Norman B. Linnell, RPR, CM, VCE, FCRR