**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

HADRON INDUSTRIES, INC., *et al.*,    :
:
     Plaintiffs,    :
:
v.    :
:    Case Number 1:19-cv-00035-LO-MSN
TRIANGLE EXPERIENCE    :
GROUP, INC., *et al.*,    :
:
     Defendants.    :

**DECLARATION OF ROBERT E. CLARE, JR.**
**IN SUPPORT OF MEMORANDA OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I, Robert E. Clare, Jr., do hereby declare pursuant to 28 U.S.C. § 1746 the following:

1.    I, Robert E. Clare, Jr., am over the age of eighteen (18) and am competent to testify to the matters set forth in this declaration. The statements contained in this declaration are from my own personal knowledge. I submit this declaration in support of the Memorandum of Points and Authorities in Support of the Motion for Summary Judgment.

2.    I reside in Ashland, Virginia.

3.    I retired from the United States Army in 2009 as a Sergeant First Class.  During my career I served in Army Special Operations.

4.    Mr. Klee Dienes is a plaintiff in the above captioned matter. Mr. Dienes lives in New Hampshire.

5.    Mr. Dienes is the president and sole owner of Hadron Industries, Inc. ("Hadron"). Hadron is another plaintiff in the above captioned matter.

6.    I am a defendant in the above captioned lawsuit in my individual capacity.

7.      I am a 51% owner in Triangle Experience Group, Inc. ("TEG"), a co-defendant in the above captioned matter.

8.      My wife, Janna Clare, owns 9% of TEG.

9.      Sean McCluskey, a defendant in the above captioned matter, owns the remaining 40% of TEG.

10.      This lawsuit revolves around a government program sponsored by the United States Air Force known as "ACES" or Advanced Collaborative Enterprise Services.  ACES originated, and has always been run and operated, out of the Air Force offices in the Pentagon, in Arlington, Virginia.

11.      ACES is a government program that aimed to bring together a variety of computer programs to help military personnel share information with each other, in real time, to solve battlefield problems.  ACES was designed to aid the warfighter.

12.      ACES has gone through several "generations."

13.      By 2013, a company called Oblong Technologies ("Oblong") had developed, and was selling, a product known as "Mezzanine."  The third "generation" of ACES was powered by Mezzanine.

14.      Toward the end of 2013, Oblong was positioned as lead ACES integrator, however, to my understanding, Oblong was not interested in provided customized solutions to military users and Oblong's business model was to move forward with selling off the shelf conference center technology to commercial enterprises.

15.      Around the same time, the United States Air Force wanted to eliminate its dependence on Oblong's Mezzanine technology.  This concept was discussed with Mr. Dienes,

Colonel James Mattey – the program manager of ACES at the time - and myself in the e-mails attached hereto as **Exhibit A**.

16.     To that effect, an ACES meeting was scheduled to occur in Rosslyn, Virginia at the end of January 2014.  Hadron and Mr. Dienes were invited to attend this meeting.

17.     To my understanding, Hadron developed a technology system known as "Photon," which was designed to interoperate with Mezzanine and build upon it. *See* Ex. A.

18.     By the end of January 2014, Colonel Mattey was excited about the prospect of working with Hadron, and sought to bring Hadron on to the ACES team. *See* E-mail attached hereto as **Exhibit B**.

19.     In February 2014, Colonel Mattey decided to take the ACES team, including me and Walter Greenberg of ALQIMI Analytics, Inc. ("AAI"), to meet John Underkoffler of Oblong.  *See* E-mail attached hereto as **Exhibit C**.

20.     The agenda for the February 2014 meeting was memorialized in an e-mail that I sent to Colonel Mattey.  *See* E-mail attached hereto as **Exhibit D**.

21.     The February 2014 meeting was to occur at Oblong's offices in Boston, Massachusetts.  I invited Mr. Dienes to attend. *See* E-mail attached hereto as **Exhibit E**.

22.     Shortly after the February 2014 meeting, Colonel Mattey was transferred off of the ACES program (though he remained interested and involved), and was replaced by Colonel Robert Herslow.

23.     Around the time of this transition, two separate contracts were considered: (i) the first contract awarded was to fund AAI's delivery of an ACES system to a lab in Arlington, Virginia known colloquially as the Rosslyn Lab; and (ii) a second contract was awarded to fund ACES customization and support of an Office of Secretary of Defense project named C2IE.

24.     The Air Force sole sourced the second contract to Hadron, under a contract known as the "Phase III SBIR." Hadron engaged subcontractors on the Phase III SBIR, including TEG. There is no written subcontract between TEG and Hadron for this work under the Phase III SBIR.

25.     It is my understanding that the second contract was intended to demonstrate ACES capabilities to government users and create ACES Operating Environment, or ACES-OE. The second contract was called the Eagle X-3 Task Order.

26.     Hadron assisted in preparing the statement of work for the Eagle X-3 Task Order. Other persons, such as Mr. Greenberg, also assisted in drafting the statement of work.

27.     Contrary to the allegations in the Amended Complaint, neither I, nor anyone on behalf of TEG provided Hadron's draft statement of work to any third-party.

28.     I was, however, copied on e-mails in which Air Force personnel or contractors provided Hadron's draft statement of work to Mr. Greenberg of AAI.  *See* E-mails attached hereto as **Exhibit F**.

29.     The draft statement of work ostensibly sought demonstrations of ACES powered by Photon, the Air Force intended the contract to demonstrate all types of ACES related technology.

30.     It was originally my understanding that AAI intended to subcontract some of the work under the Eagle X-3 Task Order to TEG and Hadron, this never occurred. Contrary to the allegations in the Amended Complaint, neither I, nor Mr. McCluskey, nor TEG had anything to do with AAI's decision to not subcontract any work to Hadron.

31.     It is my understanding that after receiving the proposal from AAI (through ParGov) in response to the statement of work on the Eagle X-3 Task Order, the Air Force

prepared a Technical Evaluation. Neither I, nor Mr. McCluskey, nor TEG were involved in the Technical Evaluation or its drafting.

32.     The Air Force ultimately awarded the Eagle X-3 Task Order to ParGov, who subcontracted the award to AAI.  AAI subcontracted some of the work to TEG.  The subcontract is attached hereto as **Exhibit G**.

33.     During this time period, TEG was a subcontractor on both the Phase III SBIR for Hadron and the Eagle X-3 Task Order for AAI.  Under TEG's subcontract with AAI, TEG was required to assist Hadron for research and development under the Phase III SBIR. Thus, TEG's monthly reports stated its efforts for both AAI and Hadron.  Before reporting TEG's efforts, I informed Colonel Herslow of this practice, and he was aware.

34.     Under the Eagle X-3 Task Order, the Air Force allocated funds for the creation of a marketing video to demonstrate ACES capabilities.

35.     AAI, TEG and Hadron engaged Janus Research Group ("Janus") to create a marketing video of ACES.

36.     AAI, TEG and Hadron collaborated with Janus to create the marketing video. After the initial funds were depleted, TEG funded the final portions of the shoot and production and was sent to Janus for final edits and completion.

37.     The video, which necessarily includes collaboration, contributions, and ideas from TEG, Hadron and AAI, was subsequently loaded into TEG's Vimeo account in order to be shared electronically at TEG's convenience.

38.     To my knowledge, the Air Force was satisfied with AAI's work on the Eagle X-3 Task Order and paid out all funds under the contract. TEG was also paid for its work.

39.     From September 2014 through December 2014, Hadron worked alongside AAI and TEG in the Rosslyn Lab at the same time. All three parties operated very closely together.

40.     In the Rosslyn Lab, there were two different spaces. One was for AAI, TEG, Hadron (funded by the Phase III SBIR) and others to showcase ACES to the government.  The other was for Hadron and TEG to demonstrate and develop ACES to the government. In the lab with AAI, TEG and Hadron, ACES was powered by both Photon and Mezzanine.  The TEG/Hadron lab initially was ACES powered by Mezzanine, but then overlapped with ACES powered by Photon.

41.     AAI, Hadron, and TEG acted in concert in performing demonstrations and marketing ACES capabilities.  Hadron's staff was necessarily involved in the marketing and demonstration of Photon, because only Hadron knew how to prepare Photon for demonstrations.

42.     The demonstrations became a jumping off point for other ACES related contracts in which TEG and Hadron worked together.

43.     Around fall 2014, TEG and Hadron discussed entering into a formal business relationship, however, the relationship was never memorialized or assented to, and instead, the parties worked essentially on a case by case basis.  A list of ACES related contracts that TEG and Hadron worked on together are: (1) Phase III SBIR, dated July 31, 2014, (2) ACES-TS contract, dated September 30, 2014, (3) ParGov ACES NRO Contract, dated August 1, 2015, (4) MOD/P001, dated September 30, 2015, (5) UNO Contract, dated May 5, 2015, (6) ParGov ACES-OE, dated October 1, 2015, and (7) UNO-EC&P Contract, dated January 25, 2016.[1]

---

[1] TEG asked Hadron to be involved in a SAIC Contract, dated July 16, 2016, and indeed, Mr. Dienes, as well as Mr. Tanner and Mr. Burton of Hadron executed the required NDA agreement to work on the SAIC Contract.

44.     TEG and Hadron each submitted proposals for an ACES contract from the Army Corps of Engineers in September 2016, however, that award was subsequently cancelled. Both TEG's and Hadron's proposal to the Army Corps of Engineers identified the other as a partner.

45.     At some point in time, I learned that Mr. Dienes was arrested for something related to the work at the Rosslyn Lab. Neither I nor anyone else at TEG had any involvement in his arrest.

46.     Subsequent to Mr. Dienes' arrest, TEG tried to contact Mr. Dienes to understand the situation, but he was unresponsive.  For reasons that I cannot recall, TEG believed that Mr. Dienes' security clearance was suspended. Mr. Dienes was complacent in this characterization regarding his clearance and did not elaborate or explain otherwise. *See* E-mails attached hereto as **Exhibit H** ("Klee's clearance is still being reviewed, and hasn't been reinstated as of this morning"). Mr. Dienes did not respond to this e-mail.

47.     In November 2016 I travelled to Logan Airport in Boston, Massachusetts to see if I could locate Mr. Dienes, as Mr. Dienes and Hadron were months behind on their work.

48.     When I met Mr. Dienes on November 16, 2016, Mr. Dienes handed me a letter in which Hadron disassociated with TEG.

49.     After receiving the letter on November 16, 2016, TEG stopped using Photon and hired another software provider – Prysm – to power the ACES system with a product called Synthesis.  At the same time, TEG contracted with Oblong, to replace Photon with another Oblong technology, but TEG could not agree on a price with Oblong.

50.     Hadron or Mr. Dienes have never inquired with TEG, Mr. Clare, or Mr. McCluskey as to recovery or retrieval of equipment allegedly owned by Hadron in TEG's possession or control.

51.     Contrary to the allegations in the Amended Complaint, TEG did not work with Prysm to "reverse engineer" Photon.

52.     The contents of Hadron's letter on November 16, 2016 raised concerns about Hadron's potential use of Oblong's technology in Photon, and I reported to Colonel Herslow about this possibility.  *See* E-mail attached as **Exhibit I**.

53.     The search revealed that nine different Oblong libraries were present in the ACES system located in the Rosslyn TEG/Hadron Lab, as well as documentation that those same libraries may have been included in the system delivered to NRO. TEG reported this information to Oblong. As far as TEG is aware, this matter between Oblong and Hadron remains unresolved.

54.     A Cross domain solution is the ability to take data from one network and pass it to another network. A cross domain solution is one type of a controlled interface solution.

55.     In September 2016, TEG was awarded a contract with a potential value of approximately $49 million to supply a controlled interface/cross domain solution.

56.     In its communications with the government to obtain this award, TEG represented that it had experience with cross domain solutions at 62 classified facilities.  TEG's Chief Engineer was John Weed. The Lazarus and Phoenix products were named by Weed as a reference to the resurrection of his career. While John Weed was not employed at TEG when he deployed the solution at these facilities, he was working for TEG during the period that TEG made these statements.

57.     In order to justify making the award to TEG, the United States government prepared a "Justification and Approval" for the decision (the "J&A").  The J&A contains some information regarding the deployment of Lazarus Cross Domain Solution in connection with ACES that needed to be addressed.  TEG promptly supplied the necessary information to

Colonel Herslow to ensure that proper action was taken before the United States Government issued the J&A.  *See* **Exhibit J**.

58.      Hadron did not submit a proposal for the cross-domain solutions contract, nor did it protest the award.  Indeed, Hadron is not involved in cross domain solutions.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated January 31, 2020

Robert E. Clare, Jr.

6/24/2018                                    Triangle Experience Group Mail - ACES -- Food for thought...can you help?

 **TEG**

Robert Clare <rclare@triangleexperience.com>

## ACES -- Food for thought...can you help?
4 messages

**Robert Clare** <rclare@triangleexperience.com>                     Tue, Sep 23, 2014 at 10:29 AM
To: "Mattey, James J (Jim) LTCOL USAF AF-A2 (US)" <james.j.mattey.mil@mail.mil>
Cc: Klee Dienes <klee.dienes@hadronindustries.com>

Sir,

As you know based on our conversation today.  The discussion in the  A2I
office yesterday and today is a bit discouraging.  With that, here are some dat points for you to review.  These point are
some what focused on OSD SCO but have a similar impact to your organization in that, ACES is a capability in which any
organization could leverage -- albeit, for different reasons but the end-state is still in the core of advanced Collaboration.

BRIEF DESCRIPTION:

Funding this requirement for AF/A2I funds the deployment of the Advanced Collaboration Enterprise Service (ACES) to
multiple mission areas across the DoD and IC, and the development of additional Government-owned services for those
mission areas.  A core ACES deployment enables organizations to collaborate across rooms, organizations, and
individual workstations without need for expensive data-level integration efforts. The ACES technology is already proven
through demonstrations to key leaders held in late September.  This funding will support deployment to already-identified
mission partners (such as OSD SCO and PACOM) as well as the development of additional mission-specific functionality
to build upon the initial ACES platform.

IMPACT IF NOT FUNDED:

Lack of funding will eliminate the ability of the AF/A2I office to deliver the ACES service—already proven in multiple
evaluations by key leaders—to existing DoD and IC mission partners. The Government need for deployment support for
ACES is articulated through solicitation W912DY-14-G-1086, already published via FedBizOpps.  If additional funds are
not made available to the ACES portfolio, mission failure may occur of PACOM's Command and Control of the Information
Environment.

Hadron was engaged in order to eliminate dependencies on Oblong's proprietary technology.
ACES is built entirely upon commercially-available, GOTS, and OSS components, with multiple competitive vendors for all
key components.  There are no ongoing license requirements for any deployable component of ACES.

Additional funding is required to ensure the minimum viable ACES product — already developed at Government expense
and successfully demonstrated to Government key leaders — is fielded and deployable to existing customers across the
DoD and IC.

 The SBIR program was designed to create competitive vendors in product spaces for the government.

This is a text book case of a SBIR program success.

ACES relied on the SBIR process to in order to create Government-owned alternatives for key components, and ensure
the existence of multiple competitive vendors for every key component of the solution.

ACES has never relied on a single vendor's product.

--
Rob Clare
Team ACES--Multi-Int Fusion & Visualization
O: 703-693-1751
C: 910-489-9520
DSN: 223-1751
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
robert.e.clare.ctr@mail.mil
www.triangleexperience.com



6/24/2018                                    Triangle Experience Group Mail - ACES -- Food for thought...can you help?

**Robert Clare** <rclare@triangleexperience.com>                                    Tue, Sep 23, 2014 at 10:32 AM
To: Gordy Dexter <gordylori@bigplanet.com>

FYSA
[Quoted text hidden]

**Mattey, James J (Jim) LTCOL USAF JS J6 (US)** <james.j.mattey.mil@mail.mil>      Tue, Sep 23, 2014 at 10:57 AM
To: Robert Clare <rclare@triangleexperience.com>
Cc: Klee Dienes <klee.dienes@hadronindustries.com>

CLASSIFICATION: UNCLASSIFIED

Thanks Rob,

Are we still on for 1300 or is this OBE?  I'm supposed to chat w/ Herslow and prob Gordy this about 1230.

Here's some questions I had before I heard the news.

1) relationships between Oblong and TEG and Hadron (now that Sean is TEG)
2) what do we call ACES 1.0, 2.0  1.0 = G-speak only, 2.0 Photon/Praxis?
3) messaging for NLCC/NMCC is different than A2I.  We didn't do so well during last week's demo.  We departed from original messaging.
4) SLUCE or next . . . a major selling factor was the capability SLUCE presented.  What wasn't clear was the depth of the support required to make it work.  SLUCE is a non-starter if it requires a full time engineer behind the scenes.  I wasn't told that upfront from anyone.  There were comments eluding to it no "hey dude, SLUCE needs an engineer".
5) Mobile Mezz, is that still on the table?  Timeline?  What Block?
6) Will Block two have the same capability to do VTC etc as G speak?  We need to have informal and formal simultaneous collaboration, persistent and non-persistent.
7) Formalized ROM for training and support once installed.

This is a good start for now.

-----Original Message-----
From: Robert Clare [mailto:rclare@triangleexperience.com]
Sent: Tuesday, September 23, 2014 10:30 AM
To: Mattey, James J (Jim) LTCOL USAF JS J6 (US)
Cc: Klee Dienes
Subject: ACES -- Food for thought...can you help?



Sir,

As you know based on our conversation today. The discussion in the  A2I office yesterday and today is a bit discouraging. With that, here are some dat points for you to review. These point are some what focused on OSD SCO but have a similar impact to your organization in that, ACES is a capability in which any organization could leverage -- albeit, for different reasons but the end-state is still in the core of advanced Collaboration.

BRIEF DESCRIPTION:

Funding this requirement for AF/A2I funds the deployment of the Advanced Collaboration Enterprise Service (ACES) to multiple mission areas across the DoD and IC, and the development of additional Government-owned services for those mission areas.  A core ACES deployment enables organizations to collaborate across rooms, organizations, and individual workstations without need for expensive data-level integration efforts. The ACES technology is already proven through demonstrations to key leaders held in late September. This funding will support deployment to already-identified mission partners (such as OSD SCO and PACOM) as well as the development of additional mission-specific functionality to build upon the initial ACES platform.

IMPACT IF NOT FUNDED:

6/24/2018                                   Triangle Experience Group Mail - ACES -- Food for thought...can you help?

Lack of funding will eliminate the ability of the AF/A2I office to deliver the ACES service—already proven in multiple evaluations by key leaders—to existing DoD and IC mission partners. The Government need for deployment support for ACES is articulated through solicitation W912DY-14-G-1086, already published via FedBizOpps. If additional funds are not made available to the ACES portfolio, mission failure may occur of PACOM's Command and Control of the Information Environment.

Hadron was engaged in order to eliminate dependencies on Oblong's proprietary technology.

ACES is built entirely upon commercially-available, GOTS, and OSS components, with multiple competitive vendors for all key components. There are no ongoing license requirements for any deployable component of ACES.

Additional funding is required to ensure the minimum viable ACES product --- already developed at Government expense and successfully demonstrated to Government key leaders --- is fielded and deployable to existing customers across the DoD and IC.

The SBIR program was designed to create competitive vendors in product spaces for the government.

This is a text book case of a SBIR program success.

ACES relied on the SBIR process to in order to create Government-owned alternatives for key components, and ensure the existence of multiple competitive vendors for every key component of the solution.

ACES has never relied on a single vendor's product.
~

Rob Clare
Team ACES--Multi-Int Fusion & Visualization
O: 703-693-1751
C: 910-489-9520
DSN: 223-1751

1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
robert.e.clare.ctr@mail.mil <mailto:robert.clare.ctr@pentagon.af.mil>
www.triangleexperience.com <http://www.triangleexperience.com>

CLASSIFICATION: UNCLASSIFIED

    🗋 smime.p7s
       6K

**Klee Dienes** <klee.dienes@hadronindustries.com>                    Tue, Sep 23, 2014 at 9:31 PM
To: "Mattey, James J (Jim) LTCOL USAF JS J6 (US)" <james.j.mattey.mil@mail.mil>, Robert Clare
<rclare@triangleexperience.com>, "Herslow, Robert D LTCOL USAF AF-A2 (US)" <robert.d.herslow.mil@mail.mil>, Sean
McCluskey <sean@triangleexperience.com>

Sir,

1) The relationship between Hadron, TEG, and Oblong is rock-solid. Hadron and TEG plan to approach this entire space as a team. I don't see either of us doing anything in this space that doesn't involve the other. Hadron and Oblong are similarly getting along well. Especially now that ACES is a viable product, and Hadron has validated the business model of developing ACES environments with Mezzanine as an important component, Oblong is seeing the value in the relationship.

2) I think the messaging of "Block 2" you used later in your list was a good one. ACES is a platform for continuous improvement. There's no need for a "version 2.0" ... this is just the next iteration and continuing realization of your original vision.

3) You are absolutely right. I think we got so used to people criticizing Mezzanine in the A2 office for being single-vendor and fixed-workflow, that we swung way too far in the other direction. The right answer is a good mix of the Mezzanine workflow with the ability of ACES to feed it with quality data from a large workspace. I'm confident we have learned from

our experience and know how to show that properly to NMCC.

4) As you intended, the ACES portfolio is a Research and Development portfolio. My understanding of the ACES "sandbox" was that it was intended to bring in external applications and evaluate them to see if they were a good fit for the ACES basic load. I know that when Sluice was spun off from Oblong, it was not in a state to be used as a general-purpose analysts' tool. Our hope was that by bringing Sluice into ACES, they would have fixed the gaps in their swing and give us a good solution moving forward.

5) Yes. I believe the ball is in A2's court to get NPS to prepare the system for pickup. We have provided shipping information and accounts so there will be no expense to the Government for shipping the system. We are able to arrange for Hadron/TEG personnel to go to NPS directly for pickup if necessary. Once Hadron receives it from NPS we can refresh it and turn it around to NMCC within 30 days.

6) Yes; absolutely. Our platform is designed to build upon and interoperate with Mezzanine (and other collaboration technologies) as an important (but not essential) component. We may bring in additional capabilities and technologies (such as Mersive or Secureview), but any changes we make to the Mezzanine basic load will always be steps forward.

7) Yes; absolutely. That's just one of many reasons we see ourselves as inseparable from TEG in this space. I'll work with Rob to come up with some defined packages.

Thanks for your support today. We are still due a whiteboard session with you. Are you available Thursday AM? Bob Giesler will be here at 1230 if you would like to attend.
[Quoted text hidden]

**Date:**    09/23/2014 21:31:21 -0400
**From:**    Klee Dienes <klee.dienes@hadronindustries.com>
**To:**    Robert Clare <rclare@triangleexperience.com>
**Subject:** Re: ACES -- Food for thought...can you help?

1) The relationship between Hadron, TEG, and Oblong is rock-solid. Hadron and TEG plan to approach this entire space as a team. I don't see either of us doing anything in this space that doesn't involve the other. Hadron and Oblong are similarly getting along well. Especially now that ACES is a viable product, and Hadron has validated the business model of developing ACES environments with Mezzanine as an important component, Oblong is seeing the value in the relationship.

2) I think the messaging of "Block 2" you used later in your list was a good one. ACES is a platform for continuous improvement. There's no need for a "version 2.0" ... this is just the next iteration and continuing realization of your original vision.

3) You are absolutely right. I think we got so used to people criticizing Mezzanine in the A2 office for being single-vendor and fixed-workflow, that we swung way too far in the other direction. The right answer is a good mix of the Mezzanine workflow with the ability of ACES to feed it with quality data from a large workspace. I'm confident we have learned from our experience and know how to show that properly to NMCC.

4) As you intended, the ACES portfolio is a Research and Development portfolio. My understanding of the ACES "sandbox" was that it was intended to bring in external applications and evaluate them to see if they were a good fit for the ACES basic load. I know that when Sluice was spun off from Oblong, it was not in a state to be used as a general-purpose analysts' tool. Our hope was that by bringing Sluice into ACES, they would have fixed the gaps in their swing and give us a good solution moving forward.

5) Yes. I believe the ball is in A2's court to get NPS to prepare the system for pickup. We have provided shipping information and accounts so there will be no expense to the Government for shipping the system. We are able to arrange for Hadron/TEG personnel to go to NPS directly for pickup if necessary. Once Hadron receives it from NPS we can refresh it and turn it around to NMCC within 30 days.

6) Yes; absolutely. Our platform is designed to build upon and interoperate with Mezzanine (and other collaboration technologies) as an important (but not essential) component. We may bring in additional capabilities and technologies (such as Mersive or Secureview), but any changes we make to the Mezzanine basic load will always be steps forward.

7) Yes; absolutely. That's just one of many reasons we see ourselves as inseparable from TEG in this space. I'll work with Rob to come up with some defined packages.

On 09/23/2014 10:57 AM, Mattey, James J (Jim) LTCOL USAF JS J6 (US) wrote:



    CLASSIFICATION: UNCLASSIFIED

    Thanks Rob,

    Are we still on for 1300 or is this OBE?  I'm supposed to chat w/ Herslow and
    prob Gordy this about 1230.

    Here's some questions I had before I heard the news,

1) relationships between Oblong and TEG and Hadron (now that Sean is TEG)
2) what do we call ACES 1.0, 2.0  1.0 = G-speak only, 2.0 Photon/Praxis?
3) messaging for NLCC/NMCC is different than A2I.  We didn't do so well during
last week's demo.  We departed from original messaging.
4) SLUCE or next . . . a major selling factor was the capability SLUCE
presented.  What wasn't clear was the depth of the support required to make it
work.  SLUCE is a non-starter if it requires a full time engineer behind the
scenes.  I wasn't told that upfront from anyone.  There were comments eluding to
it no "hey dude, SLUCE needs an engineer".
5) Mobile Mezz, is that still on the table?  Timeline?  What Block?
6) Will Block two have the same capability to do VTC etc as G speak?  We need to
have informal and formal simultaneous collaboration, persistent and non-
persistent.
7) Formalized ROM for training and support once installed.

This is a good start for now.

-----Original Message-----
From: Robert Clare [mailto:rclare@triangleexperience.com]
Sent: Tuesday, September 23, 2014 10:30 AM
To: Mattey, James J (Jim) LTCOL USAF JS J6 (US)
Cc: Klee Dienes
Subject: ACES -- Food for thought...can you help?

Sir,

As you know based on our conversation today.  The discussion in the  A2I office
yesterday and today is a bit discouraging.  With that, here are some dat points
for you to review.  These point are some what focused on OSD SCO but have a
similar impact to your organization in that, ACES is a capability in which any
organization could leverage -- albeit, for different reasons but the end-state
is still in the core of advanced Collaboration.

BRIEF DESCRIPTION:

Funding this requirement for AF/A2I funds the deployment of the Advanced
Collaboration Enterprise Service (ACES) to multiple mission areas across the DoD
and IC, and the development of additional Government-owned services for those
mission areas.  A core ACES deployment enables organizations to collaborate
across rooms, organizations, and individual workstations without need for
expensive data-level integration efforts.  The ACES technology is already proven
through demonstrations to key leaders held in late September.  This funding will
support deployment to already-identified mission partners (such as OSD SCO and
PACOM) as well as the development of additional mission-specific functionality
to build upon the initial ACES platform.

IMPACT IF NOT FUNDED:

Lack of funding will eliminate the ability of the AF/A2I office to deliver the
ACES service—already proven in multiple evaluations by key leaders—to existing
DoD and IC mission partners.  The Government need for deployment support for
ACES is articulated through solicitation W912DY-14-G-1086, already published via
FedBizOpps.  If additional funds are not made available to the ACES portfolio,
mission failure may occur of PACOM's Command and Control of the Information
Environment.

Hadron was engaged in order to eliminate dependencies on Oblong's proprietary

HADRON000003479

technology.

ACES is built entirely upon commercially-available, GOTS, and OSS components, with multiple competitive vendors for all key components.  There are no ongoing license requirements for any deployable component of ACES.


Additional funding is required to ensure the minimum viable ACES product --- already developed at Government expense and successfully demonstrated to Government key leaders --- is fielded and deployable to existing customers across the DoD and IC.

 The SBIR program was designed to create competitive vendors in product spaces for the government.

This is a text book case of a SBIR program success.

ACES relied on the SBIR process to in order to create Government-owned alternatives for key components, and ensure the existence of multiple competitive vendors for every key component of the solution.

ACES has never relied on a single vendor's product.

HADRON000003480

**Message**

| | |
|---|---|
| **From:** | Robert Clare [rclare@triangleexperience.com] |
| **on behalf of** | Robert Clare <rclare@triangleexperience.com> [rclare@triangleexperience.com] |
| **Sent:** | 1/21/2014 9:57:09 PM |
| **To:** | Jim Gmail [Jim Gmail <jjmattey@gmail.com>] |
| **Subject:** | Re: Hadron |

yeah, its good!  Its amazing to be talking with these guys about it. They have no clue on how close they are to getting it!

On Tue, Jan 21, 2014 at 9:43 PM, Jim Gmail <jjmattey@gmail.com> wrote:
This is awesome.  I'm not gonna be able to sleep tonight . Y mind will be noodling on this for awhile.

It's as of Klee has been in on our team for a while .

Sent via Jim's iPhone

On Jan 21, 2014, at 20:47, Robert Clare <rclare@triangleexperience.com> wrote:

This is between u and I...Obvious reasons, no one can see this

On Tue, Jan 21, 2014 at 7:45 PM, Robert Clare <rclare@triangleexperience.com> wrote:

On Tue, Jan 21, 2014 at 5:39 PM, Jim Mattey <jjmattey@gmail.com> wrote:
I just modified the first paragraph a little.

I'm writing this letter to express our support for you innovation efforts across the Department of Defense's scientific research areas.  Our Advanced Collaboration Enterprise Services (ACES) team is looking forward to leveraging the work you've done and we're energized with respect to further developments as we continue ACES development and look to build a synergistic, mutually beneficial relationship between A2II and Hadron.



On Jan 21, 2014, at 17:28 PM, Robert Clare <rclare@triangleexperience.com> wrote:

📄 **Letter to Hadron.docx**

Its in Google drive so lets collaborate

TEG DEFS 001104338

--
Rob Clare
AF/A2II Multi-Int Fusion & Visualization
O: 703-693-1751
C: 910-489-9520
DSN: 223-1751
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
robert.e.clare.ctr@mail.mil

--
Rob Clare
AF/A2II Multi-Int Fusion & Visualization
O: 703-693-1751
C: 910-489-9520
DSN: 223-1751
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
robert.e.clare.ctr@mail.mil

--
Rob Clare
AF/A2II Multi-Int Fusion & Visualization
O: 703-693-1751
C: 910-489-9520
DSN: 223-1751
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
robert.e.clare.ctr@mail.mil

<AF141-032TechVolume_v2.docx>

--
Rob Clare
AF/A2II Multi-Int Fusion & Visualization
O: 703-693-1751
C: 910-489-9520
DSN: 223-1751
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
robert.e.clare.ctr@mail.mil

TEG DEFS 001104339

 **TEG**

**Robert Clare <rclare@triangleexperience.com>**

## Travel Rob Clare Kip Hudson
6 messages

---

**Mattey, James J (Jim) LTCOL USAF AF-A2 (US)** <james.j.mattey.mil@mail.mil>          Tue, Feb 11, 2014 at 11:24 PM
To: "Palmer, Suzanne M (Stormy) CTR USAF AF-A2 (US)" <suzanne.m.palmer12.ctr@mail.mil>

Stormy,

First, I need to brag on Kip and Rob. Over the past two weeks, while I was at NDU, Kip and Rob put together an amazing presentation for OSD SCO Mr. BoB Giesler. Our project ACES is working on ops left of bang (phase 0) Kip and Rob put together a presentation and provided SCO options combining technology and notional intel and IO vignettes. For the first time we begin to see how the capes will be used to flush out HHQ tasking and commanders intent.

I was singing their praise to Mr. Johns this afternoon. I need them to accompany me to Boston 17-19 Feb to work with industry and our lead integrator for spatial manipulation. We'll be meeting with CTO John Underkloffler .

Thanks again for SRA's support.

Jim Mattey, Lt Col, USAF
AF/A2II ISR Innovations
☎ COMM: 703-693-1751
☎ DSN: 223-1751
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
james.j.mattey.mil@mail.mil
james.mattey@af.pentagon.smil.mil

---

**Robert Clare** <rclare@triangleexperience.com>          Wed, Feb 12, 2014 at 8:51 AM
To: Janna Clare <jclare@triangleexperience.com>

[Quoted text hidden]
--
Rob Clare
AF/A2II Multi-Int Fusion & Visualization
O: 703-693-1751
C: 910-489-9520
DSN: 223-1751
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
robert.e.clare.ctr@mail.mil

 EXHIBIT
TEG
63

**Palmer, Suzanne M (Stormy) CTR USAF AF-A2 (US)** <suzanne.m.palmer12.ctr@mail.mil>                                        Wed, Feb 12, 2014 at 1:59 PM
To: "Mattey, James J (Jim) LTCOL USAF AF-A2 (US)" <james.j.mattey.mil@mail.mil>, "rclare@triangleexperience.com" <rclare@triangleexperience.com>, "Hudson,
Justin N CTR USAF AF-A2 (US)" <justin.n.hudson.ctr@mail.mil>, "justin_hudson@sra.com" <justin_hudson@sra.com>, Janna Clare <jclare@triangleexperience.com>

Rob & Kip,
  Please submit the new travel request forms and I'll get approval.

V/R Stormy
Suzanne M. Palmer, PMP (SETA)
AF/A2CJ, ISR Integration, Interoperability and PED

IMPORTANT NOTE:  I have recently migrated to Defense Enterprise Email (DEE).  Please update your email address for me to point to the NIPR email listed
above.  My legacy Pentagon acocunt will be deleted shortly.


-----Original Message-----
From: Mattey, James J (Jim) LTCOL USAF AF-A2 (US)
Sent: Tuesday, February 11, 2014 11:25 PM
To: Palmer, Suzanne M (Stormy) CTR USAF AF-A2 (US)
Subject: Travel Rob Clare Kip Hudson

[Quoted text hidden]

---

**Robert Clare** <rclare@triangleexperience.com>                                                                          Wed, Feb 12, 2014 at 2:26 PM
To: "Palmer, Suzanne M (Stormy) CTR USAF AF-A2 (US)" <suzanne.m.palmer12.ctr@mail.mil>
Cc: "Mattey, James J (Jim) LTCOL USAF AF-A2 (US)" <james.j.mattey.mil@mail.mil>, Janna Clare <jclare@triangleexperience.com>

Stormy,
I have attached my travel request for the Boston trip Feb 17-19.
Let me know if you need anything else.

Thanks,

[Quoted text hidden]
--
Rob Clare
AF/A2II Multi-Int Fusion & Visualization
O: 703-693-1751
C: 910-489-9520
DSN: 223-1751
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
robert.e.clare.ctr@mail.mil

 **TMAS_Travel_Form_CLARE-DC_Feb 17-19_Boston.xlsx**
17K

**Palmer, Suzanne M (Stormy) CTR USAF AF-A2 (US)** <suzanne.m.palmer12.ctr@mail.mil>
To: Robert Clare <rclare@triangleexperience.com>, Janna Clare <jclare@triangleexperience.com>

Wed, Feb 12, 2014 at 3:27 PM

Will there be a travel request for NC to DC???
[Quoted text hidden]
robert.e.clare.ctr@mail.mil <mailto:robert.clare.ctr@pentagon.af.mil>

---

📄 **smime.p7s**
6K

---

**Janna Clare** <jclare@triangleexperience.com>
To: "Palmer, Suzanne M (Stormy) CTR USAF AF-A2 (US)" <suzanne.m.palmer12.ctr@mail.mil>
Cc: Robert Clare <rclare@triangleexperience.com>

Wed, Feb 12, 2014 at 4:58 PM

Stormy,
The request included both.  It was a one way car rental from NC to DC and flight out of DC to Boston and return flight to NC.  Is there a better way for submitting?  If you need me to fill it out differently or separately, let me know.

Have a good rest of the week and stay warm.

*Janna Clare*
*Triangle Experience Group, Inc*
*TEG*
*910-489-9521*

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.
[Quoted text hidden]

| Message | |
|---|---|
| **From:** | Robert Clare [rclare@triangleexperience.com] |
| **Sent:** | 2/13/2014 5:06:32 PM |
| **To:** | jim mattey [jjmattey@gmail.com] |
| **Subject:** | Spend Plan..latest v 8 2 Feb & Boston Itinerary |
| **Attachments:** | A2I Spend Plan_v8_2 Feb.xls |

# 18-Feb-2014 Boston Meeting

## Tentative Attendees (Please excuse any misspellings, titles)

- Hadron Industries
  - Klee Dienes
  - Frank Tanner
  - Jeff LeBlanc
- ACES Team
  - Jim Mattey
  - Rob Clare
  - Justin Hudson
  - Darion Harden
  - Joe Utschig
  - Walt Greenberg

## Tentative Schedule:

## 2/18 (Tuesday)

**Evening**:
ACES team arrives in Boston
Dinner depending on team arrival time

## 2/19 (Wednesday)

\* Not in the schedule yet is meeting with John Underkoffler. This should be about 1 hour.
\* Also TBD is set up of Mezzanine in DC to link to Boston.

**7am**
Introductions and agenda review

**8am**
Hadron demonstrates g-speak and NGA and AFRL work



**9am**
Run through the scenario Kip and Darion are developing in the Boston Mezz and with an

interactive google earth we will set up

**10:30am**
Debrief the scenario

**12:00pm**
Lunch

**1:00pm**
Review and refine the feature set and demo we are aiming for July
This will include deep dive on each tool:

- ORCA, IDEAS, ATEA, GMU
- Mezzanine/Photon, Google Earth/KML system
- SIFT and any other potential components

**5:00pm**
Review and refine the task list and milestones

**6:30pm**
Dinner

# 2/20 (Thursday)

**AM**
ACES team departs

--
Rob Clare
AF/A2II Multi-Int Fusion & Visualization
O: 703-693-1751
C: 910-489-9520
DSN: 223-1751
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
robert.e.clare.ctr@mail.mil

 **TEG**

Robert Clare <rclare@triangleexperience.com>

---

## Accepted: Tentative!! Hadron/ACES Meeting Boston Office @ Tue Feb 18 - Thu Feb 20, 2014 (rclare@triangleexperience.com)
1 message

**Klee Dienes** <klee.dienes@hadronindustries.com>                    Fri, Feb 7, 2014 at 8:43 PM
Reply-To: Klee Dienes <klee.dienes@hadronindustries.com>
To: "rclare@triangleexperience.com" <rclare@triangleexperience.com>

---

Klee Dienes has accepted this invitation.

### Tentative!! Hadron/ACES Meeting Boston Office

Event will be confirm once we have the "min force" required acceptance.

Hadron: Please add a dial-in number, confirm Boston conference room availability and explore a DC/Boston M2M session for folks not able to make the trip.

Travel:
Into Boston -- 18th PM (Team Dinner)
Office Time -- All day 19th
Dept for HST -- 20th am

Agenda:

1. Continue work on the Three Problem Statements
2. Identify:
- Script (Characters)
- Set the stage
- External performers
3. Label search queries for GMU/ORCA/IDEAS
4. Identify "rich" KML layers
4. Dialogue the WorkFlow/Mission Managers (I/O specific)
5. Schedule next steps

| | |
|---|---|
| When | Tue Feb 18 – Thu Feb 20, 2014 |
| Where | Oblong Industries, Summer Street, Boston, MA, United States (map) |
| Calendar | rclare@triangleexperience.com |
| Who | • Robert Clare - organizer |
| | • Klee Dienes |
| | • frank.tanner@hadronindustries.com |


EXHIBIT
TEG
62

- darion.l.harden.mil@mail.mil
- justin_hudson@sra.com
- gordon.r.dexter.ctr@mail.mil
- jeff.leblanc@hadronindustries.com
- james.j.mattey.mil@mail.mil
- paulo.shakarian@usma.edu - optional
- kenneth.g.saunders.mil@mail.mil - optional
- dpfoser@gmu.edu - optional
- kevin.doyle.ctr@sco.darpa.mil - optional

Invitation from Google Calendar

You are receiving this email at the account rclare@triangleexperience.com because you are subscribed for invitation replies on calendar rclare@triangleexperience.com.

To stop receiving these notifications, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

invite.ics
2K



Robert Clare <rclare@triangleexperience.com>

**FW: ACES SOW**
3 messages

**Hudson, Justin** <Justin_Hudson@sra.com>                                    Sun, May 4, 2014 at 10:21 AM
To: "rclare@triangleexperience.com" <rclare@triangleexperience.com>

——Original Message——
From: Hudson, Justin
Sent: Sunday, May 04, 2014 8:44 AM
To: waltg@gtsinc.net
Subject: FW: ACES SOW
Importance: High

Walt,

Please see attached for our discussion today.

Cheers,

Kip

——Original Message——
From: Herslow, Robert D LTCOL USAF (US) [mailto:robert.d.herslow.mil@mail.mil]
Sent: Thursday, May 01, 2014 10:26 AM
To: Hudson, Justin
Subject: ACES SOW


Lt Col Rob Herslow
AF/A2II ISR Innovations
☎ COMM: 703-693-1751
☎ DSN: 223-1751
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700


ACES_SOW_Rev_8_2014-04-21 (FOUO).docx
151K



**Robert Clare** <rclare@triangleexperience.com>
To: Sean McCluskey <sean@triangleexperience.com>

Sun, Jun 3, 2018 at 9:39 PM

Rob Clare
Triangle Experience Group
rclare@triangleexperience.com
910-489-9520 (mobile)
[Quoted text hidden]

📄 **ACES_SOW_Rev_8_2014-04-21 (FOUO).docx**
151K

---

**Robert Clare** <rclare@triangleexperience.com>
To: Sean McCluskey <sean@triangleexperience.com>

Sat, Nov 23, 2019 at 7:30 PM

Heres the SOW Kip Sent to WALT. A month later.
Rob Clare
Triangle Experience Group
rclare@triangleexperience.com
910-489-9520 (mobile)

---------- Forwarded message ----------
From: **Hudson, Justin** <Justin_Hudson@sra.com>
Date: Sun, May 4, 2014 at 10:21 AM
Subject: FW: ACES SOW
To: rclare@triangleexperience.com <rclare@triangleexperience.com>

[Quoted text hidden]

📄 **ACES_SOW_Rev_8_2014-04-21 (FOUO).docx**
151K

Message

| | |
|---|---|
| **From:** | Herslow, Robert D LTCOL USAF (US) [robert.d.herslow.mil@mail.mil] |
| on behalf of | Herslow, Robert D LTCOL USAF (US) <robert.d.herslow.mil@mail.mil> [robert.d.herslow.mil@mail.mil] |
| **Sent:** | 6/5/2014 5:47:10 PM |
| **To:** | Walt Greenberg [Walt Greenberg <waltg@gtsinc.net>]; 'Robert Clare' ['Robert Clare' <rclare@triangleexperience.com>] |
| **CC:** | Harden, Darion L MAJ USAF AF-A2 (US) [ Harden, Darion L MAJ USAF AF-A2 (US) <darion.l.harden.mil@mail.mil>] |
| **Subject:** | ATEA SOWs |
| **Attachments:** | ATEA-ATHENA SOW v3.pdf; ACES_SOW_Rev_9_2014-05-15 (FOUO).pdf |

```
Lt Col Rob Herslow
AF/A2II ISR Innovations
☎ COMM: 703-693-1751
☎ DSN: 223-1751
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
```





# SUBCONTRACT AGREEMENT

| CONTRACTOR: | SUBCONTRACTOR: |
|---|---|
| ALQIMI Analytics and Intelligence, LLC | Triangle Experience Group, Inc. |
| **ADDRESS:** | **ADDRESS:** |
| 9210 Corporate Blvd., Suite 150 | 2816 Charles Newland Road |
| Rockville, MD 20850 | Dunn, North Carolina 28334 |
| **PRIME CONTRACT NO.:** | **SUBCONTRACT NO.:** |
| Par Gov- W911QY-13-D-0100 | AAI-SC-2014-TEG-001 |
| **EFFECTIVE DATE:** August 5, 2014 | **SUBCONTRACT TYPE:** *Firm Fixed* |

## TABLE OF CONTENTS

**PART I, THE SCHEDULE**
Section A, Signature
Section B. Supplies and Services
Section C. Descriptions and Specifications
Section D. Packaging and Marking
Section E. Inspection and Acceptance
Section F. Deliveries or Performance
Section G. Subcontract Administration Data
Section H. Special Contract Requirements

**PART II, CONTRACT CLAUSES**
Section I.  Contract Clauses

**PART III, ATTACHMENTS**
Section J.  List of Attachments

## PART I. THE SCHEDULE

### Section A - Signature

WHEREAS, Air Force A2I ("Air Force" or the "Government") awarded Par Government Systems Corporation ("Par Gov" or the "Customer", with such term encompassing the government end-customer or meaning the end-customer (Air Force) where the context, application, or usage of the term requires) the Advanced Collaborative Enterprise Service Operating Environment ("ACES-OE") Task Order (the "ACES-OE Task Order") under Par Gov's Prime Contract No. W911QY-13-D-0100 (such Task Order and Prime Contract being referred to herein as the "Contract");

WHEREAS, ALQIMI Analytics & Intelligence, LLC (the "Contractor" or "ALQIMI") has been awarded a subcontract to perform work required by the ACES-OE Task Order, including work that the Contractor has expertise and resources to undertake (the "ALQIMI Contract");

WHEREAS, Contractor desires to subcontract certain portions of the ACES-OE TO effort under the ALQIMI Contract to Subcontractor (identified above), and Subcontractor desires to assume the obligation to perform such portions of said effort, subject to the terms and conditions of this Subcontract Agreement (the "Subcontract"). The Subcontractor agrees to support the Contractor as set forth in the Statement of Work attached hereto in accordance with the terms and conditions of this Subcontract and as authorized in individual Purchase Orders.

IN CONSIDERATION of the promises, mutual covenants, and agreements contained, herein, the Parties agree as follows:

This Subcontract Agreement constitutes the understanding and agreement between Contractor and Subcontractor (the "Parties") with respect to the subject matter, hereof, and supersedes all prior representations and agreements. It shall not be varied except by an instrument in writing of subsequent date duly executed by authorized representatives of the Parties. The laws of the State of Maryland shall govern the validity, construction, scope, and performance of this Subcontract Agreement.

-1-

AAI00006459



IN WITNESS WHEREOF, the Parties hereto have, through duly authorized officials, executed this Subcontract Agreement effective as of the date indicated below.

**ALQIMI ANALYTICS & INTELLIGENCE, LLC**

Signed: _____

Name: Ravinder Birgi

Title: SVP, Accounting & Finance

Date: 08/5/14

**TRIANGLE EXPERIENCE GROUP, INC.**

Signed: _____

Name: Robert E. Clare Jr

Title: CEO

Date: 4 Aug 2014

-2-

HIGHLY CONFIDENTIAL



## Section B – Supplies and Services

### B.1.   SERVICES AND PRICES/COSTS

(a) The Subcontractor, acting as an independent contractor and not as an agent of the Contractor shall furnish all materials, personnel and support to provide the supplies and services as set forth in Purchase Orders issued against the Statement of Work, Section J, Attachment 1.

(b) Authorization to proceed, specific periods of performance and funding will be obligated via Subcontract Purchase Orders, which will be issued against this Subcontract/Statement of Work in accordance with Section H.1. "Ordering".

### B.2.   TERM OF SUBCONTRACT

Unless terminated or extended in writing, the term of this Subcontract begins on the Effective Date noted above and will expire as of July 20, 2015.

### B.3.   LIMITATION OF OBLIGATION

Individual Purchase Orders shall determine the ceiling and funding value of this Subcontract. Contractor shall not be obligated to compensate Subcontractor for any work performed or expenses incurred in excess of the funded value as set forth in the individual Purchase Orders. For any orders other than FFP orders, Subcontractor shall notify the Contractor's Subcontracts Administrator when total funds expended are expected to exceed 75%. This notification shall include an estimate to complete.

## Section C – Descriptions and Specifications

The Subcontractor agrees to provide the supplies and/or services set forth in Section J, Attachment 1, Statement of Work.

## Section D – Packaging and Marking

### D.1.   1052.246-90 PACKAGING AND MARKINGS (DEC 2008)

Unless otherwise specifies, all items delivered under this Subcontract shall be preserved, packaged, and marked in accordance with normal commercial practices to meet the requirements of the carrier and ensure safe delivery at destination.

### D.2.   PACKAGING AND MARKINGS

Any equipment, parts, material or other deliverable items provided by the Subcontractor shall be packaged and marked with the appropriate commercial packaging to insure safe arrival at the destination. Each Purchase Order shall contain any specific marking instructions for the packaging.

## Section E – Inspection and Acceptance

### E.1.   FAR CLAUSES INCORPORATED BY REFERENCE, pursuant to Section I.1.

| CLAUSE NO. | DESCRIPTION | DATE |
|---|---|---|
| FAR 52.246-4 | Inspection of Services - Fixed Price | AUG 1996 |

-3-

AAI000006461



| FAR 52.246-5 | Inspection of Services – Cost Reimbursement | APR 1984 |
| FAR 52.246-6 | Inspection— Time-and-Material and Labor-Hour | MAY 2001 |

## Section F - Deliveries or Performance

### F.1.   FAR CLAUSES INCORPORATED BY REFERENCE, pursuant to Section I.1.

| CLAUSE NO. | DESCRIPTION | DATE |
|---|---|---|
| FAR 52.242-15 | Stop-Work Order | AUG 1989 |
| FAR 52.242-15 Alt 1 | Stop-Work Order -Alternate 1 | APR 1984 |
| FAR 52.242-17 | Government Delay of Work | APR 1984 |
| FAR 52.247-34 | F.O.B. Destination | NOV 1991 |

### F.2.   REQUIREMENTS FOR REPORTS

Subcontractor shall provide to the Contractor a Monthly Subcontract Status and Cost Performance Report for each Purchase Order issued against this Subcontract.  Subcontractor shall support the Contractor in program reviews as may be required by the Customer.  Monthly Status and Cost Performance Reports shall be submitted to the Contractor on the fifth (5th) business day of the month immediately following the reporting month.  Individual Purchase Orders shall include additional instructions.

### F.3.   PLACE OF PERFORMANCE

Specific locations will be set forth in individual Purchase Orders.

## Section G - Subcontract Administration Data

### G.1.   SUBMISSION OF INVOICES

(a)  In accordance with Attachment 2, "Invoicing Instructions", invoices shall be submitted against this Subcontract on a monthly basis.  Subcontractor shall comply with all provisions of the FAR 52.216-7, "Allowable Cost and Payment".  All invoices submitted shall be signed and approved by an authorized official of the Subcontractor who shall certify that the invoiced amounts are accurate.  Subcontractor shall maintain records for all direct and indirect costs incurred and substantiate all invoices submitted to the Contractor.  Such records shall be made available for audit by either the Contractor or the Customer, including the applicable Government agencies, upon request at any time during the term of this Subcontract and for a period of three (3) years after final payment hereunder.

(b)  The final invoice shall be marked "Final Invoice" and shall be submitted as soon as possible after the effort is completed.

(c)  The Subcontractor agrees to indemnify and hold the Contractor harmless for any claims by the Customer for fines, penalties, or request for refunds as a result of billing irregularities or rate disputes on behalf of or caused by the Subcontractor.

(d)  Contractor may, at its sole discretion, withhold payment of Subcontractor's invoices if Subcontractor fails to submit its monthly reports, as provided in Section F.2, by the 10th business day of each month.

### G.2.   PAYMENT TERMS

-4-



Subsequent to Contractor's receipt of an approved invoice, Contractor shall pay the net amount within five (5) business days of the Contractor's receipt of payment from the Customer.

G.3.   INCREMENTAL FUNDING

Purchase Orders issued under this Subcontract may be incrementally funded pursuant to the "Limitation of Funds" clause, FAR 52.232-22. If incrementally funded, a Purchase Order shall state the amount funded and the estimated date through which the funds will sufficiently fund the Purchase Order. Additionally, Firm Fixed Price Purchase Orders issued under this subcontract may be incrementally funded pursuant to the "Limitation of Government Obligation" clause, DFAR Sup 252.232-7007.

G.4.   TRAVEL

   (a) Travel cost reimbursement shall only be allowed to the extent authorized in the Statement of Work and is consistent with all applicable provisions of the FAR and any related Federal travel regulations. Profit of fee is not authorized on travel related costs.

G.5.   TECHNICAL AND CONTRACTUAL REPRESENTATIVES

   (a) The following Technical and Contractual Representatives of the Contractor and Subcontractor are hereby designated for this Subcontract:

**CONTRACTUAL REPRESENTATIVES:**

|  | For Contractor: |  | For Subcontractor: |
|---|---|---|---|
| Name: | Ravinder Birgi | Name: | Joanna L. Clare |
| Title: | SVP – Acct, Fin & Admin | Title: | CFO |
| Address: | 9210 Corporate Blvd., Suite 150 | Address: | 2816 Charles Newland rd |
|  | Rockville, MD 20850 |  | Dunn, NC 28334 |
| Phone: | 240-404-7505 | Phone: | 910 489 9520 |
| Fax: | 301-977-0260 | Fax: | 910 567 2768 |
| e-mail: | ravinder.birgi@alqimi.com | e-mail: | jclare@triangleexperience.com |

**TECHNICAL REPRESENTATIVES:**

|  | For Contractor: |  | For Subcontractor: |
|---|---|---|---|
| Name: | Kevin Donohue | Name: | Sean McCluskey |
| Title: | EVP & COO | Title: | COO |
| Address: | Same as above | Address: | 517 Post Oak rd, Annapolis MD 21401 |
| Phone: | 240-404-7511 | Phone: | 410-212-4561 |
| Fax: | 301-977-0260 | Fax: | 910-967-2768 |
| e-mail: | kevin.donohue@alqimi.com | e-mail: | sean@triangleexperience.com |

   (b) Contractor's Technical Representative, or his/her duly authorized designate, is responsible for day-to-day clarifications, directions and guidance as may be required within the scope of the technical work requirements. Such clarifications, direction and guidance shall not constitute new assignments of work, or changes, modifications or amendments, which justify any change to the Subcontract terms and conditions or price.

   (c) Contact with the Contractor regarding prices, terms, quantities, deliveries and financial adjustments shall be made between Contractual Representatives. Actions taken by the Subcontractor, which by their nature effect a change to this Subcontract, shall only be binding upon the Contractor when such action is specifically authorized in writing by Contractor's Contractual Representative or authorized designee

-5-

*RBC*

AAI00006463



(d) All commitments hereunder (subsequent to execution of this Subcontract), shall be made through the respective Parties' Contractual Representative. No verbal or written request, notices, authorization, direction or order received by the Subcontractor shall be binding upon Contractor, or serve as the basis for a change in the Subcontract cost, fee, price, schedule or any other provision of this Subcontract, unless issued (or confirmed) in writing by the Contractor's Contractual Representative or authorized designee.

(e) The Subcontractor shall immediately notify the Contractor's Contractual Representative whenever an oral or written change notification has been received from an employee of Contractor (other than the Contractual Representative or authorized designee), which would affect any of the terms, conditions, cost, schedules, etc. of this Subcontract, and the Subcontractor is to perform no work or make any changes in response to any such notification or make any claim on Contractor, unless Contractor's Contractual Representative or authorized designee directs the Subcontractor, in writing, to implement such change notification.

### G.6. MODIFICATION/WAIVER

No modification of this Subcontract (including any additional or different terms of the Subcontract) shall be binding on Contractor unless agreed to in writing and signed by Contractor's Contractual Representative or his or her designee. No course of dealing or failure by Contractor to strictly enforce any term, right, or condition of this Subcontract shall be construed as a waiver of such term, right or condition.

### G.7. SUBCONTRACT CLOSEOUT

(a) Upon approval of a final invoice, submitted by the Subcontractor, and upon Subcontractor's compliance with all terms of this Subcontract, the Contractor shall pay any balance of allowable costs.

(b) Unless separately noted herein, all subcontract closeout procedures shall be in accordance with FAR 42.708 Quick-Closeout Procedure

### G.8. SEVERABILITY

If any provision of this Subcontract is or becomes void or unenforceable by force of operation of law, the other provisions shall remain valid and enforceable.

### G.9. ORDER OF PRECEDENCE

The rights and obligations of the Parties hereto shall be subject to and governed by PARTS I through III of this Subcontract. To the extent of any inconsistency between the Sections in PART I, "The Schedule" it shall be resolved, in writing, by mutual agreement of the Parties. As to any inconsistency between the other PARTS or other provisions which are made a part of this Subcontract by reference or otherwise, the inconsistency shall be resolved by giving precedence in the following order:

(a) Section I - Contract Clauses
(b) Subcontract Purchase Orders
(c) Section J - Attachments

## Section H – Special Subcontract Requirements

### H.1. ORDERING

(a) The work to be performed under this Subcontract is specifically described in the Statement of Work, Section J, Attachment I. Authorization to proceed on work set forth in the Statement of

-6-



Work shall only be given in Purchase Orders issued by Contractor to Subcontractor. Contractor's Contractual Representative or authorized designee are the only individuals authorized to issue such Purchase Orders under this Subcontract.

(b) Purchase Orders shall be issued against the Subcontract in writing and dated and identified with a specific Purchase Order number. Each Purchase Order shall include a succinct description of the authorized materials, supplies and services from the Statement of Work and authorized funding limitations. The authorized representatives of both Parties shall sign the Purchase Orders.

(c) All Purchase Orders are subject to the terms and conditions of this Subcontract. In the event of conflict between a Purchase Order and the Subcontract, the Subcontract will take precedence.

## H.2.   SECURITY

(a) Subcontractor will abide by all applicable government security regulations with respect to personnel, facilities, technical, information systems, communications and protective programs. Security requirements are a material condition of this Subcontract. As such, this Subcontract shall be subject to immediate termination for default, without the requirement for a 10-day cure notice, when it has been determined by the Customer or the applicable Contracting Officer that Subcontractor has displayed a failure to fully comply with the security requirements of this Subcontract or the Contract as a result of willful misconduct or lack of good faith or compliance with security regulations.

(b) Security requirements are specific to the Purchase Orders issued under this Subcontract and will reflect the minimum necessary to protect the Customer's interests. Subcontractor should anticipate the levels of security from minimum through Top Secret may be required.

(c) As applicable, Cleared Personnel Certification Reporting will be provided yearly on all personnel cleared under this Subcontract.

(d) Subcontractor personnel working within Contractor's secured facility will be required to adhere to all security policies and procedures of Contractor. Failure of Subcontractor personnel to do so will result in their removal from secured facilities. Contractor reserves the right to require the removal of any Subcontractor personnel failing to comply with any such security procedures from engaging on a Purchase Order.

(e) The Government and/or Customer may conduct screening of Subcontractor personnel upon such personnel requesting a security clearance or access approval. In order to access an agency facility, the Subcontractor personnel must be a US citizen and provide the following:

(a)   Form 4311 "Industrial Security Approval or Access Request"
(b)   SF86 "Questions for National Security Positions" and
(c)   Fair Credit Reporting Act Release form.

## H.3.   GOVERNMENT PROPERTY

FAR CLAUSE INCORPORATED BY REFERENCE, pursuant to Section I.1

| CLAUSE NO. | DESCRIPTION | DATE |
|---|---|---|
| FAR 52.245-1 | Government Property | JUN 2007 |

## H.4.   ORGANIZATIONAL CONFLICTS OF INTEREST

(a) Purpose. The primary purpose of this Clause is to aid in ensuring that  (1) the Parties

-7-



objectivity and judgment are not biased as a result of their respective past, present, or currently planned interests (financial, contractual, organizational, or otherwise), which relate to work under this Subcontract, (2) neither Party obtains an unfair competitive advantage by virtue of its access to non-public information regarding the Customer's program plans and actual or anticipated resources, and (3) by virtue of its access to proprietary information belonging to others, the Parties do not obtain any unfair competitive advantage.

(b) Scope. The restrictions described herein shall apply to performance or participation by the Subcontractor and any of its affiliates or its successors in interest in the activities covered by this Subcontract or in any similar capacity.

(c) The Subcontractor warrants that, to the best of its knowledge and belief, there are no relevant facts that could give rise to Organizational Conflicts of Interest, as defined in FAR 9.501. Or, alternatively, the Subcontractor warrants that it has disclosed all relevant information regarding any actual or potential organizational conflict of interest.

(d) The Subcontractor agrees that if an organizational conflict of interest with respect to this Subcontract is discovered during its performance, an immediate and full disclosure in writing shall be made to the Contractor. Such notification shall include a description of the action the Subcontractor has taken or proposes to take to avoid, neutralize or mitigate such conflicts. The Subcontractor shall continue performance until notified by the Contractor of any contrary actions to be taken. The Contractor may, however, terminate the contract for its convenience if it deems such termination to be in its best interest.

(e) If the Subcontractor was aware of an organizational conflict of interest before award of this Subcontract and did not fully disclose the conflict to the Contractor, the Contractor may terminate the Subcontract for default.

(f) Before a Subcontract modification is made that adds new work or significantly increases the period of performance, the Subcontractor shall agree to submit either an organizational conflict of interest disclosure or representation or an update of a previously submitted disclosure or representation, if requested.

(g) Subcontractor further agrees that the Customer or the Contractor may periodically review Subcontractor's compliance with these provisions or require such self-assessments or additional certifications as required.

H.5.   KEY PERSONNEL

Any personnel specifically identified and listed by name in the Statement of Work are considered essential to the work being performed hereunder. Prior to removing, replacing, or diverting any of the specified individuals, the Subcontractor shall notify the Contractor 30 days in advance and shall submit justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on this Subcontract. No deviation shall be made by the Subcontractor without the prior written consent of the Contractor; provided, that the Contractor may ratify in writing the change, such ratification shall constitute the consent of the Contractor required by this paragraph. The personnel listed below may, with the consent of the contracting Parties, be amended from time to time during the course of the Subcontract to either add or delete personnel as appropriate.

H.6.   INSURANCE, INDEMNIFICATION, AND LIABILITY

(a) Subcontractor assumes the following risks: all risks of loss or damage to all goods, work in process, materials, and other things while under the control of the Subcontractor; all risks of loss or damage to third persons and their property until the acceptance of all the goods as herein provided; all risks of loss or damage to any property received by Subcontractor from or held by Subcontractor

-8-

AAI00006466



or its supplier for the account of Contractor, until such property has been accepted by Contractor or the Customer, as the case may be, and all risks of loss or damage to any of the goods or part thereof rejected by Contractor, from the time of shipment thereof to Subcontractor until redelivery thereof to Contractor.

(b) Subcontractor agrees to indemnify and save harmless Contractor, its officers, agents and employees from and against any and all claims and liabilities (including expenses) that may result, in whole or in part, from any act or omission on behalf of Subcontractor.

(c) In no event shall Contractor's liability for any breach or alleged breach of this Agreement exceed the total aggregate price set forth in all Subcontractor's issued and effective POs, nor shall Contractor be liable for any special, incidental or consequential damages resulting from any such breach or alleged breach.

(d) Subcontractor shall procure and maintain the below identified insurance coverage with insurers carrying a current A.M. Best Rating of A/X or better. Subcontractor shall have all policies, except Workers' Compensation and Employer's Liability, endorsed to name Contractor as an Additional Insured with respect to the work to be performed by the Subcontractor. Subcontractor agrees to notify Contractor on any reduction in aggregate limits that exceed 50% of aggregate on all liability. No insurance policies carried by Subcontractor shall contain a deductible or self-insured retention in excess of $50,000 and any such deductibles or self-insured retention shall be the sole responsibility of Subcontractor.

(1)   Workman's Comp and Employer's Liability: $500,000 minimum per occurrence.
(2)   Comprehensive or Commercial General Liability: $500,000 minimum per occurrence.
(3)   Automobile Insurance:   $200,000 per person and $500,000 per accident for bodily injury and $500,000 per accident for property damage.

(e) Prior to the commencement of work, and thereafter upon policy expiration, Subcontractor shall provide certificates of insurance to Contractor evidencing the insurance required under this clause.

H.7.   COMPLIANCE WITH LAWS

(a) The Subcontractor agrees, in the performance of this Subcontract, to comply with all federal, state, and local laws, regulations, rules, and orders applicable to this Subcontract including but not limited to, the provisions of the Fair Labor Standards Act of 1938, as amended, any applicable Executive Orders, and with the regulations and standards issued pursuant thereto.

(b) Subcontractor, in all matters relating to this Subcontract, shall be acting as an independent contractor. Neither Subcontractor nor any of the persons furnishing materials or performing work or services required by this Subcontract shall be employees of Contractor within the meaning of, or the application of, any Federal or State Unemployment Insurance Law, Social Security Law, any Workmen's Compensation Law, Industrial Accident Law, or other Industrial or Labor Law. Subcontractor shall, at its own expense, be responsible for compliance with all requirements and obligations relating to its employees under all applicable local, state, and federal statutes, ordinances, rules, and obligations including, but not limited to, employer's obligations under laws relating to: income tax withholding and reporting; civil rights; equal employment opportunity; discrimination on the basis of age, sex, race, color, religion, disability, national origin, or veteran status; overtime; minimum wage; social security contribution and withholding; unemployment insurance; employer's liability insurance, worker's compensation; veteran's rights; and all other employment, labor, or benefits related laws.

(c) Subcontractor shall procure all licenses and permits, and pay all fees and other required charges necessary to conduct its business, all at Subcontractor's expense.

-9-

   AAI00006467



(d) This Subcontract and all matters arising from or related to it shall be governed by and construed in accordance with the laws of the State of Maryland, except that any provision in this Subcontract that is (i) incorporated in full text or by reference from the Federal Acquisition Regulations (FAR) or Defense Federal Acquisition Regulation Supplements (DFARS); or (ii) incorporated in full text or by reference from any agency regulation that implements or supplements the FAR; or (iii) that is substantially based on any such agency regulation or FAR provision, shall be construed and interpreted according to the federal common law of government contracts as enunciated and applied by federal judicial bodies, boards of contract appeals, and quasi-judicial agencies of the federal Government.

H.8.   PUBLICITY/CONFIDENTIAL RELATIONSHIP

Without the Contractor's prior written consent (which shall not be unreasonable withheld), the Subcontractor shall not use or allow to be used any aspect of this Subcontract for publicity. "Publicity" means, but is not limited to, press releases, advertising (e.g. trade magazines, newspapers, Internet, radio, television etc.), communications with the media, marketing, or a reference for new business. It is further understood that this obligation shall not expire upon completion or termination of this Subcontract, but will continue indefinitely. The Subcontractor may request a waiver or release from the foregoing but shall not deviate therefrom unless authorized to do so in writing by the Contractor.

H.9.   TERMINATION FOR CONVENIENCE

FAR CLAUSES INCORPORATED BY REFERENCE, pursuant to Section I.1.

(a)  For Cost Reimbursable and Time & Materials Contracts and Purchase Orders:

FAR 52.249-6          Termination - Cost Reimbursement                    MAY 2004

(b) For Fixed Price Contracts and Purchase Orders:

FAR 52.249-2          Termination for Convenience of the
                      Government (Fixed Price)                            MAY 2004

H.10.  TERMINATION

(a)  Contractor may, subject to paragraphs (d) and (e) below, by written notice to the Subcontractor, terminate this Subcontract in whole or in part at any time in the event that:

(1)     Subcontractor fails to deliver the supplies or perform the services within the time specified in the Purchase Order or any extension;
(2)     Subcontractor fails to make progress, so as to endanger performance of the Subcontract and/or Purchase Order (but see subparagraph (b) below);
(3)     Subcontractor fails to perform any of the other provisions of this Subcontract and/or Purchase Order (but see subparagraph (b) below);
(4)     The Government has issued and Contractor has received a written Termination for Convenience notice; or
(5)     The Government has issued and Contractor has received a written Termination for Cause notice and the Subcontractor is the cause of such notice being issued to Contractor.

(b)  Contractor's right to terminate this Subcontract and/or Purchase Order under subdivisions (a)(2) and (a)(3) above may be exercised if the Subcontractor does not cure such failure within 7 calendar days (or more if authorized in writing by Contractor) after receipt of written notice from Contractor specifying the failure.

(c)  If Contractor terminates this Subcontract and/or Purchase Order in whole or in part, it may acquire, under the terms and in the manner Contractor considers appropriate, supplies or services equivalent to those terminated and the Subcontractor shall be liable to Contractor for any excess

-10-

AAI00006468



costs for those supplies or services. However, the Subcontractor shall continue any work not terminated provided that the Contractor continue to pay for services rendered.

(d) If this Subcontractor is terminated for default, Contractor may require the Subcontractor to transfer title and deliver to Contractor, as directed by Contractor, any completed supplies, partially completed supplies, materials, parts, plans, drawings, information, and contract rights (collectively referred to as "Contract Materials" in this clause) that the Subcontractor has specifically produced or acquired for the terminated portion of this Subcontract. Upon direction of Contractor the Subcontractor shall also protect and preserve property in its possession in which Contractor has an interest.

(e) Contractor shall pay the Subcontract price(s) for completed supplies delivered and accepted. The Subcontractor and Contractor shall agree on the amount of payment for Contract Materials delivered and accepted and for the protection and preservation of property. Failure to agree will be considered a dispute under the Disputes Clause. Contractor may withhold from these amounts any sum Contractor determines to be necessary to protect Contractor against loss because of out-standing liens or claims of former lien holders.

(f) The rights and remedies of Contractor in this clause are in addition to any other rights and remedies provided by law or under this Subcontract.

## H.11. CHANGES

Whether made pursuant to this provision or by mutual agreement, changes shall not be binding upon either Party until agreed to in writing by Contractor's Contractual Representative or designee. The issuance of information, advice, approvals, or instructions by Contractor's technical personnel or other representatives shall be deemed expressions or personal opinions only and shall not affect Contractor's and Subcontractor's rights and obligations hereunder unless the same is in writing, is signed by Contractor's Contractual Representative or designee, and which expressly states that it constitutes an amendment or change to this Subcontract.

CLAUSES INCORPORATED BY REFERENCE pursuant to Section 1.1.

(a) For Fixed Price Changes:

| | | |
|---|---|---|
| FAR 52.243-1 Alt. I | Changes - Fixed Price | AUG 1987 |
| FAR 52.243-1 Alt. II | Changes - Fixed Price | APR 1984 |

b) For Cost Reimbursable Changes:

| | | |
|---|---|---|
| FAR 52.243-2 | Changes – Cost Reimbursement | AUG 1987 |

(b) For Time & Materials Changes:

| | | |
|---|---|---|
| FAR 52.243-3 | Changes - Time & Materials Or Labor-Hours | SEPT 2000 |

## H.12. ASSIGNMENT

Subcontractor may not assign any rights under this Subcontract or any portion thereof, without the prior written consent of Contractor. Absent such consent, any assignment is void.

## H.13. INTELLECTUAL PROPERTY AND INDEMNIFICATION

(a) "Works" means all inventions, improvements, discoveries (whether or not patentable or copyrightable), databases, computer programs, reports, notes, studies, photographs, negatives, designs, drawings, specifications, materials, tapes, and disks conceived, reduced to practice, created or originated by the Subcontractor, its employees, agents, and Subcontractors, either individually or jointly with others in the performance of this Subcontract. Works includes "Documents." Documents are the originals of any

-11-

*ACC*

AAI00006469



databases, computer programs, reports, notes, studies, photographs, negatives, designs, drawings, specifications, materials, tapes, disks, or other materials, whether in tangible or electronic forms, prepared by the Subcontractor, its employees, agents, or Subcontractors, in the performance of this Subcontract.

(b) The Subcontractor represents and warrants that the Works and Documents created and paid for under this Subcontract and Purchase Orders do not and will not infringe upon any intellectual property rights of other persons or entities under United States law. Subcontractor agrees to indemnify and save harmless Contractor, its officers, employees, agents, representatives, or the end Customer for who the works were created from any loss, damage, or injury arising out of a claim or suit at law or equity for Subcontractor's gross negligence, or willful misconduct or omission related to actual or alleged violation of copyright, trademarks or infringement of patents under United States law, by reason of the buying, selling, or using the Works and Documents supplied under this Subcontract, and will assume the defense of any and all suits and will pay all costs and expenses incidental thereto.

(c) Subcontractor agrees that all materials, work products, and technical data that it develops under this Subcontract, including, but not limited to software and documentation, shall be considered "Works for Hire."

### H.14.  DISPUTES

(a) Disputes with the Government -- Any decision, determination, or action made by the Government in connection with the Contract ("Government Action") that is binding on Contractor shall be equally binding on Subcontractor. To the extent Subcontractor believes any Government act gives rise to a claim under this Subcontract, the Parties agree that such claim may be pursued only in accordance with the Disputes Clause, FAR § 52.233-1, of the Contract, which is incorporated herein by reference, in the following manner:

(1)  Subcontractor will submit to Contractor a fully supported written claim arising from any Government act within one year after the claim accrues, but in no event later than final payment under the Subcontract or Purchase Order, or Subcontractor shall be barred from any remedy for such claim;

(2)  Subcontractor agrees to cooperate fully with Contractor in the prosecution of the claim, including providing supporting information and testimony. Subcontractor shall be afforded the opportunity, at its expense, to participate in the prosecution of the claim, including any settlement thereof.

(3) If Contractor declines to prosecute the claim directly, it may elect to sponsor Subcontractor's claim, in which case the Subcontractor will be responsible for the prosecution and all costs of the appeal. Subcontractor agrees that Contractor shall have access to all information related to the claim proceedings and the opportunity to participate in trials, hearings, and settlement discussions with the Government. The Subcontractor agrees to indemnify and hold Contractor harmless from damages, judgments, costs (including reasonable attorney fees) and other liabilities arising from any Subcontractor miscertification, violation of Section 5 of the Contract Disputes Act of 1978, violation of common law or statutory prohibitions against misrepresentations, fraud, or false statements and any other liabilities related to Subcontractor's prosecution of the claim.

(4)  Subcontractor shall be bound by the resolution of any claim pursued under this Clause.

(b) Disputes between the Parties -- The following procedures shall govern the resolution of any controversy, dispute or claim ("Dispute") arising out of the Subcontract that is not subject to subparagraph (a) above:

(1) Negotiation. The Parties shall promptly attempt to resolve any Dispute by negotiation in the normal course of business. If, after good faith efforts, the Dispute is not resolved, either Party

-12-

HIGHLY CONFIDENTIAL



may request in writing that the Dispute be resolved via Executive Consultation pursuant to subparagraph 16.3.2 below.

(2) Executive Consultation. For Disputes submitted to Executive Consultation, each party shall designate a senior company official with authority and responsibility for attempting to resolve the matter. Either Party may initiate Executive Consultation by submission of a written request. Within 30 calendar days thereafter, the Parties shall meet and attempt to resolve the Dispute. If the Dispute is not resolved within 45 days from submission of the request, or such other amount of time as agreed between the Parties, either Party may file a legal action solely in the Federal or State courts of Maryland. Subcontractor agrees to the jurisdiction of such courts and hereby waives any and all defenses regarding the personal jurisdiction thereof.

(c) Subcontractor shall diligently proceed with the performance of work pending final resolution of any Dispute.

## H.15. LITIGATION AND CLAIMS

The Subcontractor shall give Contractor immediate notice in writing regarding the following:

(a) Any action, including any proceedings before a Federal, state or local governmental or civilian agency, filed against the Subcontractor arising out of the performance of this Subcontract; and,

(b) Any claim by a third party against the Subcontractor, the cost and expense of which is, or may be allowable under this Subcontract.

In the event of the occurrence of either of the above, the Subcontractor shall immediately furnish to Contractor copies of all pertinent papers and documents received by the Subcontractor with respect to such action or claim.

## H.16. INSOLVENCY

In addition to the rights set forth in the "Termination" clause of this Subcontract, Contractor may terminate this Subcontract, in whole or in part, by written or telegraphic notice to Subcontractor if Subcontractor shall become insolvent or make a general assignment for the benefit of creditors; or, a petition under any bankruptcy act or similar statute is filed by or against the Subcontractor and not vacated within ten (10) days after it is filed.

## H.17. WARRANTY

In addition to any other warranties specified herein, Subcontractor warrants that: (1) the services provided under this Subcontract shall be performed with the degree of skill and judgment normally exercised by recognized professional firms performing services of the same or substantially similar nature; and (2) that any goods delivered under this Subcontract will be new, unless otherwise specified, and for a period of one (1) year following acceptance, shall be free from defects in design, material, and workmanship. All goods and services will conform to applicable specifications, drawings, and standards of quality and performance. In the event of any breach of the foregoing warranties, Subcontractor shall, at its own expense, upon Contractor's election either: (1) re-perform the non-conforming services and/or correct the non-performing goods to conform to this standard; or (2) refund to Contractor that portion of the amounts received by Subcontractor attributed to the non-conforming services and/or goods. All warranties of Subcontractor shall inure to the benefit of Contractor and the Customer. The foregoing warranties shall survive any delivery, inspection, acceptance, or payment by Contractor.

Any goods delivered under this Subcontract shall be deemed accepted upon their successful installation and configuration and upon Contractor's satisfaction that the capabilities and performance of the goods conform to the requirements set forth by Contractor and the Customer.

-13-

AAI00006471



### H.18. FOREIGN SOURCES

Technologies acquired will not be under foreign ownership, control or influence. If requested in writing by the Customer or the Government, a FOCI package including documents SF328 (certificate pertaining to foreign interests) and OES (organizations entity structure) and KMPL) (key management personnel list) will be completed as an aid to review of forging ownership control or influence. All FOCI documents required will be completed expeditiously and failure to do so will be grounds for termination of this Subcontract.

In the event that the Subcontractor anticipates soliciting foreign source(s) for any work under this Subcontract which may require access to any equipment/technical data which is controlled by either the Arms Export Control Act or the Export Administration Act of 1979 (as amended), the Subcontractor shall notify Contractor's Contractual Representative fifteen (15) working days before either applying for an export license under ITAR (International Traffic in Arms Regulation), 22 CFR 121-128, or before solicitation of the foreign source(s), whichever shall occur first. This notification shall include detailed description of the data/equipment to be exported and a copy of the application for an export license, if such application has been made. This notification to Contractor shall not be construed as an application for an export license, nor shall it in any way be interpreted to impede the Subcontractor's right to apply for an export license. However, if the Government agency to whom Subcontractor submits such application disapproves the Subcontractor's application, the Subcontractor will so notify Contractor.

### H.19. COMPLIANCE WITH CONTRACTOR AND GOVERNMENT POLICIES

Subcontractor will not use any person in the direct performance of this contract who has resigned as an employee of the government sponsor agency within the last 18 months or has been barred from performing with this agency or was terminated from the agency. Any requests for clarification on this policy can be addressed in writing.

### H.20. APPROVAL OF SUBCONTRACTS AND CONSULTANTS

Contractor requires that the Subcontractor submit a request for consent before placing any lower-tier subcontract for furnishing any of the work called for in a Purchase Order. Subcontractor shall not subcontract with any lower-tier subcontractor or consultant until approval is given, in writing, by Contractor's Contractual Representative or authorized designee.

### H.21. ACCEPTANCE OF SUBCONTRACT TERMS AND CONDITIONS

(a) This Subcontract integrates, merges, and supersedes any prior offers, negotiations, and agreements concerning the subject matter hereof and constitutes the entire agreement between the Parties.

(b) Subcontractor's acknowledgment, acceptance of payment, or commencement of performance, shall constitute Subcontractor's unqualified acceptance of this Subcontract.

(c) Additional or differing terms or conditions proposed by Subcontractor or included in Subcontractor's acknowledgment hereof are hereby objected to by contractor and have no effect unless expressly accepted in writing by Contractor.

## PART II –CONTRACT CLAUSES

### Section I – Contract Clauses

-14-

HIGHLY CONFIDENTIAL

AAI00006472



I.1.   FEDERAL ACQUISITION REGULATION (FAR)

(a) The following clauses of the Federal Acquisition Regulations (FAR) set forth below are hereby incorporated by reference in this Subcontract.  The obligations of Contractor to the Customer and Government as provided in said clauses shall be deemed to be the obligations of Subcontractor to Contractor.

(b) Wherever necessary to make the context of the clauses set forth in this Section applicable to this Subcontract, the term "Contractor" shall mean Subcontractor; the term "Subcontractor" shall mean Lower-tier Subcontractor; the term "Contract" shall mean this Subcontract; and the terms "Government," "Contracting Officer," and equivalent phrases shall mean Contractor.  However, the terms "Government" and "Contracting Officer" do not change (1) in the phrases "Government Property," "Government-Owned Property," "Government Equipment," "Government-Furnished Property," and "Government-Owned Equipment;" (2) when a right, act, authorization, or obligation can be granted or performed only by the Government or the Prime Contract Contracting Officer or his duly authorized representative; (3) when access to proprietary financial information or other proprietary data is required; (4) when title to property is to be transferred directly to the Government; (5) where specifically modified as noted below; and (6) in FAR's 52.215-2, 52.227-1Alt 1, and DFARS 252.227-7027.

I.2.   CLAUSES INCORPORATED BY REFERENCE

This Subcontract incorporates by reference, those clauses set forth on Attachment 3, Section J.

### Section J – List of Documents, Exhibits and Other Attachments

(All listed documents, exhibits and attachments are included at the end of this Subcontract Agreement.)

| ATTACHMENT | TITLE |
| --- | --- |
| 1. | Statement of Work |
| 2. | Invoice Instructions |
| 3. | Clauses Incorporated by Reference |

-15-

HIGHLY CONFIDENTIAL                                                                                  AAI00006473

ATTACHMENT 1
**STATEMENT OF WORK**

SEE ATTACHED

HIGHLY CONFIDENTIAL
AAI00006474



# Statement of Work
# ("SOW")

For the

## Advanced Collaborative Enterprise Service
## Operating Environment ("ACES-OE")

For

## Triangle Experience Group, Inc. ("TEG")

August 4, 2014

Issued by
ALQIMI Analytics & Intelligence, LLC

HIGHLY CONFIDENTIAL

ACES-OE TEG SOW                                                    August 2014

1. Purpose

   This Statement of Work ("SOW") defines the services required from
   Triangle Experience Group, Inc. ("Subcontractor") for ALQIMI Analytics &
   Intelligence, LLC ("ALQIMI") in connection with the Advanced
   Collaborative Enterprise Service Operating Environment ("ACES-OE")
   program. This SOW forms a part of the Subcontract between ALQIMI and
   Subcontractor. All defined terms shall have the meaning ascribed to them
   in the Subcontract.

2. Subcontract Contract Line Items

| CLIN | DESCRIPTION | AMOUNT |
|---|---|---|
| CLIN 001 | Labor: <br> • SME – SOF Operations, Collaboration Workflow- Robert Clare <br> • SME – Spatial Applications- Sean R. McCluskey <br> • Task Manager-Resource TBD by TEG | $783,000.00 |
| CLIN 002 | Travel* | $36,000.00 |
| | | NTE TOTAL: $819,000.00 |

3. Subcontract Deliverables

   **ACES – OE System Delivery**

   Subcontractor shall assist and support the design, delivery, installation,
   and customization of a single ACES-OE prototype for both R&D and
   operational use.

   This system shall include a 6-axis, gestural tracking system (ideally
   ultrasonic, but optical if necessary), a virtual workspace consisting of at
   least six 55" monitors, integrated whiteboard, and all required software
   required to support several representative applications, including:

   • Gestural navigation within both typical mapping applications
     (Google Earth™, etc.) and 3-D simulated environments.
   • Gestural navigation through and control of multiple
     simultaneous video feeds.

ACES-OE TEG SOW                                          August 2014

* Integration of tradition presentation tools via video pass-through from existing workstations.

Subcontractor shall also install and validate one (1) instance of Oblong's Mezzanine Infopresence™ environment.

## Integration and Implementation Support

The Subcontractor shall provide spatial computing support and customized application development for the ACES-OE. Specifically, the Subcontractor shall perform the following:

* Consult on the integration of selected geospatial or situational awareness applications (such as SIRIS or Eagle Vision) for demonstration.
* Provide R&D support for specific open source analytical tools with respect to AF SBIR FA8650-14-D-6533.
* Develop scenarios and use-cases for ACES-OE.
* Work closely with ALQIMI to create an accelerated environment for the evaluation of foundational technologies to support a seamless delivery of an end-state desire for a Single Information Environment that address the capability gaps associated with internal Big Data repositories and fast moving external social concepts and ideas.
* Provide subject matter expertise to leverage pre-integrated platforms and integrate best practices combined with to solidify future decision support tools.
* Support the ACES-OE by rapidly discovering, assessing, and (while working with technical and operational performers) develop implementation technology plans which drive technology adoption.
* Provide subject matter expertise toward solution prototyping, key measurements metrics, and architectural plans that support quarterly capability drops; as well as, lead technical discussions and assessments associated with HW/SW installation, end-user workflows, and requirements generation of the ACES-OE.
* Compose technical assessments in order to identify costs and benefits of using specific technologies and unique data sets across the DoD and the IC.
* Solve technical and operational challenges associated with enhanced automation technologies that can be leveraged to support analyst operators efficiencies across industry, academia, Federally Funded Research and Development Labs (FFRDCs), and other government agencies.

ACES-OE TEG SOW                                               August 2014

- Consult with ACES-OE partners to develop a formalized process by which new technologies can be brought into the ACES-OE sandbox.
- Consult with both the ACES-OE System Integrator and All Source Intelligence Analytic Architect to identify the most efficient method to tag, index, and push data across domains.

4. Invoicing

Subcontractor may invoice for all services actually performed during the month prior to invoicing. In any event, Subcontractor shall comply with all invoicing provisions set forth in the Subcontract.

5. *Travel

Subcontractor shall be reimbursed only for necessary, reasonable, and actual travel expenses for transportation, lodging, meals, and incidental expenses at cost and only up to the amount indicated in this SOW.

6. Contractual Direction

Subcontractor shall provide the Subcontract Deliverables in coordination with and at the direction of ALQIMI's Technical Representative.

7. Subcontractor Personnel

Subcontractor services shall be performed as directed by the ALQIMI PM. A standard forty (40) hour schedule is required and any deviation from this schedule requires written consent by ALQIMI's Technical Representative.

ALQIMI may, in its sole discretion, have Subcontractor remove any specified employee or agent of Subcontractor from ALQIMI's premises. In the event of any performance issues, ALQIMI may also, in its sole discretion, direct Subcontractor to replace any individual with a substitute individual of equal or greater qualifications.

8. Period of Performance

The period of performance for this effort is July 21, 2014 to July 20, 2015.

9. Place of Performance

ACES-OE TEG SOW                                      August 2014

All Subcontractor support is to be provided at ALQIMI's facility in Northern Virginia unless otherwise directed by the ALQIMI Technical Representative.

*R&C*

HIGHLY CONFIDENTIAL                                      AAI00006479



## ATTACHMENT 2
## INVOICING INSTRUCTIONS

Invoices shall be emailed to the Contractor's Contractual Representative (Ravinder Birgi).

Each invoice must contain the following information:

* Subcontractor name and address
* Subcontractor remit to address (if other than Name and Address listed above)
* Subcontractor invoice number
* Date of invoice
* Contractor Subcontract Number (listed on cover page of Subcontract)
* Purchase Order Number
* Period of Performance for which invoice is submitted
* Hours worked by labor category during the period indicated on the invoice, if applicable
* Charges for travel, subsistence, and lodging, if applicable
* Charges for Other Direct Costs (ODC's), with detailed description of each charge, if applicable
* Total Charges for labor shall be shown separately by labor category
* Total Charges for materials and / or supplies
* Cumulative amount invoiced to date for each line item on the invoice

Invoice shall contain a written certification as to its accuracy, signed and dated by a duly authorized agent of the Subcontractor, essentially similar to the language below:

*"I hereby certify that the above invoice is correct and just, that the costs included herein have been incurred and that payment therefore has not been received, that it is in accordance with the terms and conditions of the Subcontract and that all services/supplies shown in this invoice have been performed, delivered, or incorporated into an item to be delivered. It is presented with the knowledge that the amount paid herein will become the basis for a claim against the United States Government."*

-37-

HIGHLY CONFIDENTIAL



## ATTACHMENT 3
### CLAUSES INCORPORATED BY REFERENCE

(Note: Any non-applicable clauses will be considered self-deleting)

For purposes of this subcontract, with respect to the clauses set forth below, the terms "Government" and "Contracting Officer" shall be construed to mean "ALQIMI" and where applicable "Subcontract Administrator"; the terms "Contractor" and "Contract" shall be construed to mean "Subcontractor" and "Subcontract" respectively.

An exception shall apply for all clauses providing access to **Subcontractor proprietary records to the extent** these clauses are incorporated. For these clauses only, references to "the Government", "Contracting Officer" and the like shall remain as stated and the term "Contractor" shall mean "Subcontractor". Subcontractor shall communicate and otherwise deal directly with the Contracting Officer or his authorized representative to the extent practicable and permissible as to the financial disclosure clauses. Subcontractor shall provide PAR with copies of all communications between Subcontractor and the Contracting Officer respecting the financial disclosure clause; however, Subcontractor shall not be required to disclose to PAR information that is privileged or confidential to Subcontractor.

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es): www.farsite.hill.af.mil and ww.arnet.gov.far.

| | |
|---|---|
| 52.247-1 Commercial Bill Of Lading Notations | FEB 2006 |
| 252.211-7003 Item Identification and Valuation | JUN 2011 |
| 252.211-7005 Substitutions for Military or Federal Specifications/Standards | NOV 2005 |
| 252.211-7006 Passive Radio Frequency Identification | SEP 2011 |
| 252.211-7007 Reporting of Government-Furnished Property | AUG 2012 |
| 252.211-7008 Use of Government-Assigned Serial Numbers | SEP 2010 |
| 52.246-2 Inspection Of Supplies--Fixed Price | AUG 1996 |
| 52.246-16 Responsibility For Supplies | APR 1984 |
| 52.246-18 Warranty Of Supplies Of A Complex Nature | MAY 2001 |
| 52.246-19 Warranty Of Systems And Equipment Under Performance Specifications or Design Criteria | MAY 2001 |
| 52.246-23 Limitation Of Liability | FEB 1997 |
| 52.246-24 Alt I Limitation Of Liability-High Value Items (Feb 1997) - Alt I | APR 1984 |
| 252.246-7000 Material Inspection And Receiving Report | MAR 2008 |
| 252.246-7003 Notification of Potential Safety Issues | JAN 2007 |
| 52.247-48 F.O.B. Destination-Evidence Of Shipment | FEB 1999 |
| 52.243-1 Changes--Fixed Price | AUG 1987 |
| 52.243-7 Notification Of Changes | APR 1984 |
| 52.249-2 Termination For Convenience Of The Government (Fixed-Price) | APR 2012 |
| 252.232-7007 Limitation Of Government's Obligation | MAY 2006 |
| 252.242-7004 Material Management And Accounting System | MAY 2011 |
| 252.242-7005 Contractor Business Systems | FEB 2012 |
| 252.242-7006 Accounting System Administration | FEB 2012 |
| 52.215-10 Price Reduction for Defective Certified Cost or Pricing Data | AUG 2010 |
| 52.215-12 Subcontractor Certified Cost or Pricing Data | OCT 2011 |
| 52.243-1 Changes-Fixed Price | AUG 1987 |
| 52.235-7010 Acknowledgement of Support Disclaimer | MAY 1995 |

| | | |
|---|---|---|
| 52.202-1 | Definitions | JAN 2012 |
| 52.203-3 | Gratuities | APR 1984 |
| 52.203-5 | Covenant Against Contingent Fees | APR 1984 |
| 52.203-6 | Restrictions On Subcontractor Sales To The Government | SEP 2006 |
| 52.203-7 | Anti-Kickback Procedures | OCT 2010 |

-28-

*REC*

AAI00006481



| 52.203-8 | Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity | JAN 1997 |
|---|---|---|
| 52.203-10 | Price Or Fee Adjustment For Illegal Or Improper Activity | JAN 1997 |
| 52.203-12 | Limitation On Payments To Influence Certain Federal Transactions | OCT 2010 |
| 52.203-13 | Contractor Code of Business Ethics and Conduct | APR 2010 |
| 52.203-14 | Display of Hotline Poster(s) | DEC 2007 |
| 52.204-2 | Security Requirements | AUG 1996 |
| 52.204-4 | Printed or Copied Double-Sided on Postconsumer Fiber Content Paper | MAY 2011 |
| 52.204-7 | Central Contractor Registration | APR 2008 |
| 52.204-9 | Personal Identity Verification of Contractor Personnel | JAN 2011 |
| 52.209-6 | Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment | DEC 2010 |
| 52.209-7 | Information Regarding Responsibility Matters | JAN 2011 |
| 52.209-9 | Updates of Publicly Available Information Regarding Responsibility Matters | JAN 2012 |
| 52.210-1 | Market Research | APR 2011 |
| 52.211-5 | Material Requirements | AUG 2000 |
| 52.211-15 | Defense Priority And Allocation Requirements | APR 2008 |
| 52.215-2 | Audit and Records—Negotiation | OCT 2010 |
| 52.215-8 | Order of Precedence--Uniform Contract Format | OCT 1997 |
| 52.215-11 | Price Reduction for Defective Certified Cost or Pricing Data--Modifications | AUG 2011 |

| 52.215-13 | Subcontractor Certified Cost or Pricing Data--Modifications | OCT 2010 |
|---|---|---|
| 52.215-14 Alt 1 | Integrity of Unit Prices | OCT 2010 |
| 52.215-15 | Pension Adjustments and Asset Reversions | OCT 2010 |
| 52.215-18 | Reversion or Adjustment of Plans for Postretirement Benefits (PRB) Other than Pensions | JUL 2005 |
| 52.215-19 | Notification of Ownership Changes | OCT 1997 |
| 52.215-20 | Requirements for Certified Cost or Pricing Data or Information Other Than Certified Cost or Pricing Data | OCT 2010 |
| 52.215-21 | Requirements for Certified Cost or Pricing Data or Information Other Than Certified Cost or Pricing Data-- Modifications | OCT 2010 |
| 52.215-22 | Limitations on Pass-Through Charges--Identification of Subcontract Effort | OCT 2009 |
| 52.215-23 | Limitations on Pass-Through Charges | OCT 2009 |
| 52.216-7 | Allowable Cost And Payment | JUN 2011 |
| 52.216-8 | Fixed Fee | JUN 2011 |
| 52.219-28 | Post-Award Small Business Program Representation | APR 2012 |
| 52.222-1 | Notice To The Government Of Labor Disputes | FEB 1997 |
| 52.222-2 | Payment For Overtime Premiums | JUL 1990 |
| 52.222-3 | Convict Labor | JUN 2003 |
| 52.222-19 | Child Labor -- Cooperation with Authorities and Remedies | JUL 2010 |
| 52.222-4 | Contract Work Hours and Safety Standards Act - Overtime Compensation | JUL 2005 |
| 52.222-20 | Walsh-Healey Public Contracts Act | OCT 2010 |
| 52.222-21 | Prohibition Of Segregated Facilities | FEB 1999 |
| 52.222-26 | Equal Opportunity | MAR 2007 |
| 52.222-29 | Notification Of Visa Denial | JUN 2003 |
| 52.222-35 | Equal Opportunity for Veterans | SEP 2010 |
| 52.222-36 | Affirmative Action For Workers With Disabilities | OCT 2010 |
| 52.222-37 | Employment Reports on Veterans | SEP 2010 |
| 52.222-40 | Notification of Employee Rights Under the National Labor Relations Act | DEC 2010 |

-29-

AAI00006482



| 52.222-50 Alt 1 | Combating Trafficking in Persons (Aug 2007) Alternate I | AUG 2007 |
| 52.222-54 | Employment Eligibility Verification | JAN 2009 |
| 52.223-3 | Hazardous Material Identification And Material Safety Data | JAN 1997 |
| 52.223-5 | Pollution Prevention and Right-to-Know Information | MAY 2011 |
| 52.223-6 | Drug-Free Workplace | MAY 2001 |
| 52.223-18 | Encouraging Contractor Policies To Ban Text Messaging While Driving | AUG 2011 |
| 52.223-19 | Compliance with Environmental Management Systems | MAY 2011 |
| 52.225-1 | Buy American Act--Supplies | FEB 2009 |
| 52.225-3 Alt | Buy American Act--Free Trade Agreement--Israeli Trade Act (NOV 2012) Alternate I | MAR 2012 |
| 52.225-13 | Restrictions on Certain Foreign Purchases | JUN 2008 |
| 52.225-19 | Contractor Personnel in a Designated Operational Area or Supporting a Diplomatic or Consular Mission Outside the United States | MAR 2008 |
| 52.225-25 | Prohibition on Engaging in Sanctioned Activities Relating to Iran—Certification | NOV 2011 |
| 52.227-1 | Authorization and Consent | DEC 2007 |
| 52.227-2 | Notice And Assistance Regarding Patent And Copyright Infringement | DEC 2007 |
| 52.227-10 | Filing Of Patent Applications--Classified Subject Matter | DEC 2007 |
| 52.228-3 | Worker's Compensation Insurance (Defense Base Act) | APR 1984 |
| 52.228-7 | Insurance--Liability To Third Persons | MAR 1996 |

| 52.229-3 | Federal, State And Local Taxes | APR 2003 |
| 52.230-2 | Cost Accounting Standards | MAY 2012 |
| 52.230-6 | Administration of Cost Accounting Standards | JUN 2010 |
| 52.229-8 | Taxes--Foreign Cost-Reimbursement Contracts | MAR 1990 |
| 52.232-1 | Payments | APR 1984 |
| 52.232-8 | Discounts For Prompt Payment | FEB 2002 |
| 52.232-9 | Limitation On Withholding Of Payments | APR 1984 |
| 52.232-11 | Extras | APR 1984 |
| 52.232-17 | Interest | OCT 2010 |
| 52.232-18 | Availability Of Funds | APR 1984 |
| 52.232-22 | Limitation Of Funds | APR 1984 |
|  | Change para (c) from "60" to "75" | |
|  | Change para (d) from "Sixty" to "Seventy-Five" | |
| 52.232-23 | Assignment of Claims (Jan 1986) | JAN 1986 |
| 52.232-25 | Prompt Payment | OCT 2008 |
|  | Change para B from "30th" to "60th" | |
| 52.232-33 | Payment by Electronic Funds Transfer—Central Contractor Registration | OCT 2003 |
| 52.233-1 Alt 1 | Disputes | JUL 2002 |
| 52.233-3 | Protest After Award | AUG 1996 |
| 52.233-4 | Applicable Law for Breach of Contract Claim | OCT 2004 |
| 52.242-13 | Bankruptcy | JUL 1995 |
| 52.242-15 | Stop-Work Order | AUG 1989 |
| 52.244-2 | Subcontracts | OCT 2010 |
| 52.244-5 | Competition in Subcontracting | DEC 1996 |
| 52.244-6 | Subcontracts for Commercial Items | DEC 2010 |
| 52.245-1 | Government Property | APR 2012 |
| 52.245-9 | Use And Charges | AUG 2010 |
| 52.246-23 | Limitation Of Liability | FEB 1997 |

-30-

AAI00006483



| 52.247-34 | F.O.B. Destination | NOV 1991 |
|---|---|---|
| 52.247-67 | Submission Of Transportation Documents For Audit | FEB 2006 |
| 52.249- 2 | Termination For Convenience Of The Government (Fixed- Price) | APR 2012 |
| 52.249-6 | Termination (Cost Reimbursement) | MAY 2004 |
| | Change para (d) from "120" to "90" | |
| | Change para (e) from "15" to "30" & "45" to "60" | |
| | Change para (f) from "1 year" to "6 months" | |
| 52.249-8 | Default (Fixed-Price Supply & Service) | APR 1984 |
| 52.249-14 | Excusable Delays | APR 1984 |
| 52.251-1 | Government Supply Sources | AUG 2010 |
| 52.253-1 | Computer Generated For ms | JAN 1991 |
| 252.201-7000 | Contracting Officer's Representative | DEC 1991 |
| 252.203-7000 | Requirements Relating to Compensation of Former DoD Officials | SEP 2011 |
| 252.203-7001 | Prohibition On Persons Convicted of Fraud or Other Defense | DEC 2008 |
| | Contract-Related Felonies | |
| 252.203-7002 | Requirement to Inform Employees of Whistleblower Rights | JAN 2009 |
| 252.203-7003 | Agency Office of the Inspector General | DEC 2012 |
| 252.204-0002 | Li ne Item Specific: Sequential ACRN Order | SEP 2009 |
| 252.204-0007 | Contract-wide: Sequential ACRN Order | SEP 2009 |
| 252.204-0007 | Contract-wide: Sequential ACRN Order | SEP 2009 |
| 252.204-7000 | Disclosure Of Information | DEC 1991 |
| 252.204-7003 | Control Of Government Personnel Work Product | APR 1992 |

| 252.204-7004 Al | Central Contractor Registration Al ternate A | SEP 2007 |
|---|---|---|
| 252.204-7005 | Oral Attestation of Security Responsibilities | NOV 2001 |
| 252.204-7008 | Export-Controlled Items | APR 2010 |
| 252.205-7000 | Provision Of Information To Cooperative Agreement Holders | DEC 1991 |
| 252.209-7010 | Critical Safety Items | AUG 2011 |
| 252.211-7003 | Item Identification and Valuation | JUN 2011 |
| 252.215-7000 | Pricing Adjustments | DEC 1991 |
| 252.215-7002 | Cost Estimating System Requirements | FEB 2012 |
| 252.216-7006 | Ordering | MAY 201 |
| 252.219-7003 | Small Business Subcontracting Plan (DOD Contracts) | JUN 2012 |
| 252.222-7000 | Restriction On Employment Of Personnel | MAR 200 |
| 252.222-7006 | Restrictions on the Use of Mandatory Arbitration Agreements | DEC 2010 |
| 252.223-7004 | Drug Free Work Force | SEP 1988 |
| 252.223-7006 | Prohibition On Storage And Disposal Of Toxic And Hazardous Materials | APR 2012 |
| 252.225-7001 | Buy American Act And Balance Of Payments Program | OCT 2011 |
| 252.225-7002 | Qualifying Country Sources As Subcontractors | JUN 2012 |
| 252.225-7004 | Report of Intended Performance Outside the United States and Canada ~ | OCT 2010 |

-31-

AAI00006484



| | Submission After Award | |
|---|---|---|
| 252.225-7012 | Preference For Certain Domestic Commodities | FEB 2013 |
| 252.225-7013 | Duty-Free Entry | JUN 2012 |
| 252.225-7039 | Contractors Performing Private Security Functions | JUN 2012 |
| 252.225-7040 | Contractor Personnel Authorized to Accompany U.S. Armed | JUN 2011 |
| | Forces Deployed Outside the United States | |
| 252.225-7043 | Anti terrorism/ Force Protection Policy for Defense | MAR 2006 |
| | Contractors Outside the United States | |
| 252.226-7001 | Utilization of Indian Organizations and Indian-Owned | SEP 2004 |
| | Economic Enterprises, and Native Hawaiian Small Business Concerns | |
| 252.227-7000 | Non-estoppel | OCT 1966 |
| 252.227-7001 | Release Of Past Infringement | AUG 1984 |
| 252.227-7013 | Rights in Technical Data--Noncommercial Items | FEB 2012 |
| 252.227-7014 | Rights in Noncommercial Computer Software and | FEB 2012 |
| | Noncommercial Computer Software Documentation | |
| 252.227-7015 | Technical Data--Commercial Items | DEC 2011 |
| 252.227-7016 | Rights in Bid or Proposal Information | JAN 2011 |
| 252.227-7019 | Validation of Asserted Restrictions--Computer Software | SEP 2011 |
| 252.227-7025 | Limitations on the Use or Disclosure of Government- | MAR 2011 |
| | Furnished Information Marked with Restrictive Legends | |
| 252.227-7030 | Technical Data--Withholding Of Payment | MAR 2000 |
| 252.227-7037 | Validation of Restrictive Markings on Technical Data | JUN 2012 |
| 252.227-7038 | Patent Rights--Ownership by the Contractor (Large Business) | JUN 2012 |
| 252.231-7000 | Supplemental Cost Principles | DEC 1991 |
| 252.232-7003 | Electronic Submission of Payment Requests and Receiving Reports | JUN 2012 |
| 252.232-7010 | Levies on Contract Payments | DEC 2006 |
| 252.235-7011 | Final Scientific or Technical Report | NOV 2004 |
| 252.243-7001 | Pricing Of Contract Modifications | DEC 1991 |

-32-

AAI00006485



| 252.243-7002 | Requests for Equitable Adjustment | MAR 1998 |
|---|---|---|
| 252.244-7000 | Subcontracts for Commercial Items and Commercial Components (DoD Contracts) | JUN 2012 |
| 252.244-7001 | Contractor Purchasing System Administration | JUN 2012 |
| 252.245-7001 | Tagging, Labeling and Marking of Government Furnished Property | APR 2012 |

| 252.245-7002 | Reporting Loss of Government Property | APR 2012 |
|---|---|---|
| 252.245-7003 | Contractor Property Management System Administration | APR 2012 |
| 252.245-7004 | Reporting, Reutilization, and Disposal | MAY 2013 |
| 252.247-7023 | Transportation of Supplies by Sea | MAY 2002 |
| 252.247-7024 | Notification Of Transportation Of Supplies By Sea | MAR 2000 |
| 252.251-7000 | Ordering From Government Supply Sources | NOV 2004 |

-33-

AAI00006486

 **TEG**

Robert Clare <rclare@triangleexperience.com>

## SETR with SED on Wednesday
9 messages

**cushingk@nro.mil <cushingk@nro.mil>**
To: sean@triangleexperience.com, jsal@triangleexperience.com, todd@triangleexperience.com, robert.herslow@us.af.mil, rclare@triangleexperience.com
Tue, Sep 20, 2016 at 7:41 AM

Gents,

Just confirming that the SETR is tomorrow Wednesday from 1000-1200 in 23A00A.

I have slides on NMIS in preparation for it...please check your NMIS accounts this morning.

Who are you bringing from the Technical side?  Everyone needs to be TS/SCI.

Cheers,

Seat

Kenny Cushing, Lt Col, USAF
National Reconnaissance Office (NRO)
(U) 703-808-0737
(S) 850-0737

---

**Sean Mccluskey <sean@triangleexperience.com>**
To: "<cushingk@nro.mil>" <cushingk@nro.mil>, Klee Dienes <klee.dienes@hadronindustries.com>
Cc: Joe Saleck <jsal@triangleexperience.com>, Todd Sternberg <todd@triangleexperience.com>, ROBERT D Lt Col USAF HAF AFELM SAF PROJ OFC SP/A2I HERSLOW <robert.herslow@us.af.mil>, Robert Clare <rclare@triangleexperience.com>
Tue, Sep 20, 2016 at 8:09 AM

Bringing Klee into the discussion to figure out how to best support.  Klee's clearance is still being reviewed, and hasn't been reinstated as of this morning.

v/r,
Sean

Sean McCluskey

**TRIANGLE EXPERIENCE GROUP**
SEAN@TRIANGLEEXPERIENCE.COM
+1 443 837 5839  (o)
+1 410 212 9561  (m)


EXHIBIT
TEG
121

[Quoted text hidden]

**cushingk@nro.mil** <cushingk@nro.mil>                                                    Tue, Sep 20, 2016 at 8:45 AM
To: sean@triangleexperience.com, klee.dienes@hadronindustries.com
Cc: jsal@triangleexperience.com, todd@triangleexperience.com, robert.herslow@us.af.mil, rclare@triangleexperience.com

Let me confirm that we can go down to Secret…may not be possible…have a Plan B ready…need a technical expert.


Cheers.


Seat


Kenny Cushing, Lt Col, USAF

National Reconnaissance Office (NRO)

(U) 703-808-0737

(S) 850-0737


**From:** Sean Mccluskey [mailto:sean@triangleexperience.com]
**Sent:** Tuesday, September 20, 2016 8:10 AM
**To:** Cushing Kenneth T; Klee Dienes
**Cc:** Joe Saleck; Todd Sternberg; ROBERT D Lt Col USAF HAF AFELM SAF PROJ OFC SP/A2I HERSLOW; Robert Clare
**Subject:** [Non-DoD Source] Re: SETR with SED on Wednesday


All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.



All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.


EXHIBIT
TEG 122

| Message | |
|---|---|
| **From:** | Robert Clare [rclare@triangleexperience.com] |
| on behalf of | Robert Clare <rclare@triangleexperience.com> [rclare@triangleexperience.com] |
| **Sent:** | 11/22/2016 7:35:20 PM |
| **To:** | Herslow, Robert D LTCOL USAF (US) [ Herslow, Robert D LTCOL USAF (US) <robert.d.herslow.mil@mail.mil>] |
| **CC:** | Sean McCluskey [Sean McCluskey <sean@triangleexperience.com>] |
| **Subject:** | Photon Code Base |
| **Attachments:** | ACES_Photon 16.04.01Packages.xlsx |

Sir,

Attached below is an excel spread sheet showing the full list of packages or libraries included in the ACES/Photon system that was accredited as part of the ATO at the NRO/JCC. Lee, Sean and Todd worked on this today for a bit. Im not exactly sure what this means to be honest but I definitely want to know if we have a compliance issue.

A quick search reveals 9 different Oblong libraries, and the likelihood that other Oblong g-speak libraries exist as part of the baseline, but aren't as obvious due to their naming conventions.  If this is the case, then we will need to determine whether or not we have a licensing compliance issue at NRO JCC.  We are moving quickly to clarify the issue to ensure that there is not any interruption of service for any ACES system.

Timeline:  We have scheduled a meeting Monday after Thanksgiving weekend with Mike Brown and Mike Freidel of Oblong.   If a license infringement state does in fact exist, then we will determine how Oblong wants to proceed. It may be as simple as us paying them for that license or it may not be that simple.  Post that discussion we will also provide a path forward for not only the existing system, but for future ACES deployments as well that avoid these issues in a way that is acceptable to your office.

Oblong will likely work with us if that is the case.  It is standard industry practice to work quickly to resolve compliance issues that self report.  You are welcome to attend Monday's meeting (I realize you are in VaBch), or we can schedule a follow up once all of the information is made available.

Additional notes:  Please reach out to Brian Donnelly and see if he will provide full details to what was declared under the Hadron SBIR in order to get a comprehensive picture on what technologies is governed under the SBIR program.


Rob Clare
Triangle Experience Group
rclare@triangleexperience.com
910-489-9520 (mobile)

{"email-policy":{"state":"closed","expirationUnit":"days","disableCopyPaste":false,"disablePrint":false,"disableForwarding":false,"expires":false,"isManaged":false},"attachments":{}}



| Message | |
|---|---|
| **From:** | Sean Mccluskey [sean@triangleexperience.com] |
| **Sent:** | 8/30/2016 1:43:28 PM |
| **To:** | Herslow, Robert D Lt Col USAF AF-A2 (US) [robert.d.herslow.mil@mail.mil] |
| **CC:** | Robert Clare [rclare@triangleexperience.com] |
| **Subject:** | Re: JA CDS IDIQ Final ConOps Cmts 29 Aug 2016.docx (UNCLASSIFIED) |

DRAFT:

It is the intent for the first year of this contract to explore the viability of the latest upgraded versions of the CDS solution distributed across mission partners. Those original deployments leveraged technology that was developed at private expense, but configured and deployed using government funds. Similarly, Lazarus has been built at private expense as upgrades to the existing architecture to better support the latest requirements of data sets, scenarios (tactical deployment in addition to strategic comms), and performance thresholds. TEG has leveraged over 30 years of CDS development experience and codified them into a new form factor, in order to meet these new requirements The current Lazarus CDS that A2I would like to instantiate builds upon previously versions of the technology already deployed. I'm happy to set up a meeting with TEG to provide additional background if necessary.


vr
Sean

Sean Mccluskey
1401 Wilson Blvd
B Level
Arlington VA 22209
410.212.9561 (m)
443.837.5839 (o)
sean@triangleexperience.com



EXHIBIT
TEG 705


On Aug 30, 2016, at 8:17 AM, Herslow, Robert D Lt Col USAF AF-A2 (US) <robert.d.herslow.mil@mail.mil> wrote:

How would you like to answer this one?

-----Original Message-----
From: Francis, Megan M CIV USARMY ACC (US)
Sent: Tuesday, August 30, 2016 7:27 AM
To: Herslow, Robert D Lt Col USAF AF-A2 (US) <robert.d.herslow.mil@mail.mil>
Cc: Harley, Tristan D CIV USARMY ACC (US) <tristan.d.harley.civ@mail.mil>
Subject: RE: JA CDS IDIQ Final ConOps Cmts 29 Aug 2016.docx (UNCLASSIFIED)

Is there any way to get in touch with the person that developed it to ask them this question? The SCA won't sign off on the J&A until this question is answered..

-----Original Message-----
From: Herslow, Robert D Lt Col USAF AF-A2 (US)
Sent: Monday, August 29, 2016 4:46 PM
To: Francis, Megan M CIV USARMY ACC (US) <megan.m.francis3.civ@mail.mil>
Cc: Harley, Tristan D CIV USARMY ACC (US) <tristan.d.harley.civ@mail.mil>
Subject: RE: JA CDS IDIQ Final ConOps Cmts 29 Aug 2016.docx (UNCLASSIFIED)

Megan,

Nobody has ever asked that question before.  This is my first year working with this controlled interface.  The person that developed it worked classified programs at the NRO for the last 30 years.  If you need to call to talk on the phone, please do...

Thanks,

Lt Col Rob Herslow
AF/A2I ISR Innovations
DESK: 703-693-1751
CELL:  757-404-9303
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
Robert.d.herslow.mil@mail.mil
Robert.d.herslow.mil@mail.smil.mil
Robert.herslow@af.ic.gov


-----Original Message-----
From: Francis, Megan M CIV USARMY ACC (US)
Sent: Monday, August 29, 2016 4:00 PM
To: Herslow, Robert D Lt Col USAF AF-A2 (US) <robert.d.herslow.mil@mail.mil>
Cc: Harley, Tristan D CIV USARMY ACC (US) <tristan.d.harley.civ@mail.mil>
Subject: RE: JA CDS IDIQ Final ConOps Cmts 29 Aug 2016.docx (UNCLASSIFIED)

Why has the government ever considered purchasing the TDP on previous procurements?  We will incorporate your answer into Para 5 which identifies that we will be asking the contractor to price out the cost of the TDP.

-----Original Message-----
From: Herslow, Robert D Lt Col USAF AF-A2 (US)
Sent: Monday, August 29, 2016 3:30 PM
To: Francis, Megan M CIV USARMY ACC (US) <megan.m.francis3.civ@mail.mil>
Cc: Harley, Tristan D CIV USARMY ACC (US) <tristan.d.harley.civ@mail.mil>
Subject: RE: JA CDS IDIQ Final ConOps Cmts 29 Aug 2016.docx (UNCLASSIFIED)

Are you asking me to give you an estimate for purchasing full rights to this technology?

Or can we say that a study will be done over the next 12 months to determine an estimate?

-----Original Message-----
From: Francis, Megan M CIV USARMY ACC (US)
Sent: Monday, August 29, 2016 1:44 PM

TEG DEFS 001373724

To: Herslow, Robert D Lt Col USAF AF-A2 (US) <robert.d.herslow.mil@mail.mil>
Cc: Harley, Tristan D CIV USARMY ACC (US) <tristan.d.harley.civ@mail.mil>
Subject: FW: JA CDS IDIQ Final ConOps Cmts 29 Aug 2016.docx (UNCLASSIFIED)

Lt Col Herslow - Please see additional comments on the J&A.  We need to go into a little more detail on some of their questions.

Thanks,
Megan

-----Original Message-----
From: Hunt, George R CIV USARMY ACC (US)
Sent: Monday, August 29, 2016 1:08 PM
To: Francis, Megan M CIV USARMY ACC (US) <megan.m.francis3.civ@mail.mil>
Cc: Hunt, George R CIV USARMY ACC (US) <george.r.hunt6.civ@mail.mil>; Jackson, Cynthia A CIV USARMY HQDA OGC (US) <cynthia.a.jackson64.civ@mail.mil>
Subject: JA CDS IDIQ Final ConOps Cmts 29 Aug 2016.docx (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Megan,

I have reviewed the revised J&A and made a few comments and deletions.  One of Cynthia's questions was addressed in Section7, but there were more data points that needed addressing.  The result needs to go into both Sections 5 and 7.  I deleted some text from the approval page.  I also deleted a paragraph in Section 5 that repeated language Cynthia suggested.

Let me know if you have any questions after reviewing.  I can be reached by email today.


Thank you,
George Hunt
Contracting Operations PA
Bldg. 4401, Room 122
APG-ACC
410-278-1054


CLASSIFICATION: UNCLASSIFIED

TEG DEFS 001373725

| | |
|---|---|
| **From:** | Sean Mccluskey <sean@triangleexperience.com> |
| **Sent:** | Monday, October 17, 2016 12:11 AM |
| **To:** | Rob Herslow |
| **Cc:** | Robert Clare |
| **Subject:** | Re: [Non-DoD Source] Redacted J&A |

Important point to clarify:  to date none of the LCDS work has been associated with a specific ACES deployment or effort.  In the other facts -  Procurement History - it is stated in the description that procurements of LCDS was made under previous contracts.  That is not true, and its absolutely important that someone clarifies the language to ensure we are not stating that any of our engineering of a CDS work to date was conducted under a those contracts.  ACES to the Edge procurement was not a physical thing delivered, rather in those contracts we exposed/identified the Cross Domain Requirements and ACES to the Edge requirements/needs for future ACES/Photon roadmaps.   Our, TEG, engineering team separately started to develop solutions to compliment existing ACES/Photon environments, leveraging the architectures that were used by those mission partners by previously built/deployed CDS'.  Moving forward under this contract we plan on deploying the CDS we have developed development to those existing ACES/Photon environments.

v/r,
Sean

Sean McCluskey

**T R I A N G L E   E X P E R I E N C E   G R O U P**
**S E A N @ T R I A N G L E E X P E R I E N C E . C O M**
**+1 443 837 5839 (o)**
**+1 410 212 9561 (m)**



On Oct 14, 2016, at 3:16 PM, Herslow, Robert D Lt Col USAF AF-A2 (US) <robert.d.herslow.mil@mail.mil> wrote:

monday morning?

**From:** Sean Mccluskey [sean@triangleexperience.com]
**Sent:** Friday, October 14, 2016 1:04 PM
**To:** Herslow, Robert D Lt Col USAF AF-A2 (US)
**Cc:** Robert Clare
**Subject:** [Non-DoD Source] Re: Redacted J&A

All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

Stand by - what's the due date?

1

Sean Mccluskey
1401 Wilson Blvd
B Level
Arlington VA 22209
410.212.9561 (m)
443.837.5839 (o)
sean@triangleexperience.com < Caution-mailto:sean@triangleexperience.com >

On Oct 14, 2016, at 9:03 AM, Herslow, Robert D Lt Col USAF AF-A2 (US)
<robert.d.herslow.mil@mail.mil < Caution-mailto:robert.d.herslow.mil@mail.mil > > wrote:

Anything need to be redacted?

From: Francis, Megan M CIV USARMY ACC (US)
Sent: Thursday, October 13, 2016 7:05 PM
To: Herslow, Robert D Lt Col USAF AF-A2 (US)
Cc: Harley, Tristan D CIV USARMY ACC (US)
Subject: FW: Redacted J&A

Lt Col Herslow - Could you take a look at the J&A for CDS?  We have to post it
on FedBizOpps and wanted to make sure there isn't technical language that you
guys would want redacted.

Thanks,
Megan

-----Original Message-----
From: Francis, Megan M CIV USARMY ACC (US)
Sent: Thursday, October 13, 2016 10:09 AM
To: Soyka, Thomas J CIV USARMY RDECOM CERDEC (US)
<thomas.j.soyka.civ@mail.mil < Caution-mailto:thomas.j.soyka.civ@mail.mil > >
Cc: Harley, Tristan D CIV USARMY ACC (US)
<tristan.d.harley.civ@mail.mil < Caution-mailto:tristan.d.harley.civ@mail.mil > >
Subject: FW: Redacted J&A

Hi Thom - We need to post the J&A for CDS to FedBizOpps by NLT COB
today.  Would you mind taking a look to see if there is any technical information
that you do not want released?  I have only redacted the POC information.

Please let me know soonest so that I can most this today.

2

Thanks!

MEGAN FRANCIS
Contract Specialist
ACC-APG-Research Triangle Park
(919)541-1752
Megan.m.francis3.civ@mail.mil < Caution-
mailto:Megan.m.francis3.civ@mail.mil > <CDS J&A FINAL With
Signatures_Redacted.pdf>

TEG DEFS 000366959

Message

| | |
|---|---|
| **From:** | Sean Mccluskey [sean@triangleexperience.com] |
| **Sent:** | 10/19/2016 9:22:21 AM |
| **To:** | Rob Herslow [robert.d.herslow.mil@mail.mil] |
| **CC:** | Robert Clare [rclare@triangleexperience.com] |
| **Subject:** | Re: Redacted J&A |
| **Attachments:** | PastedGraphic-1.tiff |

Suggest you also redact the following until you clarify the ACES/Photon vs pure CDS acquisition in the previous contracts:

provider of this Cross Domain Solution (CDS). The US Government between 2014-2016, purchased various versions of CDS utilizing different contract vehicles to support multiple A21 partners such as, JSOC and NRO who had no requirement to invest into the CDS intellectual property or proprietary rights for long term use. Hence, the Government has not purchased and does not possess the full technical data rights to reproduce the CDS or the package and engineering description suitable for full and open competition. With the increase need for rapid deployment and minor modifications to the CDS to meet warfighter requirements and to remedy

v/r,
Sean

Sean McCluskey

TRIANGLE EXPERIENCE GROUP
SEAN@TRIANGLEEXPERIENCE.COM
+1 443 837 5839 (o)
+1 410 212 9561 (m)

On Oct 18, 2016, at 3:19 PM, Herslow, Robert D Lt Col USAF AF-A2 (US) <robert.d.herslow.mil@mail.mil> wrote:



-----Original Message-----
From: Harley, Tristan D CIV USARMY ACC (US)
Sent: Tuesday, October 18, 2016 3:18 PM
To: Herslow, Robert D Lt Col USAF AF-A2 (US)
<robert.d.herslow.mil@mail.mil>; Francis, Megan M CIV USARMY ACC (US)
<megan.m.francis3.civ@mail.mil>
Subject: RE: Redacted J&A

Please see the attached. Do you concur?

Tristan Harley

Contracting/Grant Officer
Army Contracting Command
Research Triangle Park Contracting Division
800 Park Office Drive- Suite 4229
Research Triangle Park, NC 27709
Phone: 919-541-0580**New Number


-----Original Message-----
From: Herslow, Robert D Lt Col USAF AF-A2 (US)
Sent: Tuesday, October 18, 2016 9:56 AM
To: Harley, Tristan D CIV USARMY ACC (US) <tristan.d.harley.civ@mail.mil>;
Francis, Megan M CIV USARMY ACC (US) <megan.m.francis3.civ@mail.mil>
Subject: RE: Redacted J&A

Thanks Tristan.  I have attached pages 3 and 5 with my redactions for the
J&A for CDS.  Please let me know if this is ok....

V/R,

Lt Col Rob Herslow
AF/A2I ISR Innovations
DESK: 703-693-1751
CELL:  757-404-9303
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
Robert.d.herslow.mil@mail.mil
Robert.d.herslow.mil@mail.smil.mil
Robert.herslow@af.ic.gov




-----Original Message-----
From: Harley, Tristan D CIV USARMY ACC (US)
Sent: Tuesday, October 18, 2016 8:42 AM
To: Herslow, Robert D Lt Col USAF AF-A2 (US)
<robert.d.herslow.mil@mail.mil>; Francis, Megan M CIV USARMY ACC (US)
<megan.m.francis3.civ@mail.mil>
Subject: RE: Redacted J&A

Lt Col Herslow,

Megan is on leave. If it is ok with you, please highlight what you would
like redacted and send it back.

Regards,

Tristan Harley
Contracting/Grant Officer
Army Contracting Command
Research Triangle Park Contracting Division

800 Park Office Drive- Suite 4229
Research Triangle Park, NC 27709
Phone: 919-541-0580**New Number

-----Original Message-----
From: Herslow, Robert D Lt Col USAF AF-A2 (US)
Sent: Tuesday, October 18, 2016 8:39 AM
To: Francis, Megan M CIV USARMY ACC (US) <megan.m.francis3.civ@mail.mil>
Cc: Harley, Tristan D CIV USARMY ACC (US) <tristan.d.harley.civ@mail.mil>
Subject: RE: Redacted J&A

Hi Megan.  I do want to redact some more of this but I cannot edit this
document.  Do you have a minute to talk on the phone?  I could print and
highlight and send back to you....

Thanks,

Lt Col Rob Herslow
AF/A2I ISR Innovations
DESK: 703-693-1751
CELL:  757-404-9303
1700 Air Force Pentagon (5E1012)
Washington DC 20330-1700
Robert.d.herslow.mil@mail.mil
Robert.d.herslow.mil@mail.smil.mil
Robert.herslow@af.ic.gov

-----Original Message-----
From: Francis, Megan M CIV USARMY ACC (US)
Sent: Thursday, October 13, 2016 3:06 PM
To: Herslow, Robert D Lt Col USAF AF-A2 (US) <robert.d.herslow.mil@mail.mil>
Cc: Harley, Tristan D CIV USARMY ACC (US) <tristan.d.harley.civ@mail.mil>
Subject: FW: Redacted J&A

Lt Col Herslow - Could you take a look at the J&A for CDS?  We have to post
it on FedBizOpps and wanted to make sure there isn't technical language that
you guys would want redacted.

Thanks,
Megan

-----Original Message-----
From: Francis, Megan M CIV USARMY ACC (US)
Sent: Thursday, October 13, 2016 10:09 AM
To: Soyka, Thomas J CIV USARMY RDECOM CERDEC (US)
<thomas.j.soyka.civ@mail.mil>
Cc: Harley, Tristan D CIV USARMY ACC (US) <tristan.d.harley.civ@mail.mil>
Subject: FW: Redacted J&A

TEG DEFS 000044930

Hi Thom - We need to post the J&A for CDS to FedBizOpps by NLT COB today.
Would you mind taking a look to see if there is any technical information
that you do not want released?  I have only redacted the POC information.

Please let me know soonest so that I can most this today.

Thanks!


MEGAN FRANCIS
Contract Specialist
ACC-APG-Research Triangle Park
(919)541-1752
Megan.m.francis3.civ@mail.mil


<CDS J&A FINAL With Signatures_Redacted.pdf>

Message

| | |
|---|---|
| **From:** | Sean Mccluskey [sean@triangleexperience.com] |
| **Sent:** | 10/17/2016 8:43:44 AM |
| **To:** | Herslow, Robert D Lt Col USAF AF-A2 (US) [robert.d.herslow.mil@mail.mil] |
| **CC:** | Robert Clare [rclare@triangleexperience.com] |
| **Subject:** | Re: J&A CDS Questions |

This seems to be first time that the past contract vehicles include a description - I maybe wrong.  Since they aren't commented I missed them in the original discussion - sorry.  We need to clean this language up regarding procurement of CDS in previous contracts since that is an inaccurate statement.   How do you want to handle sir?

vr
Sean

Sean Mccluskey
1401 Wilson Blvd
B Level
Arlington VA 22209
410.212.9561 (m)
443.837.5839 (o)
sean@triangleexperience.com

On Aug 19, 2016, at 10:25 AM, Herslow, Robert D Lt Col USAF AF-A2 (US) <robert.d.herslow.mil@mail.mil> wrote:

time to talk about this?



From: Francis, Megan M CIV USARMY ACC (US)
Sent: Thursday, August 18, 2016 7:56 PM
To: Herslow, Robert D Lt Col USAF AF-A2 (US)
Cc: Harley, Tristan D CIV USARMY ACC (US)
Subject: RE: J&A CDS Questions

Lt Col Herslow - Please see the attached full J&A.  There are some more comments from the review that I am unsure about.  They are all highlighted in yellow.  Please provide me with your response.

Thanks,
Megan

-----Original Message-----
From: Francis, Megan M CIV USARMY ACC (US)
Sent: Thursday, August 18, 2016 1:13 PM
To: Herslow, Robert D Lt Col USAF AF-A2 (US) <robert.d.herslow.mil@mail.mil>
Cc: Harley, Tristan D CIV USARMY ACC (US) <tristan.d.harley.civ@mail.mil>

Subject: J&A CDS Questions

Lt Col Herslow – Will you please see the attached question from the J&A and provide us with your response?

Thanks!

MEGAN FRANCIS
Contract Specialist
ACC-APG-Research Triangle Park
(919)541-1752
Megan.m.francis3.civ@mail.mil<JA CDS IDIQ ConOps Cmts and responses.docx>

TEG DEFS 000045985

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

HADRON INDUSTRIES, INC., *et al.*,      :

      Plaintiffs,      :

                :

v.      :      Case Number 1:19-cv-00035-LO-MSN

                :

TRIANGLE EXPERIENCE
GROUP, INC., *et al.,*      :

      Defendants.      :

                :

## HADRON INDUSTRIES, INC.'S SUPPLEMENTAL ANSWERS AND OBJECTIONS TO TRIANGLE EXPERIENCE GROUP, INC.'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Hadron Industries, Inc. ("Hadron") herein submits its Supplemental Answers and Objections to Defendant Triangle Experience Group, Inc.'s ("TEG" or "Defendant") First Set of Interrogatories as follows:

### SUPPLEMENTAL ANSWERS

The following Supplemental Answers and Objections are given without prejudice to Hadron's right to further supplement and/or amend these Answers or Objections, consistent with the Federal Rules of Civil Procedure and/or the Local Rules for the United States District Court for the Eastern District of Virginia ("Local Rules").

1.    Identify the person(s) who provided information used in the preparation of the answers to these Interrogatories, and detail the matters on which such person has personal knowledge.

    **Supplemental Answer:** Hadron states that the persons who provided information in connection with preparing answers to these interrogatories are Matthew Burton, of Brooklyn, New York, and Klee Dienes, of Concord, New Hampshire. Mr. Dienes has personal knowledge of the claims and allegations set forth generally throughout the Amended Complaint. Mr. Burton has knowledge of the following: (1) events that

occurred in the A2I ACES lab during the period of August through September 2014; (2) Hadron's Phase III SBIR contract; (3) Hadron's and TEG's work pursuant to the ACES program during the period from August 2014 through the Spring of 2016, including the build-out of the Rosslyn, Virginia ACES lab, TEG's office in Southern Pines, North Carolina, NLE, and in general, the equipment supply chain for these and other projects; (4) Hadron's history of business operations and events pertaining to and occurring in the Commonwealth of Massachusetts; (5) Hadron's general technical experiences and abilities; (6) the ACoE solicitation from August 2016, and events surrounding the solicitation; (7) Hadron's and TEG's employees, staff, contractors and their various roles; (8) Hadron's cease & desist letter to TEG dated November 16, 2016, and subsequent conversations in Cambridge, Massachusetts with Rob Clare that followed its issuance. Hadron reserves its rights to further supplement this answer.  Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

2.      Identify all persons who have knowledge of the facts and matters alleged in the Amended Complaint, and for each person identified, detail the facts of which each such person has knowledge.

**Supplemental Answer and Objection:**  Hadron objects to Interrogatory No. 2 to the extent it requires Hadron to identify "all persons" with knowledge, and is overly broad and unduly burdensome, and to the extent the interrogatory requires Hadron to provide information that is not in its possession, custody or control, and/or which Defendants can obtain from some other source that is more convenient, less burdensome, or less expensive.  Hadron further objects to the extent the interrogatory requires Hadron to speculate about the extent of a particular person's or third party's knowledge on certain subject matters or facts.  Subject to and without waiving these objections, Hadron states that Mr. Dienes and Mr. Burton have knowledge of facts alleged in the Amended Complaint, as set forth in Hadron's Supplemental Answer to Interrogatory No. 1.  The following current and/or former Hadron employees also have knowledge of certain facts related to the Amended Complaint:  (1) Frank Tanner – Mr. Tanner has general knowledge of Hadron's technical experience and abilities during the period from 2013 through 2016, and knowledge of Hadron's relationship with TEG during that time period; (2) Matt Tennie – Mr. Tennie has knowledge of the ACES installations at the A2I ACES Lab, UNO, Southern Pines, and the JSOC National Level Exercise; (3) Sam Hartman – Mr. Hartman has knowledge of Hadron's software development from 2016 through present day; and (4) Jeff LeBlanc – Mr. LeBlanc has knowledge of Hadron's software development from 2012 through present day.  In addition, other individuals and entities identified in the Amended Complaint will have knowledge of certain relevant facts and matters.  These persons include Robert Clare, Sean McCluskey, Walter Greenberg, and current and/or former representatives from the following entities or governmental departments, agencies, and/or offices: TEG; AAI; USAF; United States Air Force and its Intelligence, Surveillance and Reconnaissance Innovations investment program (including Col. James Mattey and Col. Robert Herslow); Oblong Industries; PAR Government Systems Corporation; University of Nebraska-Omaha; Army Geospatial

2

Center; Federal Bureau of Investigation; Department of Justice; Department of Defense; Joint Special Operations Command; National Reconnaissance Office; Army Corps of Engineers; Air Force Research Laboratories; Army Contracting Command. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

3.      Identify all admissions, declaration against interest, or any other representation allegedly made by TEG with regard to any fact concerning this litigation. Include in detail the content of such admission, including the substance of the admission, the name if the person making the admission, the date and time of the alleged admission, and the names of all persons with knowledge of each admission.

> **Supplemental Answer and Objection**: Hadron objects to Interrogatory No. 3 to the extent that it is overly broad and unduly burdensome, and to the extent the interrogatory requires Hadron to make legal and/or evidentiary conclusions with respect to certain documents, information, or materials.  Subject to and without waiving its objections, Hadron states that it is impossible to identify all representations made by TEG regarding any fact concerning this litigation, as Hadron communicated with TEG regularly about the ACES program over a number of years. Answering further, Hadron states that during a meeting on November 16, 2016, Robert Clare, on behalf of TEG, admitted to Dienes that he was responsible for creating the circumstances that led to Hadron's lost business and legal troubles.  Clare further admitted to Dienes that he was personally responsible to getting Hadron into significant legal troubles, but that he would do it again because he knew no other way to jump start the ACES project.  In addition, Hadron directs TEG generally to its responses to TEG's First Request for Production of Documents and Hadron's document productions.  A number of those documents evidence, concern or identify representations made by TEG concerning the facts alleged in the Complaint. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

4.      Identify and describe each communication between Hadron and TEG regarding the allegations in the Amended Complaint, and identify any documents related to such communications.

> **Supplemental Answer and Objection**: Hadron objects to Interrogatory No. 4 on grounds that requesting Hadron to identify "all documents" and "each communication" is overly broad and unduly burdensome. Hadron objects further to the extent the interrogatory is not reasonably limited in time or scope, and seeks information not reasonably calculated to lead to the discovery of admissible evidence.  Hadron further objects to the extent that the Interrogatory seeks confidential, proprietary, financial, trade

3

secret or business information.  Subject to and without waiving its objections, Hadron states that it engaged in substantial oral and written communications with TEG over a number of years concerning the facts and matters that are alleged and identified in the Complaint.  Hadron therefore cannot recount each and every communication with particularity.  Answering further, Hadron states that many communications occurred via email, some of which are explicitly identified in the Complaint.  Hadron therefore directs TEG generally to its responses to TEG's First Request for Production of Documents and Hadron's document productions.  Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

5.     Identify and describe each communication between Hadron and any third-party (other than counsel) regarding the allegations in the Amended Complaint, and identify any documents related to such communications.

**Supplemental Answer and Objection:** Hadron objects to Interrogatory No. 5 on grounds that requesting Hadron to identify "all documents" and "each communication" is overly broad and unduly burdensome. Hadron objects further to the extent the interrogatory is not reasonably limited in time or scope, and seeks information not reasonably calculated to lead to the discovery of admissible evidence.  Hadron further objects to the extent that the Interrogatory seeks confidential, proprietary, financial, trade secret or business information.  Subject to and without waiving its objections, Hadron states that it engaged in substantial oral and written communications with many parties over a number of years concerning the facts and matters that are alleged and identified in the Complaint.  Hadron therefore cannot recount each and every communication with particularity.  Answering further, Hadron states that many communications occurred via email, some of which are explicitly identified in the Complaint. Hadron therefore directs TEG generally to its responses to TEG's First Request for Production of Documents and Hadron's document productions.  Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

6.     Identify each of Hadron's "salaried engineering staff," as alleged in paragraph 16 of the Amended Complaint, and for each engineer, identify their employment status, year of employment, state in which taxes were paid, address and telephone number.

**Supplemental Answer and Objection:**  Hadron objects to Interrogatory No. 6 to the extent that the interrogatory seeks information not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving this objection, Hadron answers as follows:

(1) Jeffrey LeBlanc.  Mr. LeBlanc was a full-time contractor from 2012-2017, and then a full-time Hadron employee from 2017 to the present.  Mr. LeBlanc currently resides in Cambridge, Massachusetts, and at all relevant times was a Massachusetts resident/taxpayer.

4

(2) Sam Hartman.  Mr. Hartman has been a full-time Hadron employee since 2016.  Mr. Hartman currently resides in Watertown, Massachusetts, and at all relevant times was a Massachusetts resident/taxpayer.

(3) Matt Tennie.  Mr. Tennie has been a full-time Hadron employee since 2015.  Mr. Tennie currently resides in Hudson, Massachusetts, and at all relevant times was a Massachusetts resident/taxpayer.

Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

7.      State in detail all facts that support your allegation that "Hardon independently developed two proprietary software products as a result of its SBIR related work:" Praxis and Photon, as alleged in paragraph 17 of the Amended Complaint.

> **Supplemental Answer and Objection:**  Hadron objects to Interrogatory No. 7 on multiple grounds, including that requiring Hadron to identify "all facts" related to its years long development of two proprietary software products is overly broad, unduly burdensome, not proportional to the needs of the case, and would impose on Hadron duties beyond those required by the Federal Rules of Civil Procedure and/or the Local Rules. The interrogatory is also not reasonably limited in time or scope, and seeks confidential, proprietary, financial, trade secret or business information that is not relevant to this lawsuit.  Subject to and without waiving its objections, Hadron states that it began development of Praxis in June, 2011, as part of its work on NGA SBIR HM0177-12-C-0001, July 20, 2012.  Hadron expanded upon this work using IR&D funding during and after the NGA contract, and then continued development during the execution of USAF SBIR FA8650-13-M-6388 between March 2013 and August 2013. Hadron then continued development using IR&D funding and incorporating additional capabilities developed under USAF SBIR FA8650-14-D-6533.  Hadron continues to develop Praxis using IR&D funding.  Additional facts responsive to this interrogatory are set forth more fully below in Hadron's supplemental answer to interrogatory no. 9, and hereby incorporated by reference.  Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

8.      State in detail all facts that support your allegation that "[a]s a Phase III SBIR contractor, Hadron had certain rights and privileges, including the right to sell SBIR-based products to the Government on a sole source basis and the privilege of being the Government's preferred vendor of such products," as alleged in paragraph 22 of the Amended Complaint.

> **Supplemental Answer and Objection:**  Hadron objects to Interrogatory No. 8 on grounds that requesting Hadron to identify "all facts" is overly broad and unduly burdensome.  Subject to and without waiving its objection, Hadron answers that as a

matter of federal agency policy and regulations, once Hadron was awarded and successfully completed its Phase I SBIR contracts, and satisfied its competitive bidding requirements, the USAF was statutorily authorized to award a Phase III sole source contract to Hadron. Here, Hadron was awarded Phase I contracts HM0177-12-C-0001 by the National Geospatial-Intelligence Agency in 2012, and FA8650-13-M-6388 by Air Force Research Laboratories in 2013. Under these contracts, Hadron developed a highly embodied and immersive system for broad-area imagery search, and a set of gesture-based means of interacting with data. Upon completion of these contracts by August 2013, the USAF had satisfied competition for additional acquisitions of this technology. It is the government's practice to award Phase III contracts relating to a certain technology on a sole source basis to the government contractor that actually developed the technology. A USAF "Desk Reference" manual expressly provides that:

> To the greatest extent practicable, agencies or their government-owned, contractor-operated facilities, federally funded R&D centers, or government prime contractors that pursue R/R&D or production developed under the SBIR/STTR Program, shall issue Phase III awards relating to technology, including sole source awards, to the SBIR/STTR awardee that developed the technology. Agencies shall document how they provided this preference to the SBIR/STTR awardee that developed the technology. In fact, the act requires SBA report all instances in which an agency pursues research, development, or production of a technology developed by an SBIR/STTR awardee, with a business concern or entity other than the one that developed the SBIR/STTR technology...SBA will report such instances, including those discovered independently by SBA to Congress.

*See* Phase III Desk Reference, a publication of the United States Air Force, which is publicly available at *https://www.afsbirsttr.af.mil/Portals/60/Pages/Publications/ PhaseIII_Booklet.pdf.* As such, in 2014, Hadron was awarded a Phase III contract (identified more fully in paragraph 22 of the Amended Complaint) related to its prior work on the aforementioned contracts. This Phase III contract incorporates the SBIR Data Rights clause of the Defense Federal Acquisition Regulation (clause 252.227-7018). Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

9.     State in detail all facts that support your allegation that "Hadron's proprietary software" "are the foundation of the ACES system," as alleged in paragraph 23 of the Amended Complaint.

**Supplemental Answer and Objection:**   Hadron objects to Interrogatory No. 9 on grounds that requesting Hadron to identify "all facts" is overly broad and unduly burdensome. Subject to and without waiving its objections, Hadron states that the ACES program office was created to devise new collaboration tools for airmen. Through 2013, the program office was considering using Oblong's Mezzanine as the technical

6

foundation for ACES.  During a teleconference sometime in December of 2013, Oblong engineers informed Lt. Col. Mattey of the USAF that Oblong did not intend to customize Mezzanine in the ways that Lt. Col. Mattey and the USAF thought were necessary to make the product a suitable solution for the ACES program.   Thereafter, Sean McCluskey (who was an Oblong sales representative at the time) arranged for Dienes to meet with Lt. Col. Mattey, and asked Hadron to create a vision for ACES that could interoperate with Oblong's products, but which would also meet all of A2I's requirements.  Dienes then met with Lt. Col. Mattey at A2I's Pentagon offices on January 9, 2014, and proposed an expanded vision for ACES that would build upon Hadron's SBIR work.   Immediately after this meeting, Hadron began working on multiple independent research and development projects that would enable additional technologies required for ACES, including the development of Photon. This included developing the technical infrastructure to enable operators at multiple locations to share screens, applications, and input devices.  Lt. Col. Mattey declared his intention to fund further ACES development as a SBIR Phase III program derived from Hadron's previous Phase I work.  At the ACES kickoff meeting on January 22, 2014, Lt. Col. Mattey named Hadron the systems integrator for ACES, and asked Hadron to put together a proposal in that role to manage future ACES development.  Dienes provided this proposal on Hadron's behalf on March 27, 2014.  That proposal would result in a contract award to Hadron dated July 31, 2014, tasking Hadron with building a gestural control system using the technologies developed under Hadron's aforementioned Phase I SBIR contracts, and incorporating it into Hadron's Photon collaboration environment as well as other technologies. The research and development conducted by Hadron under this contract resulted in an infrastructure management toolkit for ACES, all built on top of Photon. Today, Photon remains the underlying technology of all operational ACES deployments.

Answering further, a number of additional facts, documents, and emails support the allegations of paragraph 23, and Hadron therefore directs TEG to its responses to the TEG's First Request for Production of Documents and Hadron's document productions, which are forthcoming.  For example:

> (1) In April 2014, A2I program officer Justin Hudson tasked Dienes with generating language that described Dienes's vision for ACES.  In an email dated April 14, 2014, Hudson informed Dienes that his proposed vision for ACES was "Perfect."  Dienes' language was then used verbatim in the Government's evaluation of the PAR/Alqimi proposal.

> (2) On August 24, 2014, in an email thread regarding "ACES knowledge and info(rmation) management," McCluskey asserted that Photon was a better solution for ACES than Mezzanine.

> (3) On February 27, 2015, McCluskey submitted a draft statement of work to the Government, the primary purpose of such work being to "Expand the existing functionality and feature set to the core ACES-OE technology, Photon."

7

(4) On April 11, 2015, Clare sent an email with an attachment titled "ACES_WHY.docx." In this document, Clare exhibits his belief that Photon will enable ACES to reshape DoD IT.

(5) In June 2015, TEG submitted a proposal to the Government and/or a Government prime contractor for delivering ACES to the National Reconnaissance Office. This proposal twice referred to Photon as "the foundation of" the ACES-OE.

(6) A March 2016 briefing created by TEG for the Government included a drawing that clearly refers to Photon as the central technology of ACES.

(7) In spring 2015, Hadron and TEG facilitated Government production of a promotional video for ACES. This video depicted use of Photon. TEG later printed CDs of this video. The artwork on the exterior of this CD included the phrase, "ACES is powered by Photon."

(8) TEG marketing material created in June 2016 states that "ACES is an implementation of the Photon C2OE."

(9) An August 2016 briefing by USAF staff ("Advanced Collaboration Enterprise Services Candidate Nomination") repeatedly equates ACES and Photon.

(10) In a November 17, 2016 email, Robert Clare affirmed that "Hadron owns the IP for Photon," and that "TEG has no interest in claiming - and makes no claim of ownership over - Hadron's IP."

Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

10.    Identify all other technologies preceding and succeeding Photon as the foundation

of ACES.

**Supplemental Answer:** Hadron states that it was not deeply involved with the ACES program prior to winter of 2013/2014, and therefore Hadron does not have specific knowledge of what technology, if any, preceded Photon as the foundation of the ACES program. It is Hadron's understanding that Photon has been the foundation of ACES from the spring of 2014 through the present day. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

11.    Identify each and every one of Hadron's demonstrations of any of its technology

alleged in the Amended Complaint, including, but not limited to, demonstrations for the ACES

8

program and demonstrations for Photon and Praxis.  Include in your answer (i) the approximate

date of the demonstration; (ii) the address of the demonstration (or city and state); (iii) the

audience of the demonstration; and (iv) the purpose of the demonstration.

**Supplemental Answer and Objection:**  Hadron objects to Interrogatory No. 11 on multiple grounds, including that requiring Hadron to identify every single technology demonstration involving Praxis or Photon, or other technologies, over a period of years (when Hadron is in the business of demonstrating various technologies), is overly broad, unduly burdensome, not proportional to the needs of the case, and would impose on Hadron duties beyond those required by the Federal Rules of Civil Procedure and/or the Local Rules. The interrogatory is also not reasonably limited in time or scope, and would require Hadron to provide information that is not relevant to this lawsuit.  Subject to and without waiving its objections, Hadron answers that its staff worked closely with AAI staff at the ACES A2I Lab on a daily basis from August through December 2014, during which period ACES demonstrations were frequent.  Some of these demonstrations occurred on: (1) September 4, 2014 (with Draper Labs staff); (2) September 4, 2014 (with Master Chief Petty Officer Mike Peters); (3) September 11, 2014 (with several A2I program managers); (4) September 26, 2014 (with Robert Giesler, Deputy Director, Strategic Capabilities Office); and (5) October 27, 2014 (with James Clark, Director, A2I). Answering further, Hadron met frequently with USAF staff during 2014 through 2015 and these meetings likely pertained to or included discussions about the EOY contract and/or various technology demonstrations, including the following, for example:

(1)     January 7, 2014.  Mezzanine-to-Mezzanine demonstration for A2I.  Klee Dienes participated from Boston, Massachusetts on behalf of Hadron, with unknown participants presumably elsewhere.

(2)     January 14, 2014.  ACES brief for Air National Guard.  Participants included Clare, Mattey, and Air National Guard Staff.  Dienes participated from Boston, Massachusetts.

(3)     February 10, 2014.  Natural Disaster brief at SRA International office in Arlington, Virginia.  Participants included Dienes, Dexter, Harden, Tanner, Hudson, Mattey, and Clare.

(4)     February 10, 2014.  ACES Brief for Col. Kenneth Saunders of A2I, at SRA International office in Arlington, Virginia.  Participants included Dienes, Dexter, Harden, Tanner, Hudson, Mattey, and Clare.

(5)     February 26, 2014.  Teleconference, the topic of which was "discuss the current status of work for HAF A2I."  Participants included Hudson, Harden, Herslow, Dexter, Mattey, Dienes, Clare, and staff from Air Force Research Laboratories, George Mason University, Northrup Grumman, and Naval Postgraduate School.

ME1 31941956v.1

(6)     March 6, 2014. "ACES CPAS Discussion/intro." This meeting included Dienes, Dexter, Harden, Herslow, Hudson, Clare, Saunders, and staff from the Strategic Capabilities Office.

(7)     March 20, 2014.  Johns Hopkins Applied Physics Laboratory introduction to ACES.  This meeting occurred in Alexandria, Virginia.  Participants included Tanner, Clare, Hudson, Dienes, and staff from the Strategic Capabilities Office.

(8)     March 25, 2014.  Georgia Tech Research Institute (GTRI) participation in ACES. Participants included Clare, Dienes, and staff from GTRI.

(9)     March 31, 2014.  U.S. Military Academy introduction to ACES.  Participants included Hudson, Clare, Herslow, Harden, and Dienes.  The goal of this teleconference was to introduce Herslow to USMC staff.

(10)    April 1, 2014.  National Reconnaissance Office ACES Discussion, in Chantilly, Virginia.  The goal of this meeting was to discuss "how Team ACES can provide a potential solution to the NRO."  Participants included Clare, Dienes, Herslow, Harden, and NRO staff.

(11)    May 13, 2014.  Johns Hopkins University Applied Physics Lab A2I visit. Participants included Hudson, Dienes, Harden, Herslow, Clare, and JHU staff.

(12)    May 22, 2014.  ACES Site Survey, Air National Guard, New Castle, Delaware. Participants included Dienes, Clare, Herslow, McCluskey, and ANG staff.

(13)    May 27, 2014.  ACES Site Survey, National Reconnaissance Office headquarters, Chantilly, Virginia.  Participants included Tanner and Herslow.

(14)    May 29, 2014.  ACES conference call with the University of Nebraska-Omaha (UNO).   Participants included Clare, Harden, Mattey, Hudson, Dienes, Herslow, McCluskey, and UNO staff.

(15)    May 30, 2014. NRO Discussion with A2I/ACES Team, Arlington, Virginia. The agenda for this NRO-organized meeting was "to come see ACES live."  Participants included Clare, Harden, Cushing, Dienes, Herslow, McCluskey, Hudson, and NRO staff.

(16)    June 4, 2014.  Air National Guard technical review of ACES portfolio.  Agenda: "A2I will conduct a demo of the proposed technology and discuss next step with ANG personnel."  Participants included Clare, Harden, Hudson, Dienes, McCluskey, Herslow, and ANG staff.

(17)    June 18, 2014.  Collaborative discussion and technology review for NRO, Chantilly, Virginia.  Participants included Clare, Harden, Tanner, Hudson, Dienes, McCluskey, and NRO staff.

Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

12.    Identify each and every meeting relating to ACES, or the allegations in the Amended Complaint, between Hardon and TEG that occurred in Massachusetts. Include in your answer the approximate date of the meeting and the purpose of the meeting.

**Supplemental Answer and Objection:** Hardon objects to Interrogatory No. 12 on grounds that requesting Hadron to identify every single meeting that occurred in connection with ACES is overbroad and unduly burdensome, especially where many meetings occurred with individual participating from different locations. Subject to and without waiving its objections, Hadron states that most of its meetings with TEG occurred remotely via telephone, with Hadron representatives located in Massachusetts, in many instances. Due to the large volume of these meetings, Hadron cannot presently identify with specificity each and every meeting. Answering further, Hadron is presently aware of two in-person meetings, where TEG representatives traveled to Massachusetts to meet with Hadron representatives. The first meeting occurred on February 19, 2014. The purpose of the meeting (pursuant to a meeting agenda provided by Robert Clare) was to introduce various stakeholders of the ACES program to one another, identify data sets with which to build ACES vignettes, and plan next steps. The second meeting occurred on November 16, 2016. At that meeting, Clare traveled unannounced to Hadron's offices in Massachusetts, and the meeting that transpired covered many different aspects of the ACES program. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

13.    State in detail all facts that support your allegation in paragraph 39 of the Amended Complaint.

**Supplemental Answer and Objection:** Hadron objects to Interrogatory No. 13 on grounds that requesting Hadron to identify "all facts" is overly broad and unduly burdensome. Subject to and without waiving its objections, Hadron states that as of early 2014, the USAF envisioned and intended Hadron to be the ACES system architect and project coordinator, as explained in detail in Hadron's answer to interrogatory no. 14, which is incorporated herein by reference. Thereafter, however, the defendants actively worked to remove Hadron from the program and claim ownership of Hadron's proprietary software. This conduct is set forth more fully, for example, in Hadron's answer to interrogatory no. 20, which is also incorporated herein by reference. TEG and AAI engaged in this conduct knowing full well that Hadron was the architect of Photon and Praxis. For example, in June of 2015, TEG submitted a proposal to the Government and/or a Government prime contractor for delivering ACES to the National Reconnaissance Office. This proposal stated that "Hadron Industries has developed Photon, the foundation of the ACES-OE." In addition, on February 27, 2015, TEG authored and submitted a draft statement of work to the Government for the second task order on Hadron's Phase III contract. The draft statement of work stated that the primary purpose of the effort would be for Hadron to "Expand the existing functionality and feature set to the core ACES-OE technology, Photon." Moreover, in September of 2016, TEG submitted a proposal to the Army Corps of Engineers that stated "TEG, along with

11

its engineering partner, Hadron Industries, has developed Photon..." Hadron further directs TEG generally to its responses to TEG's First Request for Production of Documents and Hadron's document productions. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

14.     State in detail all facts that support your allegation that "the USAF intended that Hadron be allocated the funds as the system architect and project coordinator for the EOY contract," as alleged in paragraph 40 of the Amended Complaint, and identify all documents that support such allegation.

> **Supplemental Answer and Objection**: Hadron objects to Interrogatory No. 14 on grounds that requesting Hadron to identify "all facts" and "all documents" is overly broad and unduly burdensome. Subject to and without waiving its objection, Hadron states that a Government-authored briefing, titled "ACES - AOE 19-March-2014," expressly identified Hadron as the system architect and project coordinator. The briefing included a spreadsheet, for example, labeled "Approved ACES COA for 3.53m Spending Plan, 31 Oct 2013 + FY14 Fallout 19 March 2014." This spreadsheet outlines the various ACES program expenditures forecast through the end of the fiscal year, with five of the expenditures earmarked for Hadron, including "System Architecture" and "Project Coordinator" expenditures. In addition, a January 27, 2014 email from A2I program officer Justin Hudson twice refers to Hadron as "the lead systems integrator," and a February 27, 2014 email, also from Hudson, again refers to Hadron as the "ACES systems integrator." Hadron further directs TEG generally to its responses to TEG's First Request for Production of Documents and Hadron's document productions. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

15.     State in detail all facts that support your allegations that TEG "improperly passed off Hadron's work as its own and identified various ACES installations that were actually completed by Hadron," as alleged in paragraph 59 of the Amended Complaint, and identify all documents that support such allegation.

> **Supplemental Answer and Objection**: Hadron objects to Interrogatory No. 15 on grounds that requesting Hadron to identify "all facts" is overly broad and unduly burdensome. Subject to and without waiving its objection, Hadron states that it is currently aware that TEG improperly claimed credit for various ACES operating environment installations performed by Hadron throughout 2014. As discovery is ongoing, Hadron is likely to identify additional facts that support the allegations set forth in paragraph 59 of the Amended Complaint. Hadron's current knowledge of TEG's improper conduct is informed, in part, by TEG's "ACES Final Activity Report Aug

12

2014-May 2015," which TEG submitted to AAI pursuant to its subcontract under the EOY contract. In this final activity report, TEG claimed, among other things, that it had "deployed the first ACES Operating Environment in a government sponsored laboratory setting," and further that "TEG was able to model the first deployment and subsequently deploy 5 other systems to operational customers throughout the DOD and IC." These "operational customers" included the Army Geospatial Center (AGC), Joint Special Operations Command (JSOC), Wright-Patterson Air Force Base (WPAFB), and "Army National Guard Cyber Operation Center." As explained below, each of these installations, or work related to an existing installation, was performed by Hadron, not TEG.

(1) TEG claims it deployed "the first ACES Operating Environment in a government sponsored laboratory setting." In the summer and fall of 2014, Hadron had two prime Federal contracts: one with Air Force Research Laboratories, and one with Army Corps of Engineers. Both contracts tasked Hadron with installing ACES-OEs at various government facilities. The first ACES installation Hadron installed under these contracts was at the ACES A2I Lab in Rosslyn, Virginia, which was the first ACES-OE in a government sponsored laboratory setting. Hadron performed this installation with the assistance of TEG staff, work for which TEG invoiced, and was paid by, Hadron. TEG later improperly took sole credit for Hadron's installation.

(2) AGC: Only one ACES-OE exists at the AGC, and it was installed by Hadron as part of Hadron's work for its Phase III contract. In an email on October 8, 2014, Robert Clare provided Lt. Col. Robert Herslow with an update on the AGC installation that made it plainly clear that Hadron was responsible for the work. Yet in several status reports from TEG to AAI, Sean McCluskey claimed that the ongoing ACES-OE installation work at the AGC--work that the report did not mention was being performed by Hadron--was fulfilling TEG's own ACES-OE delivery requirements to AAI. The email also describes a recent AGC visit by AAI staff. During this visit, AAI staff would have seen the ongoing Hadron installation work, thus making them aware that the AGC installation on TEG's final report was actually the work of Hadron.

(3) JSOC: Unrelated to Hadron's ACES contracts in the summer and fall of 2014, Hadron was contracted by Oblong Industries (in Hadron's role as Oblong's primary federal technical partner) in September of 2014 to provide one day of on-site Mezzanine maintenance and support for a customer within Joint Special Operations Command at Virginia Beach, Virginia. This effort was arranged by Sean McCluskey, then the federal sales director for Oblong. The work entailed upgrades and debugging for a pre-existing Oblong Mezzanine installation with pre-existing 6-axis gestural control. This installation was originally installed prior to the execution of either Hadron's or AAI's summer 2014 contracts, without relation to either contract. No ACES software or hardware was added to this installation during Hadron's one-day support effort. To Hadron's knowledge, no other ACES hardware or software was delivered to any JSOC facility during the contract period.

(4) WPAFB: Hadron worked with staff at the 711th Human Performance Wing, WPAFB, to bring ACES capabilities to a laboratory with existing Mezzanine and 6-axis gesture control as part of Hadron's work for its Phase III contract. Hadron performed this

work over the course of several site visits in the winter and spring of 2015. TEG was aware of these visits and accompanied Hadron staff on some of them, billing Hadron for their time and travel.

(5) Hadron has no knowledge of an ACES-OE installation at a location known as the "Army National Guard Cyber Operation(s) Center." However, Hadron worked with the New Hampshire Army National Guard Joint Operations Center to design an ACES-OE for its missions, which include cyberdefense. To the extent TEG's was referring in the activity report to the New Hampshire Army National Guard, TEG had no involvement whatsoever in Hadron's work on that project.

Answering further, Hadron directs TEG to its document productions, which include information and document responsive to this interrogatory. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

16.     Identify each and every specific opportunity to perform "substantial future work with the Government" related to the EOY contract, as alleged in paragraph 60 of the Amended Complaint, for which Hadron was allegedly deprived, and for each such opportunity, identify the terms of the opportunity, and identify all documents related to each opportunity.

**Supplemental Answer and Objection:**  Hadron objects to Interrogatory No. 16 on grounds that requesting Hadron to identify "all facts" is overly broad and unduly burdensome.  Subject to and without waiving its objection, Hadron states that the allegations set forth in paragraph 60 describe in general terms the business opportunities lost by Hadron under the EOY contract as a direct result of the defendants' improper conduct.  Specifically, the EOY contract provided $3.5 million toward delivery of ACES--related services and equipment to various Government sites. These sites represent additional, valuable business opportunities that would have arisen under the contract. Hadron was deprived of all of those opportunities when the EOY contract was awarded to AAI, rather than Hadron.  As discovery is ongoing, Hadron is likely to identify additional facts that support the allegation that it was improperly deprived of business opportunities under the EOY contract, as many of those facts are likely in the defendants' possession. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

17.     State in detail each and every term of the alleged Agreement as alleged and referenced in paragraph 62 of the Amended Complaint.

**Supplemental Answer and Objection:**  Hadron objects to Interrogatory No. 17 to the extent it seeks information not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving its objection, Hadron states that the Agreement referenced in paragraph 62 of the Amended Complaint resulted from TEG's

and Clare's persistent yet unsuccessful attempts to form a partnership or joint venture between the companies, which Hadron and Dienes rejected. Ultimately, the parties agreed instead to an arms-length contractual relationship, as identified in paragraph 62. The genesis of the agreement relates back to the parties introduction in January 2014, when Lt. Col. Mattey recommended to Dienes that he work with Clare to support ACES requirements in development and marketing. After Hadron and AAI were awarded their respective ACES contracts in late July 2014, Clare apparently realized (after working alongside Hadron in the Rosslyn facility) that AAI would not be able to deliver ACES products and services, and that only Hadron would be capable of delivering ACES in the form envisioned by the Government. Clare and TEG thus approached Dienes to discuss partnership agreements between Hadron and TEG as a condition of moving forward. Dienes and Hadron explicitly rejected those overtures and also rejected any form of permanent or exclusive licensing rights to the core Hadron IP. Instead, after some negotiation, Dienes and Clare agreed (on behalf of Hadron and TEG, respectively) to a future buyout of TEG by Dienes. Under this arrangement, Dienes agreed to pay Clare and TEG $800,000 over a multi-year payment schedule, and would agree to license Photon and Praxis to TEG under favorable terms, in exchange for ⅔ ownership of TEG (the specific terms discussed were 60 shares for Klee and/or Hadron, 30 shares for Rob, and the remaining 10 shares to be set aside for options or other types of stock-based compensation). On August 3, 2014, Clare emailed Dienes a spreadsheet memorializing this plan (Subject "Balance sheet"). The following day, Clare sent another email (Subject: "Balance sheet v 2") with another revised spreadsheet. Under the framework of this arrangement, Hadron and TEG agreed to work together to pursue contracts from A2I and elsewhere, with Hadron developing the product and providing commercial items to TEG, and TEG managing all aspects of sales, delivery, and on-site support. The parties expressly agreed to split all revenue equally on the initial contracts, to represent the approximate division of labor and costs between the parties. In September 2014, Hadron was awarded contract W912DY-14-C-0025. In keeping with the plan, Hadron subcontracted TEG at the same labor rate Hadron was billing to the Government. Clare agreed to this plan via email. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

18.   Identify all communications and correspondence between Hadron and TEG related to the negotiation and consummation of the Agreement.

**Supplemental Answer and Objection:** Hadron objects to Interrogatory No. 18 on grounds that requesting Hadron to identify "all communications and correspondence" is overly broad and unduly burdensome. Subject to and without waiving its objections, Hadron hereby restates and incorporates by reference its answer to interrogatory no. 17. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

15

19.     State in specificity each and every "immediate and long-lasting repercussions" for Hadron's business operations as a result of Dienes' arrest, as alleged in paragraph 83 of the Amended Complaint.

**Supplemental Answer:** Dienes was arrested on the eve of Hadron installing an ACES-OE into the National Reconnaissance Operations Center (NROC). Due to the arrest, Dienes immediately pivoted his full time and attention to his criminal defense and away from Hadron's operations, including the imminent NROC installation effort. As one of only two Hadron staff with the requisite security clearance to work inside the NROC, these events significantly strained Hadron's ability to perform and complete the installation, and to monitor its quality. Dienes' absence also created the impression among NRO staff that the technology was the work of TEG, an impression substantiated by a particular 2018 NRO report discussing the installation. Specifically, this report repeatedly makes reference to "the developer" to describe actions taken by TEG, not Hadron. Additionally, the ACES installation at NROC lost its Authority to Operate (a Federal agency's certification that a technology does not put the organization at undue risk) just weeks post-installation and post-arrest. Weeks after the Eastern District of Virginia dismissed the complaint against Dienes, the Authority to Operate was restored. Answering further, following the arrest and dismissal, Hadron was required to submit a Notice of Unfavorable Information to the Provisional Industrial Security Approval (PISA) program office, the NSA entity holding Hadron security clearances. Additional events flowing directly from Dienes' arrest negatively impacted Hadron's business operations, including for example, an injury suffered by Dienes' wife during the FBI's attempt to arrest Dienes at his home (and which required Dienes to spend additional time away from his business affairs), and unnecessary legal expenses that put additional strain on the business, at a time when Hadron was sorely in need of operating capital. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

20.     State in detail the facts that support the allegation that TEG "actively worked to improperly remove Hadron from the ACES program to unlawfully and unfairly compete with Hadron and take ACES related work over for themselves," as alleged in paragraph 84 of the Amended Complaint.

**Supplemental Answer:** Hadron states that as described in paragraph 42 of the Amended Complaint, in April 2014, and in the context of the EOY spending plan, Dienes provided a proprietary draft statement of work to Clare in his role as an in-house advisor to the U.S. Air Force's A2I office. This draft plan was marked "U//FOUO" (Unclassified, For Official Use Only) with a disclosure statement that prohibited distribution, use, and duplication of the proposal "for any purpose other than to evaluate this proposal." As late as May 1, 2014, Clare was continuing to advocate for Photon as the foundation for ACES, when he wrote an email to ACES Program Manager Lt. Col. Robert Herslow, stating that

16

"mezz(anine) is not the answer for us wrt conference room technology." A2I's belief in Photon was evident as late as May 14, 2014, when A2I published Revision 9 of its Statement of Work for the EOY contract, stating that all ACES systems delivered under the contract must include "all required Praxis and Photon software," and that the vendor must "improve upon core Photon functions" as part of its effort. As detailed in the Amended Complaint, AAI was then selected by A2I as the awardee, rather than Hadron. The winning proposal, however, proposes the use of Mezzanine rather than Photon, specifically highlighting the very same conference room capabilities that Clare denigrated one month prior. The winning proposal stated that "Mezzanine provides an effective way to simultaneously engage multiple users and their data, exactly what traditional conference and telepresence rooms lack." In addition, much of the language in Hadron's proprietary draft provided to Clare was used verbatim for the Government solicitation, and also appeared in AAI's proposal (as described in paragraphs 44-47 of the Amended Complaint). Thereafter, on or about July 31, 2014, Clare explained to Dienes that he had decided to use AAI as a prime contractor in part so that TEG could have more control over the contract (through Clare's relationship with Walter Greenberg). Clare also informed Dienes that he and McCluskey were afraid that Hadron would eventually take their technology (Praxis and Photon) and use it to the exclusion of TEG, and thus they needed to "strike first" to protect themselves and regain control of the program. Subsequent to these events, in the summer of 2014, Clare's company, TEG, received a subcontract with AAI worth $819,000. One of the tasks on this subcontract was to "work with the ACES-OE System Integrator." A2I staff had repeatedly made clear to all ACES stakeholders that Hadron was the ACES-OE systems integrator. However, TEG never subcontracted Hadron for this effort. In addition, TEG claimed Hadron's own separately funded Government deliverables as their own (highly similar) deliverables to AAI, without subcontracting or informing Hadron. Clare later admitted his wrongdoing on the EOY matter to Dienes. *See* Hadron's Answer to TEG's Interrogatory no. 3.

In its proposals throughout 2014 and 2015, Hadron used standard verbiage to describe its business practices. Among these practices was the manner in which Hadron assigns work to its spatial computing engineers, a highly specialized engineering skill. Specifically, Hadron's proposals stated that Hadron would "provide the same engineers throughout the duration of the effort. This will allow the engineer to develop an intimate understanding of the needs, use cases, and behaviors within the (customer's site). The better this understanding, the more efficiently Hadron will be able to refine Photon's capabilities and fulfill the Government's needs." As Hadron's sales team, TEG staff routinely saw these documents. TEG then used the language to describe its own behavior in a proposal for an effort at NRO, despite having no spatial computing engineers of its own. Despite making clear in its proposal that it was using Hadron's Photon technology, the pricing line item for spatial computing engineers claimed that providing "the same engineers throughought (sic) the duration of the effort" "will allow the engineer to develop an intimate understanding of the needs, use cases, & behaviors. The better this understanding the more efficiently TEG will be able to refine Photon's capabilities to fill the government's needs." This proposal resulted in an award to TEG to deliver Photon-powered ACES systems to NRO. TEG never subcontracted Hadron for this effort or licensed Photon software from Hadron. TEG also produced multiple marketing documents using Hadron's Photon trademark without Hadron's knowledge or consent,

17

and in these documents referred to Photon as TEG's own product and trademarked brand. Answering further, TEG slandered Dienes to ACES Program Manager Lt. Col. Robert Herslow at a time when both TEG and Hadron were attempting to deliver ACES to A2I and NRO. With respect to Herslow, TEG also claimed that equipment installed at the NRO JCC was TEG's property that was rightfully sold to NRO as part of its delivery. In truth, this equipment was purchased and owned by Hadron.

In multiple other situations, TEG used Hadron's trademarks and Hadron's own marketing language as its own, without Hadron's knowledge or consent, and without acknowledging Hadron's original contributions to this work. For example:

> (1) In the spring of 2015, Hadron and TEG facilitated Government production of a promotional video for ACES. This video exclusively depicted use of software built entirely by Hadron. TEG later printed CDs of this video. The artwork on the exterior of this CD included the sentence, "ACES is powered by Photon, a product of the Triangle Experience Group."

> (2) In marketing material created in October of 2015, the Photon logo and trademark are used alongside TEG's logo featuring the sentence, "Photon by TEG is a Spatial Computing operating environment...".

> (3) The TEG web site continued to feature photos of the Photon-based Rosslyn ACES lab for many months following Hadron's November 2016 Cease & Desist letter.

> (4) In justifying a sole-source award ostensibly for providing network hardware, a Government contracting office described TEG's hardware product, Lazarus, as having been "designed to allow efficient collaboration between many users, unifying their computing environment into a single collaborative workspace that can be shared between all users across large distances." This is the exact language that Hadron used to describe the ACES-OE in its proprietary draft Statement of Work shared with Clare in April 2014. The Government's draft justification included no mention of Hadron. The plagiarized text was redacted in the published version. On November 16, 2016, Clare told Dienes--who had not yet seen the unredacted version--that the redactions in the published version were made to protect TEG's competition sensitive information.

> (5) In March 2015, Hadron authored a white paper on ACES for the National Defense Industry Association. In September 2018, TEG created a marketing poster for ACES that used highly similar language to the white paper.

Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

ME1 31941956v.1

21.     State in detail the facts that support the allegations that TEG acknowledged that
the ACES technology platform belonged to Hadron, as alleged in paragraph 84 of the Amended
Complaint, and identify all documents that support such allegation.

> **Supplemental Answer:**  Hadron states that on February 27, 2015, McCluskey submitted
> a draft statement of work to the Government.  This draft SOW was submitted as the
> proposed second task order for Hadron on Hadron's 2014 Phase III SBIR contract with
> AFRL.  The draft SOW states that the primary purpose of the tasks in the SOW were to
> "(e)xpand the existing functionality and feature set to the core ACES-OE technology,
> Photon."  The SOW went on to outline several tasks "for further engineering...of the
> Advanced Collaboration Enterprise Service Operational Environment (ACES-OE)
> platform to be provided by Hadron Industries," including: "Hadron will improve
> Photon's ability to share pixels in order to accelerate sharing of applications...", "Hadron
> will deploy any improvements...as directed by the Configuration Management Board,"
> and "Hadron will integrate data sets and data analytics tools into ACES."  The six-page
> document lists over 30 individual tasks and goals for Hadron and none for TEG or any
> other company.  Moreover, in June of 2015, TEG authored and submitted a proposal to
> the Government and/or a Government prime contractor for delivering ACES to the
> National Reconnaissance Office.  This proposal stated that "Hadron Industries has
> developed Photon, the foundation of the ACES-OE."  In addition, a March 2016 briefing
> created by TEG for the Government included a drawing that clearly refers to Photon as
> the central technology of ACES.  Answering further, Hadron states that documents to be
> produced as part of its document productions will provide additional, responsive
> information.  Hadron expressly reserves the right to supplement or amend this Answer as
> discovery progresses and more information becomes available.

22.     State in detail all facts that support your allegation that TEG "corrupt[ed] the
acquisitions process of a solicitation for Hadron's ACES software," as alleged in paragraph 93 of
the Amended Complaint, and identify all documents that support this allegation.

> **Supplemental Answer and Objection:**  Hadron objects to Interrogatory No. 22 on
> grounds that requesting Hadron to identify "all facts" is overly broad and unduly
> burdensome.  Subject to and without waiving its objection, Hadron states that in August
> of 2016, Clare contacted Dienes by telephone and explained that the Army Corps of
> Engineers contract office would soon issue a solicitation for ACES installations at the
> Chantilly, Virginia, headquarters of the National Reconnaissance Office.  Clare stated
> that he had spoken to the contract officer and had worked out an arrangement whereby
> TEG and Hadron would quickly notify ACE of their intent to bid.  Having received
> interest from multiple potential bidders, ACE would then claim to have satisfied their
> competition requirement and remove the solicitation from public view on fbo.gov.
> Dienes inquired as to why Hadron would not simply be issued a sole source award (given
> that ACES is eligible for such awards as a SBIR-based technology), much like Hadron's
> September 2014 contract, which was issued by the same contract officer at ACE.  Clare

19

responded that there was not enough time to issue a sole source award.  Once they proceeded with this plan and the solicitation was removed, Clare said, TEG and Hadron could then submit separate but nearly identical bids that were authored collaboratively. In September of 2016, TEG and Hadron collaborated on their mutual proposals.  In one case, McCluskey sent a "Hadron Proposal Price Schedule" to Dienes and Matthew Burton, for Hadron to submit to the contract office.  McCluskey also shared TEG's price schedule with Burton, asking for feedback prior to submission.  This solicitation was later canceled, shortly after the submission deadline.  Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

23.    State in detail each and every fact related to the allegation that the "TEG Defendants defamed and disparaged Hadron to Government officials by falsely claiming Hadron's products . . . contained unlicensed third party software code," as alleged in paragraph 95 of the Amended Complaint, including, but not limited to, the identity of the person from TEG to make the statements, to whom the statements were made, the manner in which the statement was transmitted, where the statements were transmitted, the precise statement that was allegedly made, and the exact date that the statements were made.

**Supplemental Answer and Objection:**  Hadron objects to Interrogatory No. 23 on grounds that requesting Hadron to identify "each and every fact" is overly broad and unduly burdensome. Subject to and without waiving its objection, Hadron states that on December 1, 2016, Dienes received a phone call from Oblong Chief Revenue Officer Mike Brown. Brown told Dienes that Rob Clare had told Brown that Hadron was using Oblong-proprietary software in ACES without a license.  Brown told Dienes that TEG had asked Oblong to provide TEG with licenses for Oblong's software, and to provide custom software development in support of the NRO ACES installation. Dienes told Brown that the software Hadron developed for NRO did not use Oblong sofware; that Hadron had recently terminated its relationship with TEG based upon concerns with their contracting ethics; and that ACES system designs are Hadron proprietary and/or protected by SBIR data rights. At Brown's suggestion, Dienes agreed to meet with Oblong engineers to demonstrate to them that Photon contained no Oblong software, and to learn more about TEG's accusations. Dienes contacted Oblong via both email and phone to coordinate this meeting; Oblong never responded to these attempts, however. Answering further, on December 6, 2016, Dienes received a phone call from Lt. Col. Robert Herslow. During this phone call, Herslow asked Dienes if Dienes had spoken to Oblong CEO John Underkoffler recently. Herslow said that he had spoken to Oblong Federal Sales Director Mike Friedel, and planned to speak with Underkoffler the following morning. Herslow said that Dienes needed to resolve some issues with Oblong. Dienes asked Herslow what Herslow had heard.  In response, Herslow said he had heard that Hadron was shipping source code that relied on Oblong source code.  Dienes told

Herslow that Hadron did not currently use any Oblong software as part of ACES, but had incorporated Oblong software into ACES installations in the past, with Oblong's knowledge and approval.  Dienes then informed Herslow about the aforementioned call with Mike Brown, and about Dienes' offer to Brown of a full code review.  Herslow, apparently conflating the security clearance issue with the Oblong source code issue, responded "That's not why (your clearance) was revoked, was it?"  Dienes responded that he did not believe his clearance had been revoked.  Herslow responded that Dienes cannot get into NRO. Dienes asked Herslow if he was certain of that, and Herslow responded: "Well, Rob told me you don't have a clearance."  Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

24.     State in detail each and every fact related to the allegation that the "TEG Defendants further defamed and disparaged Dienes to Government officials by falsely informing them that Dienes' security clearance had been revoked as a result of his arrest," as alleged in paragraph 96 of the Amended Complaint, including, but not limited to, the identity of the person from TEG to make the statements, to whom the statements were made, the manner in which the statement was transmitted, where the statements were transmitted, the precise statement that was allegedly made, and the exact date that the statements were made.

**Supplemental Answer and Objection:**  Hadron objects to Interrogatory No. 24 on grounds that requesting Hadron to identify "each and every fact" is overly broad and unduly burdensome.  Subject to and without waiving its objection, Hadron states that on November 16, 2016, Hadron issued a Cease & Desist notice to TEG. At approximately 4:00 PM eastern time on December 6, 2016, Dienes spoke via telephone to Lt. Col. Robert Herslow.  During this phone call, Dienes affirmed that Hadron was ready and able to support the ACES installation at the National Reconnaissance Office facility in Chantilly, Virginia.  In response, Herslow stated that Dienes "could not get into NRO." Dienes then asked Herslow why that was the case, to which Herslow replied "Rob (Clare) told me you don't have a clearance."  Months later, Army Contracting Command, in collaboration with Herslow's A2I office, issued a $9 million delivery order to TEG to deliver ACES to the National Reconnaissance Office.  The performance work statement of this task order was highly similar to the Army Corps of Engineers solicitation of August/September 2016, to which Hadron's proposal was highly sought after by the contract officer.  Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

ME1 31941956v.1

25.     State in detail all facts that support your claim for damages of "not less than $63,000,000" as alleged in the "Wherefore" clause of the Amended Complaint, and identify all documents that support your claim for damages.

**Supplemental Answer and Objection:**   Hadron objects to Interrogatory No. 25 on grounds that requesting Hadron to identify "all facts" is overly broad and unduly burdensome, and to the extent it is premature, as discovery is ongoing and Hadron may discover additional facts that support its claims for damages.   Subject to and without waiving its objections, Hadron states that as a direct and proximate result of defendants' conduct, as alleged throughout the Amended Complaint, Hadron suffered substantial damages based on, among other things, lost business opportunities, contract revenues, loss of goodwill, and other beneficial relationships.   For example, Hadron was deprived of benefits under the EOY contract, worth approximately $3.2 million; the sole source CDS contract, which TEG used to sell ACES products, worth up to $49.5 million; and the task orders on prime contracts with SAIC and PAR Government Systems to deliver ACES systems to NRO, worth approximately $6.7 million.   Additionally, TEG remains in possession of a substantial volume of Hadron equipment (valued at approximately $500,000), and AAI's false accusations reported to the FBI caused irreparable harm to Hadron's business and reputation.   Hadron is also continuing to identify documents and invoices evidencing the value of these items of equipment that remain in TEG's possession, and will produce those invoices.   Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

RESPECTFULLY SUBMITTED,

HADRON INDUSTRIES, INC.,
By its attorneys,

Thomas J. Finn  (admitted *pro hac vice*)
tfinn@mccarter.com
Paula Cruz Cedillo (admitted *pro hac vice*)
pcedillo@mccarter.com
Nicholas W. Allen (admitted *pro hac vice*)
McCARTER & ENGLISH, LLP
265 Franklin Street
Boston, Massachusetts 02110
Telephone: 617.449.6500
Facsimile:  617.326.3106

AND

ME1 31941956v.1

Franklin C. Turner  (VSB No. 77417)
fturner@mccarter.com
Alexander W. Major  (admitted *pro hac vice*)
amajor@mccarter.com
McCARTER & ENGLISH, LLP
1301 K Street, NW
Suite 1000 West
Washington, DC  20005
Telephone: 202.753.3400
Facsimile:  202.296.0166

November 15, 2019

## **DECLARATION**

I, Klee Dienes, hereby depose and state that I am the President of Hadron Industries, Inc., that I am authorized to make this Declaration on behalf of Hadron Industries, Inc., and that the facts set forth in the foregoing Supplemental Answers are true and correct to the best of my knowledge, information and belief.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing statement is true and correct.

Klee Dienes

Dated:  November 15, 2019

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of November, 2019, the foregoing Answers to TEG's First Set of Interrogatories was served by first class mail, postage prepaid, and electronic mail, on the following attorneys of record:

Richard D. Kelley, Esq.
Stephen D. Caruso, Esq.
Bean, Kinney & Korman, P.C.
2311 Wilson Boulevard, 5th Floor
Arlington, VA 22201
(703) 525-4000
(703) 525-2207 (Fax)
rkelley@beankinney.com
*Counsel for Triangle Experience Group, Inc., Sean*
   *McCluskey, and Robert E. Clare, Jr.*

Leslie Paul Machado
lmachado@ohaganmeyer.com
O' Hagan Meyer
2560 Huntington Avenue, Suite 204
Alexandria, Virginia 22303
Telephone: 703.775.8607
Facsimile: 804.403.7110
*Counsel for Alqimi Analytics & Intelligence, LLC*

Nicholas W. Allen

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

HADRON INDUSTRIES, INC., *et al.*,    :

      Plaintiffs,              :

                               :

v.                                 :

                               :     Case Number 1:19-cv-00035-LO-MSN

TRIANGLE EXPERIENCE      :

GROUP, INC., *et al.*,        :

                               :

      Defendants.          :

## DEFENDANT TRIANGLE EXPERIENCE GROUP, INC.'S
## OBJECTIONS AND ANSWERS TO PLAINTIFF
## HADRON INDUSTRIES, INC.'S FIRST SET OF INTERROGATORIES

Defendant Triangle Experience Group, Inc. ("TEG"), by counsel, and pursuant to Local Civil Rule 26(C) of the Eastern District of Virginia and Rule 33 of the Federal Rules of Civil Procedure, hereby issues its Objections and Answers to the First Set of Interrogatories issued by Plaintiff Hadron Industries, Inc. ("Hadron").

### Preliminary Objection

Pursuant to this Court's Rule 16(b) Scheduling Order (ECF No. 96), TEG preserves the attorney-client privilege and work product doctrine protection as to each Interrogatory issued by Hadron.

### Interrogatories

1.     Please identify each person who has provided responses, information, or documents for the purpose of preparing TEG's responses to these Interrogatories or the accompanying Requests for Production, and for each such person, please also state his or her professional title, and identify the Interrogatories or Requests for Production for which he or she provided such information or documents.

**Answer:** Mr. Sean McCluskey and Mr. Robert Clare, Jr. provided information in the preparation of the answers to these Interrogatories and accompanying Requests for Production. Mr. McCluskey and Mr. Clare are owners and agents of TEG. Mr. McCluskey and Mr. Clare both provided general information to all discovery responses. Mr. McCluskey and Mr. Clare also prepared the answers to these Interrogatories through the assistance of counsel, and the word usage and sentence structure may be that of TEG's counsel, and does not necessarily purport to be the precise language of TEG, Mr. McCluskey or Mr. Clare.

2.      Please identify all ACES systems and 6-axis gestural control systems that TEG and/or AAI delivered to the Government under the EOY Contract. Your response should include but not be limited to the following information: (1) the physical location of each installation; (2) the date or dates of each system delivery or installation; (3) the identity and names of all persons involved in the installation of each system; (4) a description of all documents concerning, relating to, or evidencing each system installation (such as technical documents, photographs, invoices, manuals, or other documents evidencing delivery and/or installation); (5) an itemization of all revenue received in connection with each system.

**Objection:** TEG objects to subsections (3), (4) and (5) of this Interrogatory as overly broad, vague, unduly burdensome, and because it seeks irrelevant information and is not reasonably calculated to lead to the discovery of admissible evidence. TEG further objects to this Interrogatory because it is not proportional to the needs of the case insofar as it seeks *all persons* involved in complex technological installations, a "description of all documents," and an "itemization" of revenue, which is not relevant to this dispute, and it requires TEG to provide information and/or documents that would need to be obtained from a third party not within TEG's custody or control.

**Answer:** Subject to the foregoing objections, an ACES system was delivered to the Air Force Rosslyn Lab, 1400 Wilson Boulevard, Arlington, VA in Suite 9, which was a fully functional system that included an Intersense Ultrasonic Wands tracking system, provided by Oblong. The system also included Sluice – another g-speak driven application to Suite 9. A second ACES Mezzanine system was delivered to Suite 9 after Hadron's system was moved to the Army Geospatial Center. The installation was subcontracted to Sluice and Oblong personnel. The total contract value was $819,000.

3.      Please fully describe TEG's expertise and prior experience in the fields of motion tracking, gestural input, video walls, Oblong Mezzanine, and/or virtual collaboration, as of July 2014. Your response should include, but not be limited to, the identity and names of all persons or individuals with such expertise, and a description of their experience in these fields.

**Objection:** TEG objects to this Interrogatory as vague with regards to the phrasing "expertise" and "prior experience." TEG further objects to this Interrogatory because it seeks irrelevant information and is not reasonably calculated to lead to the discovery of admissible evidence.

**Answer:** Subject to the foregoing objections, Mr. Clare of TEG has been involved with Oblong since 2012. Mr. Clare wrote and presented to A2I the first whitepaper that was the precursor to ACES called Spatial Decision Support, in which Mr. Clare outlined the potential value add for spatial computing solutions such as Mezzanine and other Oblong technology as it relates to mission space. Mr. Clare assisted Oblong by helping to expand the use case and adoption strategy of the first spatial computing system at JIATIF-NCR by helping to facilitate the sale and extension of a second system with the Navy in Virginia Beach. This system was used by the A2I portfolio managers, Lt Col James Mattey and Lt Col Rob Herslow, as reference architecture in the mission space. This was needed for A2I to justify its initial investment in ACES. Mr. Clare, as a solution

architect subcontracted to the A2I office through SRA in September of 2013, successfully leveraged his experience as a Tier 1 operator, Oblong consultant, IBM partner and employee, and A2I advisor to conceptualize the ACES program. Rob Clare was named the ACES and C2IE System Integrator by Jim Mattey in November of 2013.

In addition, Mr. Clare also had 6 months specific experience at Oblong deploying, setting up, and demoing the first ACES powered by Mezzanine and Sluice, as well as developing the first mobile systems which were delivered to AGC and JSOC.

Prior to his work with Oblong, Mr. Clare was engaged with the Air Force A2I office, working to solve collaboration challenges from a data centric perspective.

4.      Please identify all subcontracts issued by TEG to other persons, firms, or contractors from April 2014 through the present, concerning or in connection with the ACES program. Your response should include but not be limited to the following information: (1) the identity and names of each persons, firm or contractor; (2) the dates of engagement of each person, firm or contractor; (3) any applicable prime contract numbers; and (4) a full description of work performed under each subcontract.

**Objection:** TEG objects to this Interrogatory because it is overly broad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. TEG further objects to this Interrogatory because it is not proportional to the needs of the case insofar as it seeks the identity as well as specifics of each subcontractor over the span of five years without a reasonable limiting scope.

**Answer:** Subject to the foregoing objections, TEG identifies the following subcontracts issued by TEG that are responsive to this Interrogatory:

- UNO Contract PO #4500273807 with UNO, dated May 12, 2015, which TEG contracted to Hadron;

- ParGov Contract Number W911QY-13-D-0100/SC-111747-700 with NRO, dated August 1, 2015, which TEG contracted to Hadron;

- MOD P001 with NRO, dated September 30, 2015, which TEG contracted to Hadron;

- ParGov Contract Number W911QY-13-D-0100/SC-111756-100, with A2I, dated October 1, 2015, which TEG contracted to Triple M and Hadron;

- UNO-EC&P (OSD)/STRATCOM Contract Number FA4600-12-D-9000 Task Order NSRI/TOPR-0034, an ACES Study by UNO, dated January 25, 2016, which TEG contracted to Hadron;

- TO0001/CDS/SMACKM Contract Number W911NF-16-D-0037, dated September 30, 2016, which TEG contracted to the White Canvas Group;

- TEG subcontracted Oblong Industries to provide ACES related services in December 2016 thru Feb 2017;

- AF-A2Q Joint Community Contract Number W911NF-16-D-0037, dated July 27, 2017, which TEG contracted to the White Canvas Group.

TEG further states that more information responsive to this Interrogatory may be best determined by a review of the responsive subcontracts, which are being made available to Hadron for examination and copying, in accordance with Rule 33(d).

5.      Please identify and fully describe any and all engineering work product delivered by TEG and any subcontractors, under TEG's subcontract with AAI. Your response should include but not be limited to the following information: (1) the identity of every person or individual who

performed such engineering work; (2) the dates and total hours worked by each such person or individual; and (3) a full description of the specific work performed by each person or individual.

**Objection:** TEG objects to this Interrogatory because it is overly broad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. TEG further objects to this Interrogatory because it is not proportional to the needs of the case insofar as it seeks engineering work and specifics to the same that are not relevant to the instant dispute.

**Answer:** Subject to the foregoing objections, TEG states that it did not perform any engineering work because it was not on an engineering subcontract. TEG's deliverables as the ACES Solution Architect were Integration and Implementation Support and ACES-OE System Delivery.

6.    Please fully describe all work performed by PAR Government in the fields of motion tracking, gestural input, video walls, and/or virtual collaboration, under the EOY Contract.

**Objection:** TEG objects to this Interrogatory because it is overly broad and vague. TEG further objects to this Interrogatory because it requires TEG to provide information and/or documents that would need to be obtained from a third party not within TEG's custody or control.

7.    Please identify and fully describe the manner in which TEG advertised, marketed, solicited, described, and/or promoted any and all goods and services in connection with the ACES program.

**Objection:** TEG objects to this Interrogatory because it is overly broad, vague, and unduly burdensome.

**Answer:** Subject to the foregoing objection, TEG states that the answer to this Interrogatory may be best determined by a review of the TEG's marketing materials, which are being made available to Hadron for examination and copying, in accordance with Rule 33(d).

8.      Please identify and fully describe all bid proposals to the Government in connection with the ACES program.

**Objection:** TEG objects to this Interrogatory because it is overly broad, vague, and unduly burdensome.

**Answer:** Subject to the foregoing objection, TEG states that the answer to this Interrogatory may be best determined by a review of the bid proposals (which had also already been shared with Hadron), which are being made available to Hadron for examination and copying, in accordance with Rule 33(d)

9.      Please identify all communications between TEG and Joint Special Operations Command in connection with the ACES program.

**Objection:** TEG objects to this Interrogatory because it is overly broad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. TEG further objects to this Interrogatory because it is not proportional to the needs of the case insofar as it seeks a description of all communications spanning over the course of several years without a reasonable limiting scope.

**Answer:** Subject to the foregoing objections, TEG states that there are voluminous written communications between TEG and Joint Special Operations Command responsive to this Interrogatory. TEG further states that documents responsive to this Interrogatory will be made available for a reasonable examination, at which time TEG will afford Hadron the opportunity to make copies of the same, in accordance with Rule 33(d).

10.     Please identify all revenue you received from any federal government sources in connection with the ACES program. Your response should include but not be limited to the following information: (1) the specific contract, statement of work, or bid proposal under which

such revenue was received; (2) the date on which you received such revenue; (3) the amount of revenue received, itemized on a contract-by-contract basis; and (4) a full description of work performed in connection with receipt of such revenue.

**Objection:** TEG objects to this Interrogatory because it is overly broad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. TEG further objects to this Interrogatory because it is not proportional to the needs of the case insofar as it seeks an itemization of revenue on a contract by contract basis and a "full description of work performed in connection with receipt of such revenue."

**Answer:** Subject to the foregoing objections, TEG identifies the following contracts in response to this Interrogatory:

    a.    SRA/HAF/A2II Contract, Number OPM 19912C0033/SRAS000952-01, with AF A2I, which had an effective date of August 15, 2013, with $225,000 in available funds to TEG;

    b.    ParGov/Alqimi/ACES-OE/Eagle X-3 Contract, Number AAI-SC-2014-TEG-001, with AF A2I, which had an effective date of July 21, 2014, with $819,000 in available funds to TEG;

    c.    WPAFB Phase III SBIR Contract, Number FA8650-14-D-6533, with OSD Strategic Capabilities Office/AF A2I, which had an effective date of July 31, 2014, with $150,000 in available funds to TEG;

    d.    COLSA TO33 Contract, Number W31P4Q-05-A-0031/P010219100, with AF A2I, which had an effective date of August 1, 2014, with $331,109.86 in available funds to TEG;

e.      ACES-TS/Hadron Contract, Number HITEG-14-C-0025, with AF A2I, which had an effective date of September 30, 2014, with $137,000 in available funds to TEG;

f.      ParGov/NRO/ACES-OE/Eagle X-3 Contract, Number W911QY-13-D-0100/SC-111747-700, with AF A2I/NRO, which had an effective date of August 1, 2015, with $84,162.20 in available funds to TEG;

g.      MOD/P001 Contract, with AF A2I/NRO, which had an effective date of September 30, 2015, with $284,452 in available funds to TEG;

h.      ParGov/A2Q/ACES-OE/Eagle X-3/ ACES-II Contract, Number W911QY-13-D-0100/SC-111756-100, which had an effective date of October 1, 2015, with $2,673,000 in available funds to TEG;

i.      UNO-EC&P (OSD)/STRATCOM Contract, Number FA4600-12-D-9000 Task Order: NSRI/TOPR-0034, with AF A2I, which had an effective date of January 25, 2016, with $335,050.00 in available funds to TEG;

j.      SAIC Contract, Number W31P4Q-05-A-0031/P010219100, with AF A2I, which had an effective date of July 19, 2016, with $3,097,005.80 in available funds to TEG;

k.      TO0002 NRO Contract, Number W911NF-16-D-0037, with AF A2I/NRO, which had an effective date of June 8, 2017, with $1,353,750.00 in available funds to TEG;

l.      TO0003/AF-A2Q/Joint Community Contract, Number W911NF-16-D-0037, with AF A2I, which had an effective date of July 27, 2017, with $3,248,000 in available funds to TEG;

m.      TO0004/AF-A2Q/Joint Community Contract, Number W911NF-16-D-0037, with AF A2I, which had an effective of September 29, 2017, with $1,208,869.00 in available funds to TEG;

n.      TO0005/JSOC/Joint Community Contract, Number W911NF-16-D-0037, with JSOC, which had an effective date of September 27, 2018, with $509,000 in available funds to TEG.

TEG further states that documents responsive to this Interrogatory will be made available for a reasonable examination, at which time TEG will afford Hadron the opportunity to make copies of the same, in accordance with Rule 33(d).

11.     Please identify all communications between TEG and the NRO in connection with the ACES program.

**Objection:** TEG objects to this Interrogatory because it is overly broad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. TEG further objects to this Interrogatory because it is not proportional to the needs of the case insofar as it seeks a description of all communications spanning over the course of several years without a reasonable limiting scope.

**Answer:** Subject to the foregoing objections, TEG states that there are voluminous written communications between TEG and NRO. TEG further states that documents responsive to this Interrogatory will be made available for a reasonable examination, at which time TEG will afford Hadron the opportunity to make copies of the same, in accordance with Rule 33(d).

12.     Please identify all communications between TEG and any Government official concerning, referring, or relating to Hadron and/or any Hadron proprietary software.

**Objection:** TEG objects to this Interrogatory because it is overly broad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. TEG further objects to this Interrogatory because it is not proportional to the needs of the case insofar as it seeks a

description of all communications with unnamed government persons or entities related in any way to Hadron. TEG further objects to this Interrogatory because it does not contain any reasonable limiting scope or time frame.

**Answer:** Subject to the foregoing objections, TEG states that there are voluminous written communications between TEG and the Government responsive to this Interrogatory. TEG further states that documents responsive to this Interrogatory will be made available for a reasonable examination, at which time TEG will afford Hadron the opportunity to make copies of the same, in accordance with Rule 33(d).

13.     Please identify and fully describe the software license provided to NRO and any related communications between TEG and NRO regarding such licensing.

**Objection:** TEG objects to this Interrogatory because it is vague, ambiguous and overly broad insofar as it does not specify what contract is being referred to in the Interrogatory, from whom the license was provided and, moreover, seeks "any related communications" and therefore seeks information that is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. TEG further objects to this Interrogatory because it does not contain any reasonable limiting scope or time frame. TEG is therefore unable to answer this Interrogatory.

14.     Please identify all persons and individuals who made contributions to a certain Justification & Approval, formally titled "Controlled Interfaces and Cross Domain Solutions," control number JA-RTP-16-545, and please provide a full description of each person's contributions and/or roles.

**Answer:** Colonel Robert Herslow was the primary author of the document, and he, Kimberly Starling and Thomas Soyka provided, or otherwise coordinated, the majority of the content. Although TEG, Mr. Clare and Mr. McCluskey provided some input regarding certain sections, as

well as certain content recommendations upon request, TEG did not (and does not) have version control over the referenced document.

15.　Please identify and fully describe the CDS market research that was completed by A2I on or about June 1, 2016, as set forth in the Justification & Approval titled "Controlled Interfaces and Cross Domain Solutions," control number JA-RTP-16-545.

**Objection:** TEG objects to this Interrogatory because it is vague, overly broad, and seeks a "description" of "market research."

**Answer:** Subject to the foregoing objection, TEG states that the answer to this Interrogatory may be best determined by a review of a copy of the market survey, which is being made available to Hadron for examination and copying, in accordance with Rule 33(d).

16.　Please identify all persons who contributed to, or participate in, the CDS market research, and please provide a full description of each person's contributions and/or roles.

**Objection:** TEG objects to this Interrogatory because it is overly broad, vague, and unduly burdensome.

**Answer:** Subject to the foregoing objections, TEG identifies the following persons:

- Colonel Robert Herslow: Commissioned TEG to summarize some information used in the CDS market research;

- Major Dan Opstal: Authored the Whitepaper;

- Ryan Durante and Michael Bowers: Provided information regarding mission and capability gaps;

- Matt Cohen and Kevin Mitchel: represented special operation mission requirements;

- Mr. Ken Williams: wrote the requirement memorandum on behalf of the government that was included in the market survey;

- Michael Bowers, Corey Bowman, John Weed, Lloyd Evans, and Lee Quinones: Provided technical descriptions and technical input;

- Thom Klunk and Kevin Williams: Provided information related to requirements from missions space;

- Don Engel: Provided formatting and graphics.

17.    Please identify all persons who submitted any invoices on behalf of TEG, including receipts, to any U.S. Government offices, officials, agencies, or departments, between February 1, 2014 and the present.

**Objection:** TEG objects to this Interrogatory because it is overly broad, unduly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence. TEG further objects to this Interrogatory because it is not proportional to the needs of the case insofar as it seeks the identity of *each person* who submitted *any invoice* on behalf of TEG over a period in excess of five years.

**Answer:** Subject to the foregoing objections, TEG states that there were many invoices submitted on behalf of TEG to the Government in the requested time period. TEG further states that documents responsive to this Interrogatory, reflecting the requested information, will be made available for a reasonable examination, at which time TEG will afford Hadron the opportunity to make copies of the same, in accordance with Rule 33(d).

18.    Please identify and fully describe all ACES demonstrations performed at the ACES Rosslyn, VA lab from December, 2014, through the present.

**Objection:** TEG objects to this Interrogatory because it is overly broad, vague, and unduly burdensome.

**Answer:** Subject to the foregoing objections, TEG states that documents responsive to this Interrogatory, reflecting the requested information, will be made available for a reasonable examination, at which time TEG will afford Hadron the opportunity to make copies of the same, in accordance with Rule 33(d).

19.    Please state the basis for your affirmative defense that TEG did not exercise wrongful dominion over Hadron's property.

**Objection:** TEG objects to this Interrogatory because Hadron has exceeded the amount of permissible interrogatories, including subparts, pursuant to Rule 33(a) of the Federal Rules of Civil Procedure and this Court's Rule 16(b) Order. TEG further objects to this Interrogatory because it seeks a legal conclusion, mental impressions of counsel, and information protected by the attorney work-product doctrine. Indeed, the Interrogatory seeks the "basis" rather than facts or a factual basis.

20.    Please state the basis for your affirmative defense that Hadron's claims are barred by unclean hands.

**Objection:** TEG objects to this Interrogatory because Hadron has exceeded the amount of permissible interrogatories, including subparts, pursuant to Rule 33(a) of the Federal Rules of Civil Procedure and this Court's Rule 16(b) Order. TEG further objects to this Interrogatory because it seeks a legal conclusion, mental impressions of counsel, and information protected by the attorney work-product doctrine. Indeed, the Interrogatory seeks the "basis" rather than facts or a factual basis.

21.    Please state the basis for your affirmative defense that Hadron's claims are barred by equitable estoppel.

**Objection:** TEG objects to this Interrogatory because Hadron has exceeded the amount of permissible interrogatories, including subparts, pursuant to Rule 33(a) of the Federal Rules of Civil Procedure and this Court's Rule 16(b) Order. TEG further objects to this Interrogatory because it seeks a legal conclusion, mental impressions of counsel, and information protected by the attorney work-product doctrine. Indeed, the Interrogatory seeks the "basis" rather than facts or a factual basis.

22.     Please state that basis for your affirmative defense that Hadron's claims are barred by fraud.

**Objection:** TEG objects to this Interrogatory because Hadron has exceeded the amount of permissible interrogatories, including subparts, pursuant to Rule 33(a) of the Federal Rules of Civil Procedure and this Court's Rule 16(b) Order. TEG further objects to this Interrogatory because it seeks a legal conclusion, mental impressions of counsel, and information protected by the attorney work-product doctrine. Indeed, the Interrogatory seeks the "basis" rather than facts or a factual basis.

Respectfully submitted,

Richard D. Kelley, Esq., VSB No. 44228
Raighne C. Delaney, Esq., VSB No. 38787
Stephen D. Caruso, Esq., VSB No. 87376
Jonathan M. Harrison, II, Esq. VSB No. 92911
Bean, Kinney & Korman, P.C.
2311 Wilson Boulevard, 5th Floor
Arlington, VA 22201
(703) 525-4000
(703) 525-2207 (Fax)
rkelley@beankinney.com
rdelaney@beankinney.com
scaruso@beankinney.com
jharrison@beankinn.com
*Counsel for Triangle Experience Group, Inc., Sean McCluskey, and Robert E. Clare, Jr.*

## <u>VERIFICATION OF INTERROGATORY ANSWERS</u>

I Robert E. Clare solemnly affirm under penalty of perjury and in accordance with 28 U.S.C. § 1746, that the foregoing answers are true and correct to the best of my present, knowledge, information and belief.

Triangle Experience Group, Inc.

By_____

Name: Robert E. Clare
Title: Chief Executive Officer and President

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of September, 2019, the foregoing Objections to Interrogatories was issued by first class mail, postage prepaid, and electronic mail, on the following attorneys of record:

Thomas J. Finn (admitted *pro hac vice*)
Paula Cruz Cedillo (admitted *pro hac vice*)
Nicholas W. Allen (admitted *pro hac vice*)
John L. Cordani
tfinn@mccarter.com
pcedillo@mccarter.com
nallen@mccarter.com
jcordani@mccarter.com
McCARTER & ENGLISH, LLP
265 Franklin Street
Boston, Massachusetts 02110
Telephone: 617.449.6500
Facsimile: 617.326.3106

Franklin C. Turner, VSB 77417
Alexander W. Major (admitted *pro hac vice*)
fturner@mccarter.com
amajor@mccarter.com
McCARTER & ENGLISH, LLP
1015 15th Street, NW
12th Floor
Washington, DC 20005
Telephone: 202.753.3400
Facsimile: 202.296.0166
*Counsel for Plaintiffs*

Leslie Paul Machado
lmachado@ohaganmeyer.com
O'Hagan Meyer, PLLC
2560 Huntington Avenue, Suite 204
Alexandria, Virginia 22303
Telephone: 703.775.8607
Facsimile: 804.403.7110

Charles M. Sims, VSB 35845
Rachael L. Loughlin, VSB 84133
CSims@ohaganmeyer.com
RLoughlin@ohaganmeyer.com
O'Hagan Meyer, PLLC
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
Telephone: (804) 403-7114
Facsimile: (804) 403-7110
*Counsel for Alqimi Analytics & Intelligence, LLC*

Richard D. Kelley

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

HADRON INDUSTRIES, INC., *et al.*,      :
                                        :
      Plaintiffs,                    :
                                        :
v.                                      :      Case Number 1:19-cv-00035-LO-MSN
                                        :
TRIANGLE EXPERIENCE                     :
GROUP, INC., *et al.*,                  :
                                        :
      Defendants.                    :
                                        :

**PLAINTIFF HADRON INDUSTRIES, INC.'S ANSWERS TO**
**ROBERT E. CLARE, JR.'S SECOND SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Hadron Industries,

Inc. ("Hadron") herein submits its Answers to Defendant Robert E. Clare, Jr.'s ("Clare" or

"Defendant") Second Set of Interrogatories as follows:

**ANSWERS**

The following Answers are given without prejudice to Hadron's right to supplement

and/or amend these Answers, consistent with the Federal Rules of Civil Procedure and/or the

Local Rules for the United States District Court for the Eastern District of Virginia ("Local

Rules").

20.      Identify the date and location of each allegedly defamatory statement made by

TEG.

> **Answer:**      Hadron states that on December 1, 2016, Klee Dienes received a phone
> call from Oblong Chief Revenue Officer Mike Brown. Brown told Dienes that Rob Clare
> had told Brown that Hadron was using Oblong-proprietary software in ACES without a
> license. Brown told Dienes that TEG had asked Oblong to provide TEG with licenses for
> Oblong's software, and to provide custom software development in support of the NRO
> ACES installation. Dienes told Brown that the software Hadron developed for NRO did
> not use Oblong software; that Hadron had recently terminated its relationship with TEG
> based upon concerns with their contracting ethics; and that ACES system designs are

Hadron proprietary and/or protected by SBIR data rights. At Brown's suggestion, Dienes agreed to meet with Oblong engineers to demonstrate to them that Photon contained no Oblong software, and to learn more about TEG's accusations. Dienes contacted Oblong via both email and phone to coordinate this meeting; Oblong never responded to these attempts, however. Answering further, Hadron states that on November 16, 2016, Hadron issued a Cease & Desist notice to TEG. At approximately 4:00 PM eastern time on December 6, 2016, Dienes received a phone call from Lt. Col. Robert Herslow. During this phone call, Herslow asked Dienes if Dienes had spoken to Oblong CEO John Underkoffler recently. Herslow said that he had spoken to Oblong Federal Sales Director Mike Friedel, and planned to speak with Underkoffler the following morning. Herslow said that Dienes needed to resolve some issues with Oblong. Dienes asked Herslow what Herslow had heard. In response, Herslow said he had heard that Hadron was shipping source code that relied on Oblong source code. Dienes told Herslow that Hadron did not currently use any Oblong software as part of ACES, but had incorporated Oblong software into ACES installations in the past, with Oblong's knowledge and approval. Dienes then informed Herslow about the aforementioned call with Mike Brown, and about Dienes' offer to Brown of a full code review. Herslow, apparently conflating the security clearance issue with the Oblong source code issue, responded "That's not why (your clearance) was revoked, was it?" Dienes responded that he did not believe his clearance had been revoked. Herslow responded that Dienes cannot get into NRO. Dienes asked Herslow if he was certain of that, and Herslow responded: "Well, Rob told me you don't have a clearance." Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

21.    Identify each work that TEG allegedly falsely designated as its own in support of Hadron's claim for reverse passing off, and for each piece of work, identify the documents in which the allegedly false designation occurred.

**Answer:** Hadron states that the following documents support its claim that TEG falsely designated as its own certain work of Hadron: TEG DEFS 000000050-000000053; TEG DEFS 000000241-000000242; TEG DEFS 000001150-000001153; TEG DEFS 000001316; TEG DEFS 000001877; TEG DEFS 000001921; TEG DEFS 000002093-000002095; TEG DEFS 000002299-000002300; TEG DEFS 000002508-000002510; TEG DEFS 000002723-000002774; TEG DEFS 000002810-000002812; TEG DEFS 000003075-000003076; TEG DEFS 000036710-000036712; TEG DEFS 000037208; TEG DEFS 000037558-000037560; TEG DEFS 000038358-000038359; TEG DEFS 000038360-000038363; TEG DEFS 000038370; TEG DEFS 000047498-000047501; TEG DEFS 000048515-000048517; TEG DEFS 000058742-000058747; TEG DEFS 000061507; TEG DEFS 000065311-000065312; TEG DEFS 000065366-000065369; TEG DEFS 000066136-000066137; TEG DEFS 000067095-000067096; TEG DEFS 000068371-000068373; TEG DEFS 000075098; TEG DEFS 000234876-000234879; TEG DEFS 000247795-000247796; TEG DEFS 000248483; TEG DEFS 000262555; TEG DEFS 000262735-000262736; TEG DEFS 000262883-262884; TEG DEFS 000263570-000263572; TEG DEFS 000263727-000263728; TEG DEFS 000304789;

2

TEG DEFS 000366957-000366959; TEG DEFS 000388026-000388027; TEG DEFS 000395183-000395187. Answering further, discovery is ongoing and Hadron may identify additional facts relevant to this claim. For example, TEG produced approximately 1.9 million pages of bates stamped documents in response to Plaintiffs' Rule 34 document requests, including a production of 674,078 pages approximately ten days ago. Hadron is still reviewing those materials, as well as the other 1.2 million pages of documents produced by TEG, and depositions are ongoing. Hadron therefore expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

22.     Identify all facts that support any specific contractual breaches alleged by Hadron against TEG, identify every specific alleged breach, and for each alleged breach, identify the damages claimed for that breach with specificity.

**Answer:**     Hadron states that while identifying every single fact related to TEG's breach of the contract between the parties is burdensome and impracticable, the following material facts support Hadron's breach of contract claim. As an initial matter, Hadron's Answer to TEG's Interrogatory No. 17 identifies the relevant contract, through which Hadron and TEG agreed to work together to pursue contracts from A2I and elsewhere, with Hadron developing the product and providing commercial items to TEG, and TEG managing all aspects of sales, delivery, and on-site support. The parties expressly agreed to split all revenue equally on the initial contracts, to represent the approximate division of labor and costs between the parties. Because the nature of Hadron's claim, in part, is that TEG failed to disclose to Hadron certain third party contracts that would have been in the scope of the parties' contract, Hadron has not yet fully identified the extent of TEG's breach. Indeed, discovery is ongoing, and many facts relevant to the breach, or responsive to this interrogatory, may still be identified. TEG produced approximately 1.9 million pages of bates stamped documents in response to Plaintiffs' Rule 34 document requests, including a production of 674,078 pages approximately ten days ago. Hadron is still reviewing those materials, as well as the other 1.2 million pages of documents produced by TEG, and depositions are ongoing. With regards to specific breaches identified by Hadron, throughout 2015 and 2016, TEG entered into a number of contracts, including contracts with PAR Government Systems, NRO, and SAIC, to name a few. Hadron designed and built operational ACES systems contracted for under these contracts. TEG concealed information about the true value of these contracts from Hadron, and has not paid Hadron for its work. Hadron expressly reserves the right to supplement or amend this Answer as discovery progresses and more information becomes available.

23.     Identify all benefits you claim you provided to TEG in support of your claim for unjust enrichment, and for each benefit identified, state in detail the value of such benefit to TEG and all facts that support such claim of value.

**Answer:**     Hadron states that identifying all benefits received by TEG at Hadron's expense is premature, as discovery is ongoing, and the nature of Hadron's claim, in part, is that TEG failed to disclose to Hadron certain benefits that it received at Hadron's expense, or as a result of the misuse of Hadron's proprietary or confidential information. Many facts relevant to his claim, or responsive to this interrogatory, may yet be identified. For example, TEG produced approximately 1.9 million pages of bates stamped documents in response to Plaintiffs' Rule 34 document requests, including a production of 674,078 pages approximately ten days ago. Hadron is still reviewing those materials, as well as the other 1.2 million pages of documents produced by TEG, and depositions are ongoing. Answering further, Hadron delivered a substantial volume of equipment and hardware to TEG for purposes of use at various ACES demonstration systems. TEG has retained the benefit of that equipment without compensating Hadron. This equipment is specifically identified in Klee Dienes' Answer to TEG Interrogatory No. 14, at Exhibit 6. Invoices produced during discovery, ranging roughly from HADRON 218473 through HADRON 219618, support Hadron's claim of damages with respect to this equipment. Answering further, TEG has benefited from its use of confidential and proprietary information and technology of Hadron. TEG has unfairly made use of Hadron's technical capabilities for its own benefit, to secure contracts, and to foster business relationships, all to the detriment of Hadron. For example, TEG has claimed ownership of Hadron's intellectual property to pursue business with the General Services Administration office in Boston, Massachusetts; Draper Laboratories in Cambridge, Massachusetts; and the Air Force Life Cycle Management Center, Hanscom AFB, Massachusetts. Hadron has not yet fully identified all instances of unjust enrichment. As discovery is ongoing, Hadron expressly reserves the right to supplement or amend this Answer as more information becomes available.

RESPECTFULLY SUBMITTED,

HADRON INDUSTRIES, INC.,
By its attorneys,


_____/s/ Nicholas W. Allen_____
Thomas J. Finn  (admitted *pro hac vice*)
tfinn@mccarter.com
Paula Cruz Cedillo (admitted *pro hac vice*)
pcedillo@mccarter.com
Nicholas W. Allen (admitted *pro hac vice*)
McCARTER & ENGLISH, LLP

4

265 Franklin Street
Boston, Massachusetts 02110
Telephone: 617.449.6500
Facsimile:  617.326.3106

AND

Franklin C. Turner  (VSB No. 77417)
fturner@mccarter.com
Alexander W. Major  (admitted *pro hac vice*)
amajor@mccarter.com
McCARTER & ENGLISH, LLP
1301 K Street, NW
Suite 1000 West
Washington, DC  20005
Telephone: 202.753.3400
Facsimile:  202.296.0166

December 6, 2019

## DECLARATION

I, Matthew Burton, hereby depose and state that I am authorized to sign these Answers on behalf of Hadron Industries, Inc., and that the facts set forth in the foregoing Answers to Interrogatories are true and correct to the best of my knowledge, information and belief.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing statement is true and correct.


_____
Matthew Burton
Dated:  December 6, 2019

5

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of December, 2019, the foregoing Answers to Defendant Robert Clare's Second Set of Interrogatories was served by first class mail, postage prepaid, and electronic mail, on the following attorneys of record:

Richard D. Kelley, Esq.
Stephen D. Caruso, Esq.
Bean, Kinney & Korman, P.C.
2311 Wilson Boulevard, 5th Floor
Arlington, VA 22201
(703) 525-4000
(703) 525-2207 (Fax)
rkelley@beankinney.com
*Counsel for Triangle Experience Group, Inc., Sean*
*    McCluskey, and Robert E. Clare, Jr.*

Leslie Paul Machado
lmachado@ohaganmeyer.com
O' Hagan Meyer
2560 Huntington Avenue, Suite 204
Alexandria, Virginia 22303
Telephone: 703.775.8607
Facsimile: 804.403.7110
*Counsel for Alqimi Analytics & Intelligence, LLC*


/s/ Nicholas W. Allen
Nicholas W. Allen

Message

| | |
|---|---|
| **From:** | Eric Roles [eric.roles1@gmail.com] |
| **Sent:** | 2/3/2017 10:51:31 AM |
| **To:** | Michael Bowers [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=65e059faf6bf4219b70aa3cf98acc330-mbowers] |
| **Subject:** | Re: ACES/ADAPT link up |

today... probably about 50% chance we will have time.

On Fri, Feb 3, 2017 at 10:46 AM, Michael Bowers <mbowers@triangleexperience.com> wrote:

today? what day before 1200?

---

**From:** Eric Roles <eric.roles1@gmail.com>
**Sent:** Friday, February 3, 2017 10:10:01 AM
**To:** Michael Bowers
**Subject:** Re: ACES/ADAPT link up

The video is great... I have the AFRICOM J39 with me... I will see if I can squeeze this guy in for like 30 minutes at your place, but it would be before 12, he flies at 1300. How much heads up do you need?

On Fri, Feb 3, 2017 at 9:58 AM, Michael Bowers <mbowers@triangleexperience.com> wrote:

Eric,

We have a website that we invest exactly zero effort into - It tends to be a bit underwhelming....

Attached is a cut sheet of the Controlled Interface and link to our "JOC of the future" video. The video hits the high points only and usually serves just to start a more technical conversation.

The office is usually fairly lean on Fridays - Next week will have us in-processing a herd of engineers, it will be chaotic (yet exciting...) but if your guy is on a short timeline, we will absolutely work him in regardless. Let us know what your availablilty looks like.

https://vimeo.com/130448343 p/w: 1289

V/r,

Mike

---

Private video on Vimeo

vimeo.com

Join the web's most supportive community of creators and get high-quality tools for hosting, sharing, and streaming

TEG DEFS 000002810

videos in gorgeous HD with no ads.

**From:** Roles, Eric <eric.roles@darpa.mil>
**Sent:** Friday, February 3, 2017 8:39:38 AM
**To:** Michael Bowers; eric.roles1@gmail.com
**Cc:** John Buchanan; Rob Clare; Sean McCluskey
**Subject:** RE: ACES/ADAPT link up

Do you guys have a website with info on your products?

Eric Roles
Major, Army Special Forces
DARPA Service Chiefs Fellow
Mobile 706 580 1291
Office 571 218 4997
eric.roles1@gmail.com

-----Original Message-----
From: Michael Bowers [mailto:mbowers@triangleexperience.com]
Sent: Tuesday, January 31, 2017 10:06 AM
To: Roles, Eric <eric.roles@darpa.mil>; eric.roles1@gmail.com
Cc: John Buchanan <John@triangleexperience.com>; Rob Clare <rclare@triangleexperience.com>; Sean McCluskey
<sean@triangleexperience.com>
Subject: ACES/ADAPT link up

Eric - Meet the team.

We are open for a Wednesday meeting - What time are you available?

Mike

—
Eric Roles
Mobile 706 580 1291
SIPR rolesen@nps.navy.smil.mil

TEG DEFS 000002811

--
Eric Roles
Mobile 706 580 1291
SIPR rolesen@nps.navy.smil.mil

TEG DEFS 000002812

Appointment

| | |
|---|---|
| **From**: | Maura Parisi [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C0CEA87CB0B04BE08D7849B55FE2D517-MAURA] |
| **Sent**: | 1/31/2017 3:47:51 PM |
| **To**: | Rob Clare [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=bcc78287eebd40c89273fa7bf748faf6-rclare_4bff]; Team TEG [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=295a0adab8c6466885f4b55e1d1206ba-teamteg_781]; calendar@triangleexperience.com; Sean McCluskey [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=25d3dedb826d43a0935d4c98b8faa54c-sean]; Larry Lins [LLins@prysm.com]; Lee Quiñones [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=40b11fcabc3f412eb591b8387c3a9916-lee.quinone]; Brian Noe [BNoe@prysm.com] |

| | |
|---|---|
| **Subject**: | Prysm visit to TEG |
| **Attachments**: | TEG WelcomePacket..pdf |
| **Location**: | TEG Rosslyn, 1401 Wilson Blvd Level B-01 Arlington, VA 22209 United States |
| **Start**: | 2/7/2017 |
| **End**: | 2/10/2017 |
| **Show Time As**: | Free |
| **Recurrence**: | (none) |
| **Required Attendees**: | Rob Clare; Team TEG; calendar@triangleexperience.com; Sean McCluskey; Larry Lins; Lee Quiñones; Brian Noe |

You're receiving this message because you're a member of the **Team TEG** group. If you don't want to receive messages from this group, unsubscribe.

View group conversations   |   View group files

TEG DEFS 000003075



TEG DEFS 000003076

| | |
|---|---|
| **From:** | Joe Saleck <jsal@triangleexperience.com> |
| **Sent:** | Saturday, September 12, 2015 4:04 PM |
| **To:** | Robert Clare; Sean McCluskey |
| **Subject:** | Fwd: Need To Show You Our Demo |

This could get good! I'll let you know if they choose 1030 or 1 on Weds.

---------- Forwarded message ----------
From: **Joe Saleck** <jsal@triangleexperience.com>
Date: Saturday, September 12, 2015
Subject: RE: Need To Show You Our Demo
To: Balan Ayyar via LinkedIn <01fc7f81-7f3d-47f7-b688-c820a39fb7d7@reply.linkedin.com>

Perfect!! Let's do Wednesday at 1030 and lunch after or 1pm if you guys can! Just let me know and we will make it happen!

Joe

On Friday, September 11, 2015, Balan Ayyar via LinkedIn <member@linkedin.com> wrote:



 **Balan Ayyar**
Chief Operating Officer, Sevatec, Inc.

Joe,

I'll review this weekend. Let me bring a few IT leaders in this space with me including the CEO of InfoReliance. He's a good friend. They're a $100M+ company as well.

I'll send a note Monday. If we can do it Wednesday, I'll bring a friend from the Valley who just sold his firm to Palo Alto Networks.

Balan

On 9/10/15, 6:38 AM, Joe Saleck wrote:
-------------------
Balan -- This is a short video of what TEG has developed under A2I and is currently a phase III SBIR.

This video shows some of the key collaboration aspects of the platform: https://vimeo.com/131455863. The password is 1289.

Video is decent but a demo in our lab in Rosslyn will show you the full capability! Lets get you in here as soon as you have time!!

1

TEG DEFS 000036710

Joe


On 8/27/15, 10:16 AM, Balan Ayyar wrote:
-------------------
Hi Joe,

Thanks for the thoughtful note, I'd love to come by. I left the service from Command of a
JTF in Afghanistan that had all the IC in it. We are just aligning with a couple of
opportunities in that space. If I can help, I'll be glad to. I'll see what we can get on the
schedule.
Best,
Balan
c-571-395-7288
bayyar@sevatec.com

On 8/27/15, 8:26 AM, Joe Saleck wrote:
-------------------
Balan --

Hope all is going great! I spoke with Kenny yesterday and he said he mentioned what I
was up to and I told him we need to get you into our Rosslyn lab and discuss some
possible opportunities. Kenny knows I don't get too excited about anything so he knows I
don't reach out unless it's a game changer. We are a small company with very little
connections but we have the answer to next generation ops and intel. It would be great to
show you what we have and get your take on it! Just fyi, I was a Watch guy and a JIC guy
during my 20 years and felt the pain of not being able to collaborate and share info and
put together products as fast as I wanted so this capability we have has got me fired up to
help our airmen right now!

Let me know if you are interested and when you can come by!! My cell is 703-728-9559.

Hope to catch up soon!!

Joe


**Reply to Balan**

☐ Replying via your email application will message everyone in the conversation.

You are receiving member message notifications emails. **Unsubscribe**
This email was intended for Joe Saleck (Senior Account Manager, Triangle Experience Group). **Learn why we included
this.**
If you need assistance or have questions, please contact **LinkedIn Customer Service.**

© 2015, LinkedIn Corporation. 2029 Stierlin Ct. Mountain View, CA 94043, USA



--

TEG DEFS 000036711

Joe Saleck
jsal@triangleexperience.com


--
Joe Saleck
jsal@triangleexperience.com

TEG DEFS 000036712

| | |
|---|---|
| **From:** | Joe Saleck <jsal@triangleexperience.com> |
| **Sent:** | Monday, August 24, 2015 10:36 AM |
| **To:** | baumanam@westinghouse.com |
| **Cc:** | Robert Clare; Sean McCluskey |
| **Subject:** | Fwd: This is the stuff that can take your training to the next level |
| **Attachments:** | aces-onesheet-modified-names-digital-distro.jpg; Copy of aces-onesheet-modified-names-digital-distro.pdf; Copy of photon-system-diagram.pdf |

Alex --

Ian sent me your contract info and said you may be interested in what TEG is up to.  We believe there is definitely some opportunities to improve some of your mission areas with our product. I've attached a static graphic explaining some of the technology.  Here's a link to a video that illustrates some of the key collaboration aspects of the platform:  https://vimeo.com/131455863.  The password is 1289.  Please feel free to forward this information as needed. Please do not hesitate to reach out with any questions you may have.

We can host you at our lab in Rosslyn or down at Fort Bragg if you are interested in seeing ACES and how it could help you across several mission areas!!

Hope to talk with you soon!


Joe




--
Joe Saleck
Senior Account Manager
jsal@triangleexperience.com
703-728-9559

1

TEG DEFS 000037208